1

**KAUFMAN DOLOWICH & VOLUCK, LLP**
LOUIS H. CASTORIA, ESQ.(SBN 95768)
lcastoria@kdvlaw.com
MARION V. CRUZ, ESQ.(SBN 244223)
mcruz@kdvlaw.com
IAN A. JOHNSTON, ESQ. (SBN 287229)
ijohnston@kdvlaw.com
425 California Street, Suite 2100
San Francisco, CA 94104
Telephone: (415) 926-7600
Facsimile:  (415) 926-7601

Attorneys for Plaintiff,
THOMAS MORE LAW CENTER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| THOMAS MORE LAW CENTER,<br><br>Plaintiff,<br><br>vs.<br><br>KAMALA HARRIS, in her Official Capacity as Attorney General of California,<br><br>Defendant. | Case No.  2:15-cv-03048-R-FFM<br><br>Action Filed:  April 23, 2015<br>Trial Date:  June 28, 2016<br><br>**NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  June 6, 2016<br>Time:  10:00 a.m.<br>Courtroom:  8<br>Judge:  Hon. Manuel L. Real |

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on June 6, 2016, at 10:00 a.m., in Courtroom 8 of the above-entitled court, located at 312 N. Spring Street, Los Angeles, California 90012, before the Honorable Manuel L. Real, Plaintiff Thomas More Law Center ("Law Center") hereby moves for an order granting Summary

1

NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

Judgment pursuant to Fed. R. Civ. P. 56.

The Law Center brings this motion on the grounds that it is entitled to summary judgment on its as-applied constitutional challenge because the material facts of this case have already been decided in the case of *Americans for Prosperity Found. v. Harris*, No. CV 14-9448-R, 2016 WL 1610591 (C.D. Cal. Apr. 21, 2016). Furthermore, there is no dispute of material fact regarding the Law Center's overwhelming evidence of actual burden on First Amendment rights.

The Law Center's motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Law Center's Local Rule 56-1 Statement of Uncontroverted Facts and Conclusions of Law, the Proposed Judgment, the Declaration of Louis Castoria, the Declaration of Pamela Geller, the Declaration of Robert Spencer, the Declaration of Francia Morello, the Declaration of Melissa Wood, the Declaration of Richard Thompson, the Supplemental Declaration of Richard Thompson, the Declaration of Sally Kern, the Expert Report of Dr. Paul G. Schervish, the Expert Report of Dr. James T. McClave, and the Request for Judicial Notice.

This motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on April 12, 2016.

DATED: May 9, 2016     **KAUFMAN DOLOWICH & VOLUCK, LLP**


                        /s/  *Louis H. Castoria*
                        Louis H. Castoria
                        Marion V. Cruz
                        Ian A. Johnston
                        Attorneys for Plaintiff
                        THOMAS MORE LAW CENTER

2

NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

# <u>TABLE OF CONTENTS</u>

**Page**

I. INTRODUCTION……………………………………………...........1

II. ARGUMENT………………………...……………………..........3

A. Legal Standard for Summary Judgment………………………….3
B. The Attorney General Is Precluded From Re-Litigating The
 Issues Decided in *AFPF*………………………………………….3

 1. Identity of Issues for Issue Preclusion…………………………..4
 2. The Issues Decided In *AFPF* Apply Equally in the Law
  Center's Case…………………………………………………4
 3. The Attorney General Actually Litigated the Issues in an
  Extensive Trial…………………………………………….....5
 4. The Facts Were Necessarily Decided……………………………6
 5. Application of Issue Preclusion Would Not Be Unfair to the
  Attorney General……………………………………………..6

C. The Collection of Schedule Bs, as Contrasted to Overseeing
 Charitable Trusts, Serves No Important Government Interest,
 Therefore Failing the "Exacting Scrutiny" Test…………………….....7

 1. Schedule Bs Are Almost Never used by the Registry or the
  Attorney General……………………………………………..8
 2. The Collection of Schedule Bs is Not Narrowly Tailored to
  the Attorney General's Interest…………………………………10

D. The Attorney General Cannot Maintain the Confidentiality of
 Schedule Bs……………………………………………………11

E. Collecting Schedule Bs Creates an Actual Burden on First
 Amendment Rights……………………………………………13

 1. The Law Center Easily Establishes An Actual Burden on
  First Amendment Rights………………………………………13
 2. Disclosure to a State Official is a Cognizable First
  Amendment Injury in Itself…………………………………...14
 3. Donors' Speech is Reasonably Chilled by Loss of Anonymity………15
 4. If the Donors to Thomas More Law Center Were Disclosed,

i
NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

Those Donors Would Face a Reasonable Likelihood of
Threats, Harassment, or Reprisal.........................................................16

i.      Declarations of Richard Thompson……………………….16
ii.     Declaration of Francia Morello.................................................17
iii.    Declaration of Pamela Geller...................................................18
iv.     Declaration of Robert Spencer.................................................20
v.      Declaration of Melissa Wood...................................................20
vi.     Declaration of Representative Sally Kern……………………21
vii.    The Issue of First Amendment Burden is Properly
        Resolved on Summary Judgment.............................................23

F.  The Attorney General's Demand Infringes the Law Center's and
    its Donors' First Amendment Right to Free Exercise of Religion
    and Fourth Amendment Right to be Free of Unreasonable Search
    and Seizure........................................................................................23

III.    CONCLUSION………………………………………………………25

NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

# **TABLE OF AUTHORITIES**

**Cases**                                                   **Page**

*Am. Family Ass'n. Inc. v. City & Cnty. of San Francisco*
   277 F.3d 1114 (9th Cir. 2002)……………………...………………….24

*Am. Fed'n of Labor & Cong. of Indus. Organizations v. Fed. Election Comm'n.*
   333 F.3d 168 (D.C. Cir. 2003)……………………………………..………13, 23

*Americans for Prosperity Found v. Harris*
   2016 WL 1610591 (C.D. Cal. Apr. 21, 2016)…………1, 2, 3, 7, 8, 9, 12, 13, 16

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)……..……………….3

*Appling v. State Farm Mut. Auto. Ins. Co.*
   340 F.3d 769 (9th Cir. 2003)……………………………………...4, 5, 6

*Averill v. City of Seattle*
   325 F. Supp. 2d 1173 (W.D. Wash. 2004)………...………………………...23

*Buckley v. Valeo*
   424 U.S. 1, S. Ct. 612, 46 L. Ed. 2d 659 (1976)………..…………...13, 14, 16

*Center for Competitive Politics v. Harris*
   No. 15-152 (U.S.)…………………………………………...…………15

*Jackson v. Bank of Hawaii*
   902 F.2d 1385 (9th Cir. 1990)…………………………………….....3

*John Doe No. 1 v. Reed*
   561 U.S. 186 (2010)………………………………………………10, 16

*Louisiana v. NAACP*
   336 U.S. 293 (1961)………………………………………..……10

*Miller v. Reed*
   176 F.3d 1202 (9th Cir. 1999)………………………………..……...24

NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

*New York Civil Liberties Union, Inc. v. Acito*
     459 F. Supp. 75 (S.D.N.Y. 1978)……………………………..…………………23

*Parklane Hosiery Co. v. Shore*
     439 U.S. 322 (1979)……………………………………………..……...4, 6

*Westgate-California  Corp.*
     642 F.2d 1174 (9th Cir. 1981)……………………………………….....6

**Statutes**

California Gov. Code

        § 6250-6270.5……………………………………..………………12

**Court Rules**

        Fed. R. Civ. P. 56(a)……………………………….…………………….....3

NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

The material facts of this case have already been decided.  This Court issued its preliminary injunction in favor of the Thomas More Law Center (the Law Center") on May 19, 2015.  The order was modified by the Ninth Circuit with respect to the *facial* constitutional challenges brought by the Law Center and, separately, by the Americans for Prosperity Foundation ("AFPF"), but the appellate court's decision in its consolidated ruling on appeals from the preliminary injunctions in both cases did not detract from this Court's ability to adjudicate the *as-applied* challenges.

After a lengthy trial on the merits, with the Court acting as fact finder, AFPF's case[1] resulted in an Order for Judgment for AFPF dated April 21, 2016. (Request for Judicial Notice ("RJN"), Exhibit C (Order for Judgment).  That adjudication on the merits is binding upon the Attorney General as to all three of the findings of fact and conclusions of law stated in the Court's Order for Judgment:

(1) The Court focused on the only real issue in the case: whether the Attorney General's interest *in obtaining unredacted "Schedule B" national donor lists* is, in fact, essential to its function of protecting Californians against misconduct by charitable trusts.  Based on overwhelming evidence—mostly by way of admissions against interest by the Attorney General's own witnesses, which apply with equal, dispositive force in this case—the Court found that the Attorney General could identify only five cases (out of approximately 540) in which a Schedule B form was used in an investigation, and no cases at all in which a Schedule B was the initiating cause of an investigation.  *AFPF*, 2016 WL 1610591,

---

[1] *Americans for Prosperity Found. v. Harris ("AFPF")*, No. CV 14-9448-R, 2016 WL 1610591 (C.D. Cal. Apr. 21, 2016).

at *2.  And, the demand for Schedule B lists is not narrowly tailored to fit the Attorney General's "interest" in a document it almost never uses.  *Id.*, at *3.

(2) Donors who give anonymously to charitable trusts for public advocacy purposes have a legitimate fear of reprisal, abuse, and scorn for supporting conservative causes in today's fractured and fractious public arena.  *See id.,* at 4. While AFPF's evidence included evidence from its own personnel and a significant donor, Mr. Pope, the evidence was replete with such threats being made against conservative causes generally, from a video game depicting the mass murder of various conservative group representatives to news reports of violence, boycotts, threats of bodily injury, and the "outing" of donors through mass media. AFPF also introduced the uncontradicted opinions of Dr. Paul Schervish, whose opinions were backed by his studies and interviews with anonymous charitable donors who had no relation to AFPF.  This evidence would, by itself, be sufficient to have preclusive effect against the Attorney General in the Law Center's case, but the Law Center presented ample evidence of its own in support of its motion for preliminary injunction, and presents much more evidence is support of this motion.  The Law Center and AFPF may have differing bases for their beliefs— religious vs. economic—but anonymous donors to both organizations have the same First Amendment and self-defense interests in staying anonymous.

(3) The Court's third finding, that the Attorney General has repeatedly been incapable of keeping confidential Schedule B forms safe from public disclosure, applies with equal force to the Law Center, since AFPF's evidence was not unique to its own donor lists.  AFPF documented over 1,700 confidential Schedule Bs erroneously uploaded to the Attorney General's publicly-available Web site.  *Id.*, at *5.  Moreover, the Attorney General failed to establish that its proposed new regulation, which it had vaunted to the Ninth Circuit as a panacea, was in effect, would actually protect Schedule Bs if it took effect, or would prevent Schedule B

disclosures via California's Public Records Act, malicious hacking of the Attorney General's leaky web site, or employee theft of the forms.  Again, the evidence was not unique to AFPF, but was conclusive as against the Attorney General.

The Law Center is prepared to put on AFPF's case in its entirety, through the voluminous record in that case plus the same two experts and Law Center's own witnesses, but for purposes of summary judgment and issue preclusion, the Law Center's case has already been established.

## II.   ARGUMENT

### A.   Legal Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A mere disagreement about a material issue of fact does not preclude summary judgment.  *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1389 (9th Cir.1990).  Only disputes "over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

### B.   The Attorney General is Precluded from Re-Litigating the Issues Decided in *AFPF*.

After the vigorously contested litigation in *Americans for Prosperity Foundation v. Kamala Harris ("AFPF[2],")* No. CV 14-9448-R, 2016 WL 1610591 (C.D. Cal. Apr. 21, 2016), this Court ordered that the Attorney General be permanently enjoined from requiring the Americans for Prosperity Foundation ("AFPF") to file its Schedule B with the Registry.  The Law Center seeks a

---

[2]  We refer to the *Americans for Prosperity Foundation* case as "*AFPF*" rather than "*Harris*," and to the plaintiff in that case as AFPF, without the italics, to avoid confusion with the Law Center's case.

permanent injunction against the Attorney General's demands for the same confidential records as AFPF: each organization's confidential Schedule B donor lists. Because the critical facts and legal conclusions in the two cases are the same, the Attorney General is precluded from re-litigating those issues.

Offensive issue preclusion appropriately applies even if the plaintiff was not a party to the prior action if "(1) the issue sought to be litigated is sufficiently similar to the issue presented in an earlier proceeding and sufficiently material in both actions to justify invoking the doctrine, (2) the issue was actually litigated in the first case, and (3) the issue was necessarily decided in the first case." *Appling v. State Farm Mut. Auto. Ins. Co.*, 340 F.3d 769, 775 (9th Cir. 2003); *see Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329-33 (1979). In addition, the application of issue preclusion must not be unfair. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330-31. All of the elements are easily satisfied here.

### 1. Identity of Issues for Issue Preclusion

There are three issues from *AFPF* that are particularly appropriate for issue preclusion: (1) The collection of Schedule Bs serves no important government interest, and the collection of Schedule Bs is not narrowly tailored to any interest. (2) In contrast, anonymous donors have strong and constitutionally protected interests in maintaining their anonymity as against all-too-real threats to their liberty and safety. (3) The Attorney General cannot guarantee the confidentiality of Schedule Bs once they are collected.

### 2. The Issues Decided in *AFPF* Apply Equally in the Law Center's Case.

The Court made findings in *AFPF* as to what the Attorney General does with Schedule Bs, how little the Attorney General has ever used them for the stated law enforcement goals, and how ineffectively the Attorney General has kept them confidential. As to these findings, all of the evidence is exactly the same in the

NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

two cases.  There is no plaintiff-specific evidence regarding how the Attorney General uses Schedule B, how the Attorney General could obtain the type of information on Schedule B in alternative ways, or how the Attorney General has failed to maintain the confidentiality of the Schedule Bs, and indeed cannot do so under California law.  No evidence was admitted in *AFPF* as to what the Attorney General did with AFPF's Schedule Bs, because, like the Law Center, AFPF has not produced them, despite the Attorney General's threats of fines and other reprisals. All the evidence in *AFPF* regarding the nearly nonexistent *actual use* of Schedule Bs in initiating or conducting investigations, and the judicial admissions by the Attorney General that other, less intrusive means exist to get the same information, addresses the Attorney General's conduct regarding all Schedule Bs, and is not specific to AFPF.

The two cases also involve the application of the same rule of law, because the Law Center seeks resolution of the same question that AFPF sought: is there a substantial relation between the disclosure requirement and a sufficiently important government interest?  *AFPF*, 2016 WL 1610591, at *2.

### 3. The Attorney General Actually Litigated the Issues in an Extensive Trial.

Invoking issue preclusion also requires that the issue was "actually litigated" in the prior litigation.  *Appling*, 340 F.3d at 775.  The Attorney General cannot legitimately dispute that every aspect of AFPF's challenge to the demands that it turn over its Schedule Bs were actually and fully litigated.

*AFPF* was a massive case that spanned two years, involved 13 attorneys (including six from the Attorney General), produced thousands of pages of documents, created almost 200 docket entries, and ultimately resulted in a six day trial that included over 700 exhibits. (RJN, Exhibit A (AFPF docket), RJN Exhibit B (AFPF Exhibit list)).  Despite repeated laments of "underfunding," the Attorney

NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

General expending tremendous resources in litigating *AFPF*, and had a full and fair opportunity to be heard.

### 4.    The Facts Were Necessarily Decided.

Another element of issue preclusion is that the issues to be precluded were necessarily decided in the first case.  *Appling*, 340 F.3d, at 775.  Not only was each of the issues relied on herein necessarily decided in *AFPF*, each of them formed an independent basis for the judgment against the Attorney General.  When, for the purposes of issue preclusion, the prior court rests its judgment on two or more independent grounds, each determination is considered necessarily decided in support of the judgment.  *In re Westgate-California Corp.*, 642 F.2d 1174, 1176 (9th Cir. 1981).

### 5.    Application of Issue Preclusion Would Not Be Unfair to the Attorney General.

Nothing about the application of issue preclusion here would be unfair to the Attorney General.  *Parklane Hosiery* identified certain "circumstances that might justify reluctance to allow the offensive use of collateral estoppel."  *Parklane Hosiery*, 439 U.S. at 331.  But here, as in *Parklane Hosiery*, none of those circumstances are present.  As in *Parklane Hosiery*, the Attorney General "had every incentive to litigate the [prior] lawsuit fully and vigorously[.]"  Further, the judgment in *AFPF* is not inconsistent with any other decision, *AFPF* having been the only Schedule B case to proceed to trial.  And, since the Attorney General is bound by her witnesses' admissions against interest under oath in AFPF, there are no "procedural opportunities" available in the Law Center's case that were not available in the *AFPF* case.  *Id.*, at 332.  That is what *preclusion* means: no "mulligans" as to dispositive facts and legal conclusions.

Furthermore, this is not a case where the plaintiff delayed in filing to "wait and see" the result of the prior case.  The Law Center's case was filed five months

6
NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

1   after AFPF's case, simply because the Attorney General's written demand

2   threatening sanctions against the Law Center was dated five months after the

3   substantially same demand was made to the Law Center.  (RJN, Exhibit A, (AFPF

4   docket), RJN, Exhibit E (Law Center Docket), RJN, Exhibit F (AFPF sanction

5   letter), Declaration of Richard Thompson in Support of Plaintiff's Application for

6   Temporary Restraining Order ("Thompson Decl."), Exhibit C (Law Center

7   sanction letter)).

8        **C.**     **The Collection of Schedule Bs, as Contrasted to Overseeing**

9                   **Charitable Trusts, Serves No Important Government Interest,**

10                  **Therefore Failing the "Exacting Scrutiny" Test.**

11       The issue of whether the government has any important interest in

12  collecting Schedule Bs was necessarily decided against the Attorney General in

13  *AFPF.*  The Court concluded:  "The record before the Court lacks even a single,

14  concrete instance in which pre-investigation collection of a Schedule B did

15  anything to advance the Attorney General's investigative, regulatory or

16  enforcement efforts." *AFPF*, 2016 WL 1610591, at *2

17       The Court ultimately held that the Attorney General had a "failure to

18  establish a substantial relationship between her demand for [AFPF's] Schedule B

19  and a compelling governmental interest…"  *Id.*, at *4.  The Attorney General's

20  demand for the Law Center's Schedule B does not serve a "compelling" state

21  interest, because of her exceedingly rare *use* of Schedule Bs, the overbreadth of

22  her demand, the lack of any active investigation of AFPF or the Law Center, and

23  the myriad other means available to her to accomplish her regulatory goals.

24       The Attorney General has not alleged any particular law enforcement

25  interest in the Law Center, apart from retaliation for filing this suit.  Therefore,

26  there is no reason to believe that the Attorney General's interest in the Law Center

27

28

NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

is any greater than its interest was in AFPF.  Thus, the unambiguous findings in *AFPF* cannot be litigated again.

### 1.  Schedule Bs Are Almost Never Used by the Registry or the Attorney General.

For each year from 2001 through 2014, the Attorney General accepted the Law Center's annual registration and listed the foundation as an active charity in compliance with the law.  (Thompson Decl., ¶11, 14).  It was not until 2012 that the Attorney General first notified the Law Center that its filing was incomplete because of the lack of Schedule B.  *Id.*, at ¶12.  The reason why the Law Center's 'lack of compliance' went unnoticed for over a decade is that the Attorney General does not use the Schedule B in its day-to-day business.  This admission against interest was made by David Eller, the Registrar for the Registry of Charitable Trusts in the Department of Justice.  (Declaration of Louis H. Castoria ("Castoria Decl."), Exhibit A, Eller Test. 3/3/16, p. 75:16–20)("Q: Mr. Eller, does the registry put the Schedule B to any use as part of its day-to-day business? A: No, they don't.")).

Schedule Bs are hardly ever used in investigations either.  Steven Bauman, a supervising investigative auditor for the Attorney General, testified that out of the approximately 540 investigations conducted over the past ten years in the Charitable Trusts Section, only five instances involved the use of a Schedule B.  (Castoria Decl., Exhibit A, Bauman Test. 3/4/16, p. 22:4–23:25).  The Court correctly concluded in *AFPF* that the "Attorney General does not review Schedule Bs upon collection and virtually never uses them to investigate wrongdoing."  *AFPF*, 2016 WL 1610591, at *6.

Mr. Bauman's admission at trial stands in stark contrast to his representations under oath to the Court in his Declaration opposing the Law

NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

Center's preliminary injunction.  Specifically, Bauman made the following statement in his Declaration:

> "In particular, I use the information contained in Schedule B, in conjunction with other information required under state law to determine, among other things, whether donors are potentially donating funds to the charity to pass money through to their family members, or to fund the donor's enterprise, project, or venture. Schedule B information can also be used to determine whether donors are related to entities that are doing business with a charity.  I have also used the information contained in Schedule B to find witnesses for my investigations."

(Castoria Decl., Exhibit B, Decl. of Steve Bauman, ¶5).

Bauman's stated uses of Schedule Bs and his reference to plural "donors" and "witnesses" give the false impression that he routinely uses Schedule Bs in investigations.  But at trial in *AFPF*, Bauman could only come up with only *one single* investigation where he ever used a Schedule B:

> Q.  And over that ten-year period, if I'm remembering right, you came up with one investigation, one, that you were personally involved in that implicated Schedule B; isn't that true?
>
> A.  There was one that I recalled.

(Castoria Decl., Exhibit A, Bauman Test. 3/4/16, p. 19:15-19).

The Attorney General thus failed to establish a "sufficiently important" governmental interest in forcing charities to divulge their anonymous donors' identities.  This failure established an independent, sufficient basis for the judgment, because "Exacting scrutiny requires . . . a 'sufficiently important' governmental interest."  *AFPF*, 2016 WL 1610591, at *2.  As the Court noted, this

9

NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

standard of scrutiny "encompasses a balancing test, wherein the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.*, citing *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010).

In this balancing test, the Attorney General's declared "need" to collect every Schedule B list of national donors from every public charitable trust has the weight of a hummingbird's feather. On the other side of the scale, the Law Center's and its donors' right to be free of government violation of their privacy has the weight of the First Amendment to the Constitution.

### 2. The Collection of Schedule Bs is Not Narrowly Tailored to the Attorney General's Interest.

In *AFPF* this Court held that in the context of associational rights, as opposed to electoral rights, "even though the Attorney General's purpose [may] be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Id.*, at *3 (citing *Louisiana v. NAACP*, 336 U.S. 293, 296 (1961).

As the Court found, the Attorney General's method for collecting Schedule Bs is not sufficiently narrowly tailored: "Here, like in *NAACP*, even assuming the Government presented a sufficiently important governmental interest, its interests can be more narrowly achieved as evidenced by the testimony of the Government's own attorneys." *Id.*, (citing *Louisiana v. NAACP,* 366 U.S., at 296). The Court specifically referred to Bauman's testimony, wherein he admitted that he successfully audited charities for years without using Schedule Bs. *Id.* The court concluded: "If heightened scrutiny means anything, it at least requires the Government to convincingly show that its demands are substantially related to a compelling interest, including by being narrowly tailored to achieve that interest." *Id.*

NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

The factual finding that the Attorney General's regulatory interests can be achieved by means more narrowly tailored to a specific investigation is binding on the Attorney General in the Law Center's case, and cannot be re-litigated. The Attorney General had to prevail on this issue in *AFPF* to meet the heightened scrutiny standard applicable to AFPF's as-applied challenge. The Attorney General bears the same burden in the Law Center's case, but cannot meet it given the admissions against interest by the Attorney General's witnesses in *AFPF*.

Repeatedly, those witnesses admitted that there were less intrusive means to ferret out self-dealing, abuse of funds, and other misconduct. They could and sometimes did issue subpoenas. (Castoria Decl., Exhibit A, Ibanez Test. 3/4/16, p. 69:9-19). They could obtain information from the IRS, if they opted to accept the IRS security procedures, which they did not. (Castoria Decl., Exhibit A, Johns Test. 2/26/2016, p. 14:20–17:20). By failing to prove that the Registry's practices were narrowly tailored, the Attorney General created another sufficient and independent basis for the judgment in *AFPF*, and for granting summary judgment to the Law Center.

### D.   The Attorney General Cannot Maintain the Confidentiality of Schedule Bs.

Having determined the negligible relevance of Schedule Bs to the Attorney General's regulatory function, the Court in *AFPF* thus turned to the actual burden placed on First Amendment rights. The Attorney General argued in *AFPF*, as in this case, that donors' First Amendment rights would not be burdened because the Schedule Bs would be held confidentially by the Attorney General. *AFPF*, 2016 WL 1610591, at *5.

Yet Attorney General has not maintained confidentiality. The plaintiff's expert in the *AFPF* trial found that 1,778 confidential Schedule Bs were publically available on the Registry's website. *Id.* That expert, Dr. James T. McClave,

NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

Ph.D., ("Dr. McClave") has been retained by the Law Center to repeat his testimony in this case, though issue preclusion would make this waste of the Court's time to hear the reprise unnecessary.  (Expert Report of Dr. James T. McClave).  Dr. McClave found in his report that "numerous confidential documents were publically available on the Registry in 2015 and likely well before that."  (*Id*., at 6).

Based on a complete record, the Court rejected the Attorney General's promise of confidentiality: "As made abundantly clear during trial, the Attorney General has systematically failed to maintain the confidentiality of Schedule B forms" *AFPF*, 2016 WL 1610591, at *5.  "Accordingly, the Court finds against the Attorney General on the alternative grounds that her current confidentiality policy cannot effectively avoid inadvertent disclosure."  *Id*.  The Attorney General cannot re-litigate this issue.

The release, even if inadvertent, of an anonymous donor's identity creates an irreversible loss.  As this Court noted:  "Once a confidential Schedule B has been publically disseminated via the internet, there is no way to meaningfully restore confidentiality."  *Id.*

Even in a perfect data security system, the Attorney General cannot protect Schedule Bs from public disclosure.  Under current California Law, Schedule B information is subject to disclosure pursuant to the California Public Records Act as well as Section 310 of title 11 of the California Code of Regulations, which allows for public inspection of the Registry's records.  *See* Cal. Gov. Code §6250-6270.5.  The fact that any Schedule B is subject to public disclosure under California law was confirmed by the head of the Registry, Tania Ibanez, at the trial of *AFPF*.  (Castoria Decl., Exhibit A (Ibanez Test. 3/4/2016, p. 94:1–7, 95:23–96:3).  Further, as the Attorney General's witnesses were forced to admit in trial, the Schedule Bs in their "safekeeping" face risks of malicious disclosures,

NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

generated internally or by external data bandits.  (Castoria Decl. Exhibit A, Eller Test. 3/3/2016 at 99:4–100:11).

### E.   Collecting Schedule Bs Creates an Actual Burden on First Amendment Rights.

#### 1.   The Law Center Easily Establishes An Actual Burden on First Amendment Rights.

In order for the Attorney General to prevail on an as-applied challenge, "the strength of the Governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *AFPF*, 2016 WL 1610591, at \*2.  *Buckley v. Valeo* suggested that to establish an actual burden on First Amendment rights, the "evidence offered need show only a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Buckley v. Valeo*, 424 U.S. 1, 74, 96 S. Ct. 612, 661, 46 L. Ed. 2d 659 (1976).

Nonetheless, courts have argued that even the minimal evidentiary showing in *Buckley* was only required *after* the Government had demonstrated a properly tailored, compelling governmental interest:  "[T]he [*Buckley*] Court required such an evidentiary showing only *after* concluding that the disclosure requirements at issue survived strict scrutiny as the least intrusive means of achieving several compelling governmental interests." *Am. Fed'n of Labor & Cong. of Indus. Organizations v. Fed. Election Comm'n*, 333 F.3d 168, 176 (D.C. Cir. 2003) (emphasis added).

The Law Center easily surpasses its low evidentiary burden, as there is a wealth of evidence that the Attorney General's disclosure demands will subject donors to the same threats, harassment, and reprisals that the Law Center and its clients already face.

13

NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

**2.     Disclosure to a State Official is a Cognizable First Amendment Injury in Itself.**

The disclosure of anonymous donors' identities just to state officials is in itself a cognizable First Amendment injury.  This fact has been repeatedly held by the Supreme Court:  "But we have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment."  *Buckley v. Valeo*, 424 U.S. at 64.

Dr. Paul G. Schervish ("Dr. Schervish"), Ph.D., Professor Emeritus of Sociology, has been widely recognized for his extensive work on charitable giving. (Expert Report of Dr. Paul G. Schervish, ("Schervish Report") ¶ 11-13).  In Dr. Schervish' s report, he found that donors may "reasonably fear that disclosure of their gifts to the Attorney General will open them up to persecution by their state or local government, or an audit by the IRS."  (*Id.*, at ¶ 31).  Dr. Schervish also noted in his report that the perceived use of government informants in mosques has had a chilling effect on attendees' charitable giving, for fear that the informant might report their individual donations to government officials.  (*See Id.*).

Fear of political retaliation by state officials is heightened for donors to a conservative advocacy organization like the Law Center, particularly within the decidedly liberal California Attorney General's office.  In particular, Law Center donors have a "healthy fear of government" and have "witnessed retaliation by government officials to conservative causes."  (*Id.*, at ¶ 48).  The fact that the Attorney General is an elected official currently running for national political office makes the potential for political rivalry even more acute.  (*Id.*, at ¶ 49).  Under these circumstances, "requiring the Law Center to disclose the names and addresses of its donors to the Registry would reasonably chill their contributions to the Law Center and truncate their liberty."  (*Id.* at ¶ 48).

14
NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

Attorneys General from other states agree that disclosure to state officials is itself a cognizable First Amendment injury.  The state Attorneys General of Arizona, Michigan, and South Carolina argued in an amicus brief filed with the Supreme Court in *Center for Competitive Politics v. Harris*, No. 15-152 (U.S.), stating that "disclosure to a state official is a cognizable [F]irst [A]mendment injury" and that state officials have the "potential to misuse donor information." (RJN, Exhibit D, at 5).

### 3.  Donors' Speech is Reasonably Chilled by Loss of Anonymity.

Donors who expect that their identities will be revealed to the public will be reasonably chilled from donating.  In Dr. Schervish's report, he concluded that the Law Center's donors are typical in their wish to be anonymous, that they reasonably fear "harassment, reprisals, and threats" if their identities are revealed, and that those fears produce a chilling effect on donors ability to participate in Freedom of Association and Free Expression.   (Schervish Report, at ¶ 20-21).

In particular, in today's politicized climate, business, individuals and foundations are punished for their political associations.  (*Id*. at ¶ 33).  Other donors have been punished for their financial support of conservative causes: Donors to the California Proposition 8 campaign in support of the traditional definition of marriage faced threats, boycotts, harassment, and vandalism after their information was posted on the internet.  (*Id*. at ¶ 32).  Mozilla co-founder Brendan Eich was forced to resign as CEO following attacks on social media after it became public that he supported the Proposition 8 campaign.  Chick-fil-a also suffered a significant backlash after its CEO revealed unpopular political views regarding gay marriage, while Hobby Lobby was threatened with a boycott after its Supreme Court case on religious accommodation.  (*Id*. at ¶ 33).  Retaliation for public advocacy can operate in the other direction as well.  McDonalds faced a

NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

boycott until one of its executives resigned from an LGBT group, while Planned Parenthood's corporate donors faced similar boycotts.  (*Id*. at ¶ 34).

Donors' desire for anonymity is especially important in the age of the Internet.  The leak of a donor list can now travel instantly, and "be copied, mined, and reposted endlessly."  (*Id*. at ¶ 39).  After content is posted online, "there is no un-ringing the bell – once a donor's information enters the public domain, it will remain public for all time."  (*Id*.).

The two forces of the increased acridity of political discourse, along with the privacy-destroying pressures of the internet, have converged to establish a trend of reasonable donors being very fearful of exposure.  (*Id*. at ¶ 40).  When anonymity cannot be achieved, the fear of exposure reasonably leads donors to opt-out, rather than to engage in the freedoms of association and speech.

> **4.      If the Donors to Thomas More Law Center Were Disclosed, Those Donors Would Face a Reasonable Likelihood of Threats, Harassment, or Reprisal.**

The Law Center's evidentiary burden is not high:  "speakers must be able to obtain an as-applied exemption without clearing a high evidentiary hurdle."  (Alito, J., concurring*) John Doe No. 1 v. Reed*, 561 U.S. at 204.  The types of evidence sufficient to succeed on an as-applied challenge include "past or present harassment of members due to their associational ties, or of harassment directed against the organization itself, or a pattern of threats or specific manifestations of public hostility."  *AFPF*, 2016 WL 1610591, at *4 (citing *Buckley*, 424 U.S. at 74).  As the Declarations of witnesses submitted in support of this motion clearly demonstrate, the Law Center and its publicly-known clients have faced harassment, ranging from obscene emails to assassination attempts.

> **i.      Declarations of Richard Thompson**

The Law Center President and Chief Counsel, Richard Thompson, notes that

NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

the causes for which the Law Center advocates are not always politically popular, though its donors' belief in them is deeply held and founded on sincere religious convictions.  (Supplemental Declaration of Richard Thompson, ("Supp. Thompson Decl.") ¶ 6). Some examples of the Law Center's advocacy include:

a)  Filing *amicus curiae* briefs in U.S. Courts of Appeal and the United States Supreme Court in opposition to same-sex marriage, including a brief in support of California's voter-enacted Proposition 8;

b)  Supporting free speech rights of pro-life student and non-student groups;

c)  Advocating for religious freedom, but with a concern for the domestic activities of radical Islamic groups; and

d)  Supporting a strong U.S. military and their families.

(*Id.*).

Many of the Law Center's donors would be deterred from participating in the Law Center's activities if they were exposed to the types of hateful, abusive derision that the Law Center itself often receives from those who disagree with the Law Center when its positions are stated publicly or are reported in mass media. (Thompson Decl., ¶ 8).

### ii.    Declaration of Francia Morello

The Law Center is dependent upon charitable donations for its existence and operation.  (Declaration of Francia Morello ("Morello Decl."), ¶ 4).  The Law Center sends "Direct Mailers" which are letters and membership forms to the general public to invite membership and donations.  (*Id.*, ¶¶  3, 7).  The Law Center often receives negative, hateful, and hostile communications because of the cases it handles and the causes it supports.  (*Id.*, ¶ 17).  For example, the Law Center has received negative and obscene comments on communications received on direct mailers.  (*Id.*).  These include:

-  Comments telling the Law Center to "fuck off," or "go to hell," and referring

NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

1    to its supporters as "pathetic followers." (*Id.*).

2    -    A large volume of hateful emails and obscene emails calling the Law Center

3         "misguided homophobic morons," comparing it to the Ku Klux Klan, and

4         calling its supporters "assholes." (*Id.*, ¶ 12).

5    -    Pornographic materials that were mailed via direct mail return. (*Id.*, ¶ 16).

6         Donors would be deterred from participating in the Law Center's activities if

7    they were exposed to the types of hateful and negative communications that the

8    Law Center receives. (*Id.*, ¶ 21).

9                        **iii.    Declaration of Pamela Geller**

10        Pamela Geller is the co-founder and President of American Freedom

11   Defense Initiative ("AFDI"), a non-profit organization dedicated to freedom of

12   speech, freedom of conscience, freedom of religion, and individual rights.

13   (Declaration of Pamela Geller ("Geller Decl."), ¶¶ 3, 4).  The Law Center provided

14   AFDI with legal counsel in a case in Detroit, arising from that city's transit

15   authority's refusal to allow print advertisements on its buses that were critical of

16   radical Islamic threats. (*Id.*, ¶ 8).

17        Ms. Geller has been subject to hateful insults, comments and death threats,

18   including an attempt on her life by two ISIS operatives at an event where she was

19   scheduled to speak on May 3, 2015. (*Id.*, ¶ 12).  The event was partially sponsored

20   by AFDI in Garland, Texas, held in protest of the terrorist killings in Paris, France

21   earlier that year after the satiric magazine Charlie Hebdo had published a cartoon

22   of the Prophet Muhammad. (*Id.*).  The event was intended to support free speech

23   rights through an art exhibit of depictions of the Prophet Muhammad. (*Id.*)

24        Shortly following the event, an American ISIS leader, Abu Ibrahim Al

25   Ameriki, issued a Fatwah—a legal pronouncement binding on his followers—

26   calling for her assassination. (*Id.*, ¶ 13).  The Fatwah stated "[e]veryone who

27   houses her events, gives her a platform to spill her filth are legitimate targets."

28

                                        18
     NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

1    (*Id.*, ¶ 14).

2          This was not the only attack on Ms. Geller.  As the Washington Post

3    reported on April 21, 2016, an ISIS operative in Boston had been ordered to kill

4    her in New York after the Garland, Texas attack.  (*Id.*, ¶ 16).  Two men have been

5    charged with plotting to kill Ms. Geller.  (*Id.*).

6          Since the May 3, 2015 assassination attempt, Ms. Geller's life changed

7    dramatically.  For example:

8    -    Ms. Geller has received so many hateful, threatening, and obscene emails

9          from supporters of jihad—including very graphic death threats—that her

10         emails are now forwarded to the FBI, the New York City Police Department,

11         and the federal Joint Terrorism Task Force.

12   -    Recent emails threatening to kill her state:  "I will withdraw the bones of

13         your body" "I wish you were in front of me so I could kill you then piss all

14         over your ugly dead body" "Coming to slay you[.] STILL ALIVE . . . NOT

15         FOR LONG!!!!!!!"

16   -    Jihadists have posted Ms. Geller's home address, including photographs, on

17         Twitter, making her an easier target to find.

18   -    As a result of the threats against her, Ms. Geller is no longer able to venture

19         outside her home without incurring private security guard costs of roughly

20         $4,000 each time.

21         (*Id.*, ¶ 17).

22         The list of donors that the Attorney General seeks from the Law Center is

23   information that jihadists would like to get their hands on.  (*Id.*, ¶ 19).  The chilling

24   effect upon donors to the Law Center would be devastating if they risked reprisals

25   from jihadists.  (*Id.*).

26

27

28
                                        19

### iv.     Declaration of Robert Spencer

Robert Spencer, is co-founder and Vice President of AFDI.  (Declaration of Robert Spencer ("Spencer Decl."), ¶ 3).  Through AFDI and his website, jihadistwatch.org, Mr. Spencer exercises free speech and provides coverage regarding the threat of jihadist terror groups, such as ISIS.  (*Id.*, ¶ 9).

Mr. Spencer routinely receives threats of violence or death, including communications that evidence that he is being stalked.  Examples include:

- At an event in Stuttgart, Germany, he was told by a stranger in the crowd that "if there weren't so many police here, you'd be dead by now."
- Emails stating "Specner (*sic*) is still at large after tracing him from NEW-YORK yesterday. Can someone tell me where he lives then I will show him his ability;" and "Mr (*sic*) Spencer Why dont (*sic*) you still not telling me a location to meet you right away. I would treat you like a GOAT."

Based on Mr. Spencer's experience, anyone who engages in the type of work that he does receives these kinds of threats.  (*Id.*, ¶ 18).  One example is an individual who voluntarily made and sold t-shirts for Mr. Spencer's website. When Mr. Spencer met this individual, he learned that the individual abruptly stopped making the shirts because the individual's spouse was worried about the individual being targeted for jihad because of his association with Mr. Spencer. (*Id.*).

### v.     Declaration of Melissa Wood

Ordinary citizens like Melissa Wood, who have publicly exercised their freedom of speech, also experience harassment and threats.

Ms. Wood is the wife of John Kevin Wood ("John"), who served in the U.S. Marine Corps for eight years.  John and Melissa have a teenage daughter ("C.W.") who attends La Plata High School in La Plata, Maryland.  (Declaration of Melissa Wood ("Wood Decl."), ¶ 3).

NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

John discovered that C.W. was being forced by her World History teacher to complete assignments that promoted Islam.  (*Id.*, ¶ 4).  In January 2016, with the help of the Law Center, the Woods filed a federal civil rights action against Defendants Charles County Public Schools, the Board of Education of Charles County, and the Principal and Vice Principal of La Plata High School.  (*Id.*, ¶ 7).

The Woods are no longer anonymous citizens.  (*Id.*, ¶ 8).  Ms. Wood and her family have experienced an extreme amount of stress, have lost friends, and have received death threats and threats of physical violence.  (*Id.*, ¶ 10).  These threats and hateful comments affect Ms. Wood personally and keep her up at night.  (*Id.*).  Some examples include:

- A Facebook message sent to John on May 28, 2015, from a person that claims to go to C.W.'s high school that states: "You racist I go to la plata. I DARE you to come here and make that threat again.  I see your daughter Melissa before. Ill stab her stomach to leave a hole and then hang a hook inside her and hang her from a tree.  The brown skin man has killed your friends, racist americunt.  I'll find you in la plata and stab your body open and piss in it in front of your pathetic racist kids! Long live Asians, kill racist whites.  Kill the marines.  Jokes on you racist."  The same person sent another message to John on June 1, 2015, which states, "Your blonde wife comes to my house."  (*Id.*, ¶ 13).

- In approximately November or December 2014, Federal Bureau of Investigation (FBI) agents visited Ms. Wood, saying they heard "chatter" about her husband.  The FBI agents instructed her to put their phone numbers on speed dial and warned John to pay attention to his surroundings at all times.  (*Id.*, ¶ 14).

### vi.   Declaration of Representative Sally Kern

Sally Kern is a member of the Oklahoma House of Representatives,

representing the 84th District.  (Declaration of Sally Kern ("Kern Decl."), ¶ 3).  The Law Center provided Representative Kern ("Rep. Kern") with legal counsel in 2008 when she received national attention and hateful, insulting, and lewd comments for her remarks opposing homosexual marriage.  (*Id.*, ¶ 4).

In 2008, Rep. Kern gave a presentation relating to out-of-state activists funding or supporting of an individual who was at the time running for state-wide office in Oklahoma.  (*Id.*, ¶ 5).  An out-of-context snippet of that presentation was published on YouTube.  (*Id.*).  The following week, Rep. Kern received thousands of emails, letters and phone calls from individuals and groups who did not agree with her opinion on homosexuals.  (*Id.*).  She received approximately 30,000 emails in one week.  (*Id.*).  Below are samples of emails sent in March 2008:

> a.  "I heard what you said and you should be killed you stupid cunt bitch!"
>
> b.  "Why don't you do the world a favor and kill yourself, you failed abortion. The reason this country is so incredibly f*cked up is because of knuckledragging, mouthbreathers like you. Crawl back under your rock with your 'bible' and wait for the rapture."
>
> c.  "I sincerely hope you die a slow, horrible death due to breast cancer," which was signed "Sincerely….Toronto (land of gay rights and gay marriage) Canada…"

(*Id.*, ¶ 6).

Rep. Kern received a threatening communication while on the floor of the Oklahoma House of Representatives.  As a result and due to concerns regarding her safety, a state trooper was assigned to follow her from her office at the State Capitol to her home for her security.  (*Id.*, ¶ 7).

The public scrutiny Rep. Kern received following the release of portions of her leaked presentation has affected her and her family.  (*Id.*, ¶ 9).  Based on Rep.

Kern's experience, people who become publicly known to support conservative, religious-based values are likely to be subject to hateful, insulting and threatening communications, such as the ones she received. (*Id.*, ¶ 11).

### vii.   The Issue of First Amendment Burden is Properly Resolved on Summary Judgment.

The Attorney General may attempt to downplay these facts, but their cumulative effect is horrific. In comparison to the Declarations and voluminous, threatening and obscene emails the Law Center has presented, the Attorney General is limited to a record of five times that a Schedule B was ever used in an investigation. How many donors need to be ostracized, tormented, or worse before the Attorney General drops her demands for anonymous donor lists that she hordes but almost never uses?

The "right level" of First Amendment harm that the Law Center needs to demonstrate as a part of the balancing test is a matter of law, which is properly resolved on summary judgment. *See Am. Fed'n of Labor & Cong. of Indus. Organizations v. Fed. Election Comm'n*, 333 F.3d 168, 177 (D.C. Cir. 2003) (Finding, in an election setting, where the government interest is very strong, that the plaintiff made sufficient showing under *Buckley* to warrant summary judgment); *Averill v. City of Seattle*, 325 F. Supp. 2d 1173, 1178 (W.D. Wash. 2004) (same); *New York Civil Liberties Union, Inc. v. Acito*, 459 F. Supp. 75, 88 (S.D.N.Y. 1978) (same)).

### F.   The Attorney General's Demand Infringes the Law Center's and its Donors' First Amendment Right to Free Exercise of Religion and Fourth Amendment Right to be Free of Unreasonable Search and Seizure.

NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

The causes for which the Law Center advocates and its donors' belief in them are deeply held and founded on sincere religious convictions.  Therefore, while the Attorney General's demand for the names and addresses of the Law Center's contributors does not directly target religious practice on its face, it has the effect of burdening the Law Center's and its donors' right to free exercise of religious expression under the First Amendment.

The demand also violates the Fourth Amendment because it constitutes an unreasonable search and seizure, without due process or probable cause, by the Attorney General.  The Attorney General's stated governmental interest in obtaining the Law Center's donor list is to detect and prevent charitable fraud.  However, the demand is fatally overbroad in that it demands confidential, private information that is not necessary for the Attorney General to perform her stated governmental purpose.  Thus, the Attorney General's demand constitutes a search and seizure that is warrantless, suspicionless, arbitrary, and unreasonable.

Because the disclosure of donors implicates several constitutional protections, including freedom of speech, religion, assembly, association, right to petition the government for redress, and privacy, the requirement is subject to strict scrutiny.  *See Am. Family Ass'n, Inc. v. City & Cnty. of San Francisco*, 277 F.3d 1114, 1124 (9th Cir. 2002) (citing *Miller v. Reed*, 176 F.3d 1202, 1206 (9th Cir. 1999) (internal quotation and citation omitted)).

The Law Center's application for an injunction is, *inter alia*, based on violations of its and its donors' rights to free exercise of religion and right to be free from unreasonable search and seizure, which were not raised in the AFPF case.  Thus, the evidence supporting a permanent injunction in this case is even stronger than that of AFPF.  Accordingly, summary judgment in favor the Law Center is warranted.

//

24

NOTICE OF PLAINTIFF'S MOTION AND MOTION FOR SUMMARY JUDGMENT

1

## III.    CONCLUSION

2          Having established that there is no triable issue of fact as to Plaintiffs' as-

3    applied challenge, the Law Center is entitled to summary judgment. The evidence

4    is overwhelming, even without issue preclusion, to establish the Law Center's right

5    to a permanent injunction as a matter of law.

6

7

8    DATED:  May 9, 2016                    **KAUFMAN DOLOWICH & VOLUCK, LLP**

9

10                                          /s/  *Louis H. Castoria*

11                                          Louis H. Castoria

12                                          Marion V. Cruz
                                            Ian A. Johnston
13                                          Attorneys for Plaintiff
                                            THOMAS MORE LAW CENTER
14

15

16    4810-6449-2337, v.  1

17

18

19

20

21

22

23

24

25

26

27

28
                                          25