**KAUFMAN DOLOWICH & VOLUCK LLP**
LOUIS H. CASTORIA (California Bar No. 95768)
lcastoria@kdvlaw.com
MARION V. CRUZ (California Bar No. 244223)
mcruz@kdvlaw.com
425 California Street, Suite 2100
San Francisco, CA 94104
Telephone: (415) 926-7600
Facsimile: (415) 926-7601

Attorneys for Plaintiff,
The Thomas More Law Center

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| THOMAS MORE LAW CENTER, | Case No. 2:15-cv-03048 R(FFMx) |
| Plaintiff, | Action Filed: April 23, 2015 |
| vs. | **EXPERT REPORT OF DR. PAUL G. SCHERVISH** |
| KAMALA HARRIS, in her Official Capacity as Attorney General of California, | Trial Date: June 28, 2016<br>Time: 9:30 a.m.<br>Judge: Hon. Manuel L. Real<br>Courtroom: 8 |
| Defendant. | |

1

# TABLE OF CONTENTS

2

3   I.      INTRODUCTION ................................................................................3

4   II.     QUALIFICATIONS AND BACKGROUND.....................................6

5   III.    RETENTION AND COMPENSATION...........................................9

6   IV.     BASES FOR OPINION AND MATERIALS COVERED.............10

7   V.      SUMMARY OF OPINIONS…………………………………………..10

8           A.    Anonymity:  Definition and as a Right ...............................12

9           B.    Why Donors Choose Anonymity:  To Avoid Harassment ..................14

10          C.    In General, Technology Exacerbates Repercussions for Individuals
                  and Their Families, and Businesses .......................................20

11
            D.    Specifically, Donors to Thomas More Law Center Legitimately Fear
12                Harassment ...............................................................................23

13          E.    Registry Unable to Keep Information From Public.............27

14          F.    Threatened Disclosures of Schedule B Donors Would Chill Donor
15                Behavior ...................................................................................30

16

17

18

19

20

21

22

23

24

EXPERT REPORT OF DR. PAUL G. SCHERVISH

## I. INTRODUCTION

1.      I have been retained by Kaufman Dolowich & Voluck, LLP on behalf of its client, The Thomas More Law Center (the "Law Center"), to provide expert analysis and opinion regarding whether and to what extent the Law Center and its donors and potential donors may reasonably fear the loss of their anonymity and disclosure of their identities, including disclosure to California's Registry of Charitable Trusts ("the Registry"), and whether and to what extent donors' participation and support may be chilled when and if the prospect of disclosure arises. For purposes of formulating my opinions, I have been asked to draw on my academic background, peer-reviewed academic research, related electronic and print documentation, and case materials.

2.      I have also been asked to review my Expert Report in the case of *Americans for Prosperity Foundation v. Kamala Harris*, Case No. 2:14-cv-09448-R-FFM, in which I appeared at trial as an expert witness on behalf of the plaintiff on February 25, 2016, regarding the same matters.  True and correct copies of my Report, my Curriculum Vitae and list of my publications, and the materials I considered in preparing my Report in that case, are attached hereto as Exhibits A, B and C, respectively, and I incorporate these exhibits in this Report by this reference. Attached hereto as Exhibits D, E, and F, respectively, are true and correct copies of my Supplemental Report and Supplemental Materials Considered in the *Americans for Prosperity* case, and my additional Materials Considered in this case.

3.      I have also been asked to review materials that are specific to this case, including the Amended Complaint of The Thomas More Law Center, the Declaration

1   of Richard Thompson dated April 23, 2015, and the Supplemental Declaration of

2   Richard Thompson dated May 6, 2015, including the exhibits to those documents.

3       4.    I have also been asked to provide expert analysis and opinion regarding

4   whether and to what extent the donors and potential donors to the Law Center may

5   reasonable fear that their expression of and advocacy for their religious beliefs,

6   expressed through their financial support of the Law Center, may be chilled by

7   disclosure to the California Attorney General's Registry, and the loss of their

8   anonymity in making such donations.  For purposes of formulating my opinions, I

9   have been asked to draw on my academic background, peer-reviewed academic

10  research, related electronic and print documentation, and case materials.

11      5.    I have reviewed the Complaint, the Preliminary Injunction briefing,

12  relevant Orders of the Court, and additional case materials described in Exhibit F to

13  this Report.  From my review of the case materials, I understand that the Registry is

14  requiring the Law Center to submit its unredacted Schedule B to the Registry as part

15  of the Law Center's annual filing with the Registry.  I understand that the Law Center

16  files its unredacted Schedule B to the IRS each year, but does not file its unredacted

17  Schedule B with California or with any other state.  Although I have not seen any of

18  the Law Center's unredacted Schedule Bs, I understand that they contain the

19  individual names and addresses of the Law Center's major donors.  More specifically,

20  I understand that the Law Center presently uses the $5,000 threshold in listing its

21  donors on -its Schedule B:  the Law Center's Schedule B lists each of the Law

22  Center's donors who contribute $5,000 or more to the Law Center in the previous

23  year.  I understand that the Law Center, in challenging the Registry's Schedule B

24  submission requirement states in its filed Complaint that "The First Amendment  and

the Internal Revenue Code protect the privacy rights of individuals who provide monetary support to charitable organizations by prohibiting public disclosure of their names and addresses. The rights to free speech, association, petition, free exercise of religion, and privacy, guaranteed by the United States and California Constitutions, are threatened, ironically, by the chief law enforcement officer of the State of California, the Attorney General of California, who now demands disclosure of Plaintiff Thomas More Law Center's list of contributors, and threatens severe and immediate punitive, regulatory, and monetary repercussions unless the Thomas More Law Center violates its own and its contributors' rights by revealing their identities to the Attorney General." (Complaint p. 2)

6.     Although I am not an attorney, I understand that the Attorney General has taken the position that the First Amendment is not implicated unless donors, including potential donors, have reasonable concerns that would tend to lead them to withdraw or reduce their support, or to otherwise decline to donate, in the face of disclosure requirements. I further understand that this prospect is commonly referred to as a "chilling effect." I also understand that the Registry's commitment and ability to keep Schedule B confidential, in practice, bears upon this chilling effect. My analysis and opinions herein focus on these issues.

7.     I have reviewed numerous case materials from an array of sources dealing with reprisals that demonstrate why the Law Center's donors' fears of disclosure, including fear of harassment, reprisal, and/or threats are legitimate and reasonable. My review of these materials including, but not limited to, the Thompson Declarations, indicates various threats against the Law Center, its associates, and its clients.

8.      I have outlined my opinions from my review of case materials in this report and am prepared to testify about them.  If asked by the court, the Law Center's attorneys, or the California Attorney General's attorneys.

9.      I may provide additional testimony regarding this report, or the opinions of any of the Attorney General's experts.  I reserve the right to modify or supplement my opinions and their bases to account for any additional information that may emerge in this matter, including additional deposition or trial testimony or newly produced documents.  As I understand it, factual discovery remains ongoing, such that numerous documents have yet to be produced and important depositions have yet to be taken; in light of that, my reservation of rights to supplement is especially appropriate and warranted.  If the Attorney General submits an expert report corresponding to this report, I reserve the right to rebut any positions taken in that report and to provide a supplemental report in light of them.

10.     In connection with my anticipated testimony in this action, I may use documents produced in this case that refer or relate to the matters discussed in this report as exhibits.  In addition, I reserve the right to create or help create demonstrative evidence to assist my testimony.

## II.  QUALIFICATIONS AND BACKGROUND

11.     I am Paul G. Schervish, Ph.D., Professor Emeritus of Sociology and recently retired Director of Boston College's Center on Wealth and Philanthropy, which I founded and where I served as Director for over thirty years.  I graduated *summa cum laude* from the University of Detroit; studied theology and philosophy for one year and a half at the Jesuit Bellarmine School of Theology in North Aurora, Illinois; and earned my M.A. in Sociology from Northwestern University in 1970.  I

1 received my Ph.D. in Sociology from the University of Wisconsin, Madison in 1980.

2 I also hold a Master of Divinity from the Jesuit School of Theology at Berkeley.  As a

3 member of the Society of Jesus, a Catholic religious order, from 1964 through 1981

4 and an ordained Jesuit priest from 1975-1981, I received instruction in theology,

5 philosophy, spirituality, and pastoral counseling during every phase of my training.

6       12.     Over the course of my career, I have been involved in the fields of (1)

7 philanthropy and charitable donations; (2) spirituality, theology, and pastoral care in

8 my training and life as a Jesuit for 17 years; and (3) and research and teaching on the

9 sociology of religion during my years at Boston College.  I helped found, and until

10 this year was a senior advisor and presenter with, the Wealth & Giving Forum, a peer-

11 centered endeavor to deepen the philanthropic engagement of the nation's 15,000

12 wealthiest families.  I also helped found, and was a faculty member with, the Legacy

13 Associates' Wealth Coach Network, a training forum for financial and fundraising

14 professionals.

15       13.     I have been widely recognized for my work in philanthropy—both my

16 statistical findings and my philosophical and spiritual works.  For example, *The*

17 *NonProfit Times* recognized me as one of the most effective leaders in the non-profit

18 world on its annual "Power and Influence Top 50" list five times, and inducted me

19 into its Top 50 Hall of Fame, where my name appears alongside other leaders in the

20 nonprofit world such as Bill Gates, Melinda Gates, and George Soros.  In 2008, I

21 received the Scott Fithian Leadership Award from the International Association of

22 Advisors in Philanthropy, an organization that stresses the spirituality and inner

23 meaning of finances and philanthropy.  The Scott Fithian Leadership award is

24 presented annually "to an individual with a distinguished career in service to a

philanthropic community."  More recently, I won the American Sociological

Association's Distinguished Career Award for the Section on Altruism, Morality, and

Social Solidarity in 2013—a section with a special focus on the deep-seated

significance of pro-social activity and philanthropy.

14.   I have particular expertise regarding the overall behavior, mindset and

motivations, and religious orientations of wealthy donors who donate relatively large

amounts to various causes and organizations.  I have published dozens of articles, and

given hundreds of lectures, and presentations on the personal meanings and public

practices of high-dollar donors.  I directed the "Study on Wealth and Philanthropy," a

three-year examination of the strategies of living and giving among 130 millionaires.

With Mary A. O'Herlihy and John J. Havens, I produced the 2001 High-Tech Donors

Study, in which we interviewed twenty-eight high-tech wealth holders about the "new

philanthropy."  I co-authored the 1999 report, *Millionaires and the Millennium*, which

predicted the now well-known $41 trillion wealth transfer.  In 1998, I published the

"Bankers Trust/Deutche Bank Survey on Wealth with Responsibility," with John J.

Havens.  Together, we surveyed 112 wealth holders with net worth in excess of $5

million regarding their charitable activities, attitudes about social issues, socially

responsible investing, trust and estate planning, and the transfer of value to their heirs.

15.   I have also been recognized for my academic work on anonymous

giving.  My article *The Sound of One Hand Clapping:  The Case for and Against

Anonymous Giving* won the 1995 Virginia A. Hodgkinson Prize "for best research

paper or essay published in 1994 that provides new understanding of issues regarding

philanthropy, voluntary action, nonprofit organization and management, fundraising,

or civil society."  I presented an earlier version of this paper at the Conference on

1   Anonymous Giving, hosted by the Center on Philanthropy in Indianapolis.  I have

2   kept abreast of the field of anonymous donations ever since.  Many of my articles on

3   philanthropy addresses the spiritual experiences and motivations that lead donors to

4   make charitable contributions, describe the process of spiritual discernment by which

5   donors decide in the light of spiritual experience to made charitable contributions, and

6   explain the meaning of a moral, religious, and spiritual biography by which

7   individuals put into motion their financial resources to care for others.  My latest book

8   (with Keith Whitaker) is *Wealth and the Will of God: Discerning the Use of Riches in*

9   *the Service of Ultimate Purpose*. The book reviews the teachings of Aristotle, Thomas

10   Aquinas, Ignatius Loyola, Calvin, Luther, and Jonathan Edwards on the ultimate

11   purpose of life, the principal means to achieve that end, the meaning of wealth, and

12   the rationale for financial care of others.

13       16.    I have testified previously as an expert witness on reasonable wealth

14   holder behavior in 2008, in *Gilbert Hyatt v. California Franchise Tax Board*.  I have

15   also testified as an expert witness regarding the chilling effect on donors who are

16   exposed to loss of anonymity and subsequent harassment in February 2016, in

17   *American for Prosperity Foundation v. Kamala Harris in her Official Capacity as*

18   *Attorney General of California*.

19       17.    My qualifications are set forth more fully in my Curriculum Vitae.  My

20   Curriculum Vitae lists every article, book, and report I have published, and all of the

21   presentations I have given.  It is attached as Exhibit A.

22   **III.   RETENTION AND COMPENSATION**

23       18.    I am being compensated for my time on this case on an hourly basis at

24   my current standard rate of $500 per hour. I am also being reimbursed for expenses

1   that I incur, including travel expenses and travel time.  My compensation is not

2   contingent upon the results of my analysis or the substance of my testimony.

3   **IV.    BASES FOR OPINION AND MATERIALS COVERED**

4          19.    In addition to the materials listed in Exhibits A and B, the materials

5   described above in this Declaration, and the testimony and evidence that I heard and

6   saw during my attendance at the trial of the *Americans for Prosperity Foundation*

7   case, I have reviewed and considered the materials listed in Exhibit C in forming my

    opinions in this case.

8   **V.     SUMMARY OF OPINIONS**

9          20.    I have drawn upon my education, experience, and expertise, and formed

10  the following opinions from my review of the materials in Exhibit B.  I focus here on

11  the reasonable justifications the Law Center's donors have for wanting to remain

12  anonymous to the public as well as the Registry—and the reasonable fears and

13  chilling effect they will predictably face if disclosure of any of their identities may

14  nonetheless be required pursuant to the Attorney General's demands.  My research

15  confirms that the interests and fears of the Law Center's donors are typical and

16  widespread among donors in general who wish to give anonymously.  This

17  phenomenon extends across everyday interactions and surges even higher in contexts

18  that are socially and/or politically charged.  Moreover, although this phenomenon is

19  longstanding as has been evident for the decades I have been studying it, it has only

20  grown in recent years, as our society and polity become more polarized, as divergent

21  factions become more insular, desensitized, and acrimonious, and as the Internet

22  becomes an instrument for disseminating information and coordinating targeted

23  campaigns nationwide, and, indeed globally.

24

1    21.    The following summarizes my key arguments and conclusions as to the

2 Law Center and its donors:

3    **A. Anonymous Giving and Donor Bill of Rights**

4    Anonymous giving is a social relationship between the donor and other

5    parties in which the name of the donor is restricted to the public; assuring

6    donors' confidentiality is included in the donor bill of rights.

7    **B. Anonymity Linked to Fear of Negative Repercussions**

8    Donors seek to be anonymous for many reasons, but mainly revolving around

9    kinds of problems, strife, and harassment that can arise when gifts that are

10   intended to remain anonymous are made publicly known, especially in

11   today's caustic political, social, and religious environment.  .

12   **C. In General, Technology Exacerbates Repercussions for Individuals and**

13   **Their Families, and Businesses**

14   Today donors are especially vulnerable to losing their anonymity because of

15   the increased technology of hacking, use of the Internet, and prominence of

16   electronic and social media.  Political activists, headline-seeking media, and

17   the cutting-edge industry of for-profit and in-house prospect research

18   organizations and software variously seek to track down, benefit from, and

19   carry out harassment based on information about the backgrounds, personal

20   predilections, and societal pursuits of donors.

21   **D. For Donors to Thomas More Law Center**

22   Because their contributions occur in today's acrimonious environment,

23   Schedule B, non-Schedule B, and potential donors to the Law Center have a

24   reasonable and legitimate fear that their loss of anonymity will result in one or

1    more of forms of harassment, reprisals, and threats.

2    **E. Registry Unable to Retain Privacy**

3    The Registry of Charitable Trusts under the California Attorney General–who

4    was elected to office and is currently running for the U.S. Senate–contributes

5    to this loss of anonymity and ensuing harassment by failing in practice and by

6    law to keep the Schedule Bs of many charities private.

7    **F. Chilling Effect Impedes Freedom of Association and Free Expression of**

8    **Religion**

9    Such disclosure impedes the Constitutional rights of donors and potential

10    donors to freely participate in the Foundation, producing a reasonable chilling

11    effect on the right to freedom of association and free expression of religion by

12    leading donors to refuse, withdraw, or reduce their support.

13    **A. <u>Anonymity:  Definition and as a Right</u>**

14    22.    The academic literature defines "[a]nonymous giving" as "a social

15  relation in which knowledge about the identity of the donor is restricted."[1]  Donors

16  are rarely totally anonymous.[2]  Thus, anonymous donors are donors whose identities

17  are concealed from the recipient, from the public, or from other third parties.[3]

18  Anonymous donors are usually individuals, but corporations, foundations, and

19  associations may also request anonymity.[4]

20

___

21    [1]  Paul G. Schervish, *The Sound of One Hand Clapping:  The Case for and Against Anonymous*

22  *Giving*, VOLUNTAS: INT'L J. VOLUNTARY & NONPROFIT ORGS., Feb. 1994, at 1, 23.
    [2]  *Id.* at 2.

23    [3]  *Id.* at 23.
    [4]  ELEANOR T. CIRERCHI & AMY WESKERNA, SURVEY ON ANONYMOUS GIVING 17 (1991);

24  Schervish, *supra* note 1, at 2.

23.     Anonymous donations include confidential donations.  Philanthropic gifts may have different "identifiable *realms* of anonymity depending on which groups are kept in the dark about the source of a gift."[5]  A donor's interest in anonymity or confidentiality is not a binary choice between complete anonymity or complete publicity—rather, the academic literature recognizes degrees of anonymity between these two extremes.[6]  In their seminal study on anonymous giving, Eleanor T. Cirerchi and Amy Weskerna identified five degrees anonymity, ranging from one of total anonymity to one where the donor's identity is fairly widely assumed but not publicly acknowledged.[7]

24.     In fact, purely anonymous giving is rare and, practically speaking, difficult.  People within a donor's favored charitable area, industry, or peer group may know generally to whom or to what the donor gives, but that does not mean that the state knows, or that the information is publicly available.[8]  For example, a donor may lend his name to a private fundraising dinner with 400 like-minded individuals, but might not want his name publicized in the Los Angeles Times or disclosed to the State of California.[9]  Thus, donor anonymity encompasses donors whose identities are known within the recipient organization, but whose identities are kept confidential from third parties.[10]

---

[5]  Schervish, *supra* note 1, at 23.
[6]  CIRERCHI & WESKERNA, *supra* note 4, at 15.
[7]  *Id.*
[8]  Schervish, *supra* note 1, at 23.
[9]  *See* Sam Kean, *Donors Increasingly Make Their Big Gifts Anonymously, Chronicle Analysis Finds*, CHRON. PHILANTHROPY (Jan. 9, 2008), https://philanthropy.com/article/Donors-Increasingly-Make-Their/163267.
[10]  Schervish, *supra* note 1, at 23.

25.     This concept of anonymity is widely and increasingly recognized in philanthropy today.  The Association of Fundraising Professionals' donor bill of rights recognizes a donor's right to the confidentiality of his donation,[11] and donor solicitation forms commonly, if not by default, allow a donor to check a box to make an anonymous donation.[12]  The trend has been for large million-dollar plus donors to increasingly avail themselves of this well-established and increasingly-cherished right.[13]  For example, between June 2008 and April 2009, nearly nineteen percent of the 422 total $1 million-plus gifts were made anonymously, which was up from 3 to 5 percent during the preceding decade.[14]

## B. Why Donors Choose Anonymity:  To Avoid Harassment

26.     In my award winning, peer-reviewed academic research, I interviewed 130 millionaires and identified multiple reasons why donors choose to give anonymously.[15]  Those same and additional reasons are identified in other sources.

27.     Historically, wealthy donors most commonly gave anonymously to minimize solicitations from other organizations.[16]  Once a donor's large gift becomes known publicly, that donor risks becoming a "mark" for every fundraiser in town.[17]

---

[11]   ASS'N OF FUNDRAISING PROF'LS ET AL., A DONOR BILL OF RIGHTS (2015), *available at* http://www.afpnet.org/files/ContentDocuments/DonorBillofRights.pdf.
[12]   *See, e.g.*, *Donate Now*, SALVATION ARMY, https://donate.salvationarmyusa.org/southernnewengland/page.aspx?pid=509 (last accessed Nov. 18, 2015).
[13]   *See* Kean, *supra* note 9.
[14]   Ben Gose, *Anonymous Giving Gains in Popularity as the Recession Deepens*, CHRON. PHILANTHROPY (Apr. 30, 2009), https://philanthropy.com/article/Anonymous-Giving-Gains-in/162627.
[15]   Schervish, *supra* note 1, at 1.
[16]   CIRERCHI & WESKERNA, *supra* note 4, at 18; Schervish, *supra* note 1, at 2.
[17]   Mark Oppenheimer, *In Big-Dollar Philanthropy, (Your Name Here) vs. Anonymity*, N.Y. TIMES (May 10, 2013), http://www.nytimes.com/2013/05/11/us/in-philanthropy-your-name-here-vs-
(footnote continued)

1  As early as 1913, the New York Times observed that philanthropists give

2  anonymously "to save themselves from the deluge of appeals from societies and

3  individuals that descends upon any donor nowadays whose benefactions become a

4  matter of public record."[18]  Anonymity, therefore, serves to shield donors and their

5  families from unwelcome and incessant additional requests.[19]

6      28.    Academic studies and other sources have identified additional reasons

7  donors give anonymously.  For example, a donor might not want family members or

8  heirs to know the level of the donor's wealth.[20]  Or the donor may be motivated to

9  give from a deeply felt sense of privacy, humility, or modesty.[21]  Still other wealthy

10  donors have expressed concern for theirs and their family's safety, if the extent of

11  their wealth becomes known.[22]  The list goes on;[23] each reason provides donors with

12  an additional incentive for confidentiality.

13      29.    More recently, fear of repercussion has become a prominent and

14  powerful motivation for donors to give anonymously.  Donors are judged for how

15  they spend their money—philanthropists have faced public criticism for giving to art

16  museums instead of to starving children.[24]  Contemporary philosophers, such as Peter

17

18  anonymous-giving.html.

19      [18] *Anonymous Philanthropy is Greatly Increasing*, N.Y. TIMES, Nov. 23, 1913, at 12; *see also*
    Ursula Vils, *Anonymous Giving: Acts of Charity That Have No Name*, L.A. TIMES (Dec. 25, 1985),
20  http://articles.latimes.com/print/1985-12-25/news/vw-21250_1_anonymous-giving.
      [19] Schervish, *supra* note 1, at 6.
21      [20] CIRERCHI & WESKERNA, *supra* note 4, at 20; *see also* Schervish, *supra* note 1, at 4–5.
      [21] Schervish, *supra* note 1, at 2, 8.
22      [22] CIRERCHI & WESKERNA, *supra* note 4, at 25–26; Kean, *supra* note 9.
      [23] *See, e.g.*, Schervish, *supra* note 1, at 8–12.
23      [24] *See* Noel King, *What's Wrong with Giving Money Away?  Even Generosity Has Critics*,
    MARKETPLACE (Dec. 10, 2013), http://www.marketplace.org/topics/wealth-poverty/lot-give/whats-
24  wrong-giving-money-away-even-generosity-has-critics.

Singer, have criticized philanthropists for supporting pet causes instead of maximizing world utility.[25]  Thus, wealthy donors risk criticism for their gifts, even gifts that are relatively non-controversial.

30.     Donors may request anonymity to avoid association with a controversial cause or organization in their communities.[26]  For example, when AIDs causes were controversial in the early 1990s, donations to those causes were "often done anonymously to protect [donor] identity."[27]

31.     More recent examples demonstrate the vexing stage on which controversial advocacy, including and especially religious advocacy, is being played out. Donors to the Thomas More Law Center legitimately fear harassment as a religiously oriented legal-assistance organization that takes up controversial cases in defense of freedom of religious expression and freedom of association in general.  Its opponents seek to locate, track, list, criticize, and orchestrate resistance to those who create and support organizations and activities deemed to be ideologically dangerous and socially threatening.  Today, associating with radical, fringe, or even mainstream causes can and does damage donors personally and professionally, particularly within important, distinct circles.  Some donors might reasonably fear that disclosure of their

---

[25]  Oliver Milman, *Peter Singer:  I Want to Shame Charities into Proving the Worth of Their Spending*, GUARDIAN (Mar. 26, 2015), http://www.theguardian.com/society/2015/mar/27/peter-singer-charities-effective-altruism; Peter Singer, Op-Ed., *Good Charity, Bad Charity*, N.Y. TIMES (Aug. 10, 2013), http://www.nytimes.com/2013/08/11/opinion/sunday/good-charity-bad-charity.html; Peter Singer, *The Singer Solution to World Poverty*, N.Y. TIMES MAG. (Sep. 5, 1999), http://www.nytimes.com/1999/09/05/magazine/the-singer-solution-to-world-poverty.html; Alexandra Wolfe, *Peter Singer on the Ethics of Philanthropy*, WALL ST. J. (Apr. 3, 2015), http://www.wsj.com/articles/peter-singer-on-the-ethics-of-philanthropy-1428083293.
[26]  CIRERCHI & WESKERNA, *supra* note 4, at 25.
[27]  *Id.*

1  gifts to the government will open them up to persecution by their state or local

2  government, or an audit by the IRS.[28]  For instance, a comprehensive report by the

3  ACLU explicitly documented the chilling effect of government surveillance on

4  attendance and donations to mosques across the U.S. after 9/11:  "The ACLU found

5  that the perceived use of informants to infiltrate mosques has had a chilling effect of

6  congregants' rights to association, speech, and religion.  Some reported limiting their

7  attendance at congregational prayer in mosques and limiting their charitable giving,

8  for fear that an informant was reporting their presence at the mosque or their

9  individual donations made during charitable fundraisers at the mosque."[29]

10         32.     Many donors have been forced by political or ideological enemies to

11  suffer for their generosity.  For example, donors to the successful Proposition 8

12  campaign faced threats, boycotts, harassment, and vandalism after their names and

13  addresses were posted on the Internet.[30]  One supporter found a flier in his

14  neighborhood that called him a bigot and listed his employer, another donor lost his

15  job after his donation was revealed,[31] and the Mormon Church received envelopes of

16  suspicious white powder at its Salt Lake City headquarters following its support of the

17  measure.[32]  Such controversial donations do not quickly become old news:  Mozilla

18  _____

19  [28]  *E.g.*, Stephanie Strom, *I.R.S. Drops Audits of Political Donors*, N.Y. TIMES (Jul. 7, 2011), http://www.nytimes.com/2011/07/08/business/irs-drops-audits-of-donors-to-political-groups.html.

20  [29]  AM. CIVIL LIBERTIES UNION, BLOCKING FAITH, FREEZING CHARITY:  CHILLING MUSLIM CHARITABLE GIVING IN THE "WAR ON TERRORISM FINANCING" 77 (2009), *available at*

21  https://www.aclu.org/files/pdfs/humanrights/blockingfaith.pdf.
   [30]  Thomas M. Messner, *The Price of Prop 8*, BACKGROUNDER 1 (Heritage Found., Washington,

22  D.C.), Oct. 2009, *available at* http://www.heritage.org/research/reports/2009/10/the-price-of-prop-8; Jesse McKinley, *Marriage Ban Donors Feel Exposed by List*, N.Y. TIMES (Jan. 18, 2009),

23  http://www.nytimes.com/2009/01/19/us/19prop8.html.
   [31]  McKinley, *supra* note 30.
   [32]  *California Proposition 8: Post Election Events*, FAIRMORMON,

24  (footnote continued)

1  co-founder Brendan Eich was forced to resign as CEO in 2014, following social

2  media attacks and a revolt among Mozilla staffers over his $1,000 contribution to

3  support the ballot measure six years earlier.[33]

4      33.    In today's politicized climate, businesses, individuals, and foundations

5  are punished for their associations.  Chick-fil-A donated from a religious motivation

6  to family values organizations, but dramatically cut its support of groups considered

7  to be anti-gay, after suffering a backlash for its CEO's comments.[34]  And, Hobby

8  Lobby was threatened with a boycott following its successful Supreme Court case in

9  which it argued for accommodation for religious organizations and for private

10  businesses headed by religiously oriented owners in regard to Health and Human

11  Services regulations requiring health plans to include contraceptive coverage.[35]

12      34.    Such phenomena run across the political spectrum.  For example,

13  McDonald's suffered a five month long boycott until one of its executives resigned

14  from the board of the National Gay and Lesbian Chamber of Commerce in 2008.[36]

---

http://en.fairmormon.org/Mormonism_and_politics/California_Proposition_8/Post-Election_Events (last accessed Oct. 23, 2015).

[33] William Saletan, *Purge the Bigots*, SLATE (Apr. 4, 2014), http://www.slate.com/articles/news_and_politics/frame_game/2014/04/brendan_eich_quits_mozilla_let_s_purge_all_the_antigay_donors_to_prop_8.html.

[34] Leon Stafford, *Cathy Seeks to Put Gay Marriage Flap Behind Chick-fil-A*, MYAJC (Mar. 14, 2014, 12:27 PM), http://www.myajc.com/news/business/cathy-seeks-to-put-gay-marriage-flap-behind-chick-/nfCHj/.

[35] Harry Bradford, *Hobby Lobby Lawsuit Over Obamacare Morning After Pill Mandate Sparks Backlash*, HUFFINGTON POST (Sep. 21, 2012, 4:39 PM), http://www.huffingtonpost.com/2012/09/21/hobby-lobby-obamacare-lawsuit-morning-after-pill_n_1903472.html.

[36] Mike Hughlett, *American Family Association Ends McDonald's Boycott After Executive Resigns from Gay Business Group*, CHI. TRIB. (Oct. 10, 2008), http://articles.chicagotribune.com/2008-10-10/news/0810090433_1_lesbian-chamber-boycott-national-gay.

1  Planned Parenthood's corporate donors faced similar boycotts from conservative

2  groups in 1990,[37] and took down its corporate donor webpage earlier this year, after

3  several corporations asked to be removed from the organization's donor list.[38]

4  NARAL's supporters, a pro-choice advocacy organization, are often threatened and

5  harassed – even in New York.  In fact one individual who threatened the organization

6  was convicted for having plotted to bomb an abortion clinic.[39]  And, the Clinton

7  Foundation has been criticized for accepting large donations from corporations,

8  foreign individuals, and governments such as Saudi Arabia, Kuwait, Australia, and

9  Norway.[40]  Increasingly, disclosure of a supporter's affiliation with a controversial

10 cause or a cause's affiliation with a controversial donor brings damaging

11 repercussions.

12        35.    As our politics and discourse have become more divisive and internecine

13 in recent years, the threats to those associated with a potentially controversial cause

14 have become more pronounced, as have the reasonable concerns of those who fear

15 their association with any given cause may become known.

16        36.    Notably, what is uncontroversial in one particular region or community

17

18    [37]  Tamar Lewin, *Anti-Abortion Group Urges Boycott of Planned Parenthood Donors*, N.Y.
19 TIMES (Aug. 8, 1990), http://www.nytimes.com/1990/08/08/us/anti-abortion-group-urges-boycott-
   of-planned-parenthood-donors.html.
      [38]  Melissa Clyne, *Planned Parenthood Removes Corporate Donor Page from Website*,
20 NEWMAX (July 24, 2015, 1:56 PM), http://www.newsmax.com/Newsfront/Planned-Parenthood-
   corporate-donors-website/2015/07/24/id/658777/.
21    [39]  *E.g.*, Thomas Kaplan, *Nonprofits Are Balking at Law on Disclosing Political Donors*, N.Y.
   TIMES (Aug. 20, 2013), http://www.nytimes.com/2013/08/21/nyregion/citing-safety-nonprofits-
22 balk-at-law-on-disclosing-donors.html.
      [40]  Kevin Sack & Sheri Fink, *Rwanda Aid Shows Reach and Limits of Clinton Foundation*, N.Y.
23 TIMES (Oct. 18, 2015), http://www.nytimes.com/2015/10/19/us/politics/rwanda-bill-hillary-clinton-
   foundation.html.
24

1    may be controversial in another.[41]  All it takes is one or a few ideological opponents

2    to inflict serious damage—as we've seen above—on a donor's relationships with

3    employers, clients, and neighbors.[42]

4    ### C. In General, Technology Exacerbates Repercussions for Individuals
5    ### and Their Families, and Businesses

6    37.    This donor desire for anonymity is increasingly challenged by growth in

7    personal information and accessibility to that information on the Internet.  The already

8    formidable ability of prospect research companies and in-house prospect researchers

9    at charities to obtain information on donors and potential donors advances with every

10   iteration of Internet data mining, storage and search capabilities.  For instance, APRA

11   (Association of Professional Researchers for Advancement) defines "Prospect

12   Development" as "the strategic arm of an organization's fundraising operation,

13   focusing on prospect pools and pipelines. Prospect Development professionals

14   collaborate with gift officers and development leaders to ensure fundraising efforts

15   are focused on working with the right donors for the right gifts at the right time (and

16   in many cases, with the right initiatives)."[43]  Its first goal is "discovering and

17   evaluating prospective donors, and their interests, relationships, inclination to give

---

18   [41]  Steven J. Tepper, *The Social Nature of Offense and Public Protest over Art and Culture*,
19   GIA READER, Fall 2012, *available at* http://www.giarts.org/article/social-nature-offense-and-public-
     protest-over-art-and-culture ("Cities exhibit different profiles of contention based, in part, on the
20   demographic, institutional, and political make-up of the city."); *see also* Michael Dobbs, *Footloose
     or Dancing-Free?*, WASH. POST (May 17, 1987),
21   https://www.washingtonpost.com/archive/lifestyle/1987/05/17/footloose-or-dancing-free/ed9486e0-
     5a41-41d9-9836-1aac557a9a57/ (describing the public dancing ban in Anson, Texas).
22   [42]  Deborah G. Johnson, Priscilla M. Regan & Kent Wayland, *Campaign Disclosure, Privacy
     and Transparency*, 19 WM. & MARY BILL RTS. J. 959, 972 (2011) (detailing harassment of
23   Proposition 8 donors in their local communities).
     [43]  *A Brief Description of the Prospect Development Profession*, ASS'N PROF'L RESEARCHERS
24   FOR ADVANCEMENT (May 16, 2014), http://www.aprahome.org/p/cm/ld/fid=37.

1  and philanthropic capacity to inform and support an organization's fundraising

2  strategies and outreach efforts."[44]  It explains how "advances in information

3  management technology, data storage, trends in information availability, and

4  increased need for data-driven decision making" have improved the success of

5  prospect research.[45]

6        38.    The Internet has exacerbated the danger of disclosure.  Anyone can target

7  and investigate specific persons or donors.[46]  Organization and technology are now

8  such that the leak of a donor's name can travel at the click of a button, and make that

9  person a target around the country, and, indeed, around the world.  American Bridge,

10  a Democratic group devoted to uncovering politically damaging information about

11  Republicans, has ten employees dedicated to digging up dirt on the Koch brothers,

12  which it disseminates to other liberal groups.[47]  And these dangers are by no means

13  confined to the Kochs:  For-profit prospect research firms and charities now track

14  every major gift in the country, to provide information to other institutions about the

15  financial wherewithal of prospective or current donors.[48]

16

17  [44]  *Id.*

    [45]  *Id.*

18  [46]  Kean, *supra* note 9 ("Officials [who know donor identities] guard details, of course, because

19  the Internet makes it far easier than before to tease out people's identities from scraps of
    information.").

20  [47]  Fredreka Schouten, *Charles Has No Plans to Back a Candidate in Republican Primary*,
    USA TODAY (Nov. 11, 2015),

21  http://www.usatoday.com/story/news/politics/elections/2015/11/11/charles-koch-not-backing-
    candidate-republican-primary/75576772/.

22  [48]  Preeti Gill, *Don't Be Alarmed, I'm a Prospect Researcher*, FUNDCHAT (Nov. 20, 2013),
    http://www.fundchat.org/2013/11/20/dont-be-alarmed-im-a-prospect-researcher; Margaret King,

23  *Prospect Research: What You Don't Know—and How It Can Hurt You*, NONPROFITPRO (Aug. 1,
    2007), http://www.nonprofitpro.com/article/research-prospective-major-donors-before-you-meet-

24  with-them-71419/all/.

39.     Once donor information is posted on a public website, it can be "copied, mined, and reposted endlessly," on unexpected places with unexpected results.[49] Once that exposure happens, there is no un-ringing the bell—once a donor's information enters the public domain, it will remain public for all time.[50]  Regardless of best efforts (indeed, Herculean efforts), information that has found its way into the public and media domain, particularly via the Internet, cannot be satisfyingly purged: In today's society, it is impossible to erase memories, censor news stories, or retrieve countless downloads.  As such, donors who lose the protective cloak of anonymity and its associated advantages (as described above) can never regain it.  The only way for them to protect their anonymity is to resist disclosure of their identities in the first instance, at least in the absence of maximum necessity and precautions.

40.     These trends are all converging and moving in a direction where reasonable donors have more and more reason to be fearful of exposure.  It is unsurprising that gifts over $1 million dollars are increasingly made anonymously,[51] despite charities' frequent and earnest desire to have names attached to gifts to encourage additional donations by the donor's peers.[52]  Nonprofit leaders do not like to leak anonymous donors' names, because donor confidentiality is viewed as an ethical obligation.[53]  Thus, the importance of maintaining anonymity from the

---

[49]  Johnson, Regan & Wayland, *supra* note 12, at 971.
[50]  *See id.* at 972 ("[T]he donor's loss of control of personal data is now 'the price one pays' for making a donation.").
[51]  Gose, *supra* note 14.
[52]  CIRERCHI & WESKERNA, *supra* note 4, at 30; Schervish, *supra* note 1, at 14–15; Oppenheimer, *supra* note 17; Vils, *supra* note 18.
[53]  *See, e.g.*, ASS'N OF FUNDRAISING PROF'LS ET AL., A DONOR BILL OF RIGHTS, *supra* note 11; Kean, *supra* note 9.

1  perspective of reasonable charities and their donors is high and only rising.

2  **D. Specifically, Donors to Thomas More Law Center Legitimately Fear**
3  **Harasssment**

4      41.    I have opined in previous sections that donors and activists in general are
5  increasingly being harassed for taking controversial positions and that this harassment
6  is exacerbated and more widely disseminated by increasingly sophisticated software,
7  the Internet, and electronic media—all of which more effectively, and for readership,
8  financial and/or political advantage, seek out and make use of the identities of wealth
9  holders who are relevant for their purposes.  According to the declaration of Richard
10  Thompson the purposes, methods, and reprisals of such discovery, communication,
11  and application of knowledge about controversial donors specifically applies to those
12  for whom the Law Center advocates.

13      42.    I quote the following instances of reprisals directly from Thompson's
14  Declaration.

15                              [Begin quotation]

16          [R]eprisals are not hypothetical threats. Individuals and
17          organizations who the Law Center has supported have already been
18          targeted by violent protesters:

19          a) Pamela Geller, Executive Director, Robert Spencer, Associate
20              Director   and   American   Freedom   Defense   Initiative's
21              ("AFDI")  have  very  recently  been  in  the  national  news  for
22              having been targeted for death by ISIS-affiliated terrorists who
23              attempted  to  assassinate  them  during  an  event  in  Texas,  but
24              were   thwarted   by   law   enforcement.   Pamela   Geller,   Robert

1    Spencer, and AFDI are represented by the Law Center in a

2    case filed in the U.S. District in the national news for having

3    been targeted for death by ISIS-affiliated terrorists who

4    attempted to assassinate them during an event in Texas, but

5    were thwarted by law enforcement. Pamela Geller, Robert

6    Spencer and AFDI are represented by the Law Center in a case

7    filed in the U.S. District Court for the Eastern District of

8    Michigan, arising from their efforts to run anti-jihad

9    advertisements on public buses in three Michigan counties.

10   Although the bus authority had allowed other advertisements

11   with a religious or anti-religious message, it disallowed

12   AFDI's proposed bus advertisements, offering help for those

13   in fear for their lives for attempting to convert from Islam.

14   Pamela Geller, Robert Spencer and AFDI were also

15   represented by the Law Center in a case filed in the United

16   States District Court of New York, arising from their efforts to

17   run advertisements on Metropolitan Transpiration Authority

18   ("MTA") buses and subways in New York.   MTA had

19   previously allowed other advertisements with religious or anti-

20   religious messages.  ISIS has indicated it is targeting anyone

21   associated with Pamela Geller and has soldiers ready to attack

22   in different states, specifically identifying California as one of

23   the five states where ISIS has trained militants and is ready to

24   attack. Attached as **Exhibit J** is the May 6, 2015 front page of

-24-                               Case No. 2:15-cv-03048-R-FFM

the Drudge Report, with a photo of Pamela Geller and a link titled, "ISIS vows to kill Pam…" The section referring to her and to related stories about the ISIS threats are highlighted on this printout. Attached as **Exhibit K** is a May 5, 2015 article from the NY Daily News, titled "ISIS threatens controversial blogger Pamela Geller in message boasting of '71 trained soldiers in 15 different states.'"

b) I am informed and believe that Michael Potter, founder of Eden Foods, another of the Law Center's clients, has received over 3,337 disparaging emails as a result of challenging, with the Law Center's help, the Health and Human Services Department's mandate that employers provide coverage for contraception services.   As a result of this publicity, his business has been negatively affected.

c) The Law Center itself has been identified and discussed in the Southern Poverty Law Center's "Hatewatch" blog. The Law Center's donors could face public and private detriments as well as social ostracism for being affiliated with a "hate group" if their identities became public. It could affect their employability, security clearances, and other privileges, all because an advocacy group with an opposing viewpoint has applied this pejorative term to the Law Center.  Attached as **Exhibit L** are several blog postings about or referencing the Law Center, taken from the Southern Poverty Law Center's

1    "Hatewatch" blog.

2    d) The Law Center bas received many hateful emails over the

3    years, each time it participates in a public debate or civil right

4    lawsuit. With the dominance of social media as a means of

5    communication, the Law Center receives derision and hateful

6    obloquy, including vulgarities, from persons with opposing

7    views-often anonymously. Exposing our donors' identities

8    would expose them to the same type of vicious, online

9    bullying.

10   e) I am informed by the Law Center's staff that emails that use

11   vulgarities of hateful terms have been routinely deleted from

12   our system. We never expected to need them to oppose an

13   effort by any state's government to force the disclosure of our

14   donor list. I am in the process of determining if those emails

15   can be retrieved from any electronic storage system that the

16   Law Center uses, but I do not have that data available to me in

17   time to include it in this Declaration.

18   f) Erin Mersino (formerly unmarried with the name "Erin

19   Chau"), an attorney at the Law Center, was specifically

20   targeted.  An official, albeit frivolous, complaint to the Attorney

21   Grievance Commission of the State of Michigan was filed against

22   her and another Law Center attorney, alleging use of defamatory

23   language against homosexuals as a class of people in a federal

24   Complaint filed in Michigan.  Attached as **Exhibit M** is an

1    excerpt from an article published about this official complaint

2    against Mersino. An attack on a person's livelihood has a clear

3    chilling effect on free speech and advocacy.

4    g) The Law Center and I, personally, have been targeted by the

5    "Right Wing Watch" web site of the People for the American

6    Way organization. A collection of some of the headlines that

7    refer to the Law Center or to me in a derogatory manner, and a

8    sample of a full blog post, are attached hereto as **Exhibit N.**

9    [End quotation]

10   43.    Indeed, having studied philanthropic giving extensively and intensively

11   for many years, I see the Law Center and its donors as presenting a paradigmatic

12   illustration of why the ability to donate anonymously is so essential—and why

13   donors' insistence upon their anonymity is so well justified. For the reasons I have

14   stated, these propositions generally hold for charitable organizations and their donors

15   around the country. Yet they hold especially true for this charitable Law Center and

16   its donors, as compared to others, given the demonstrated and pronounced threats

17   against them and the controversial, politically contested, high-profile, and often

18   inflammatory nature of their association in the eyes of many.

19   **E. Registry Unable to Keep Information From Public**

20   44.    The reasonably grounded importance of maintaining anonymity extends

21   to disclosure of a donor's name and address to the Attorney General on the Law

22   Center's Schedule B. According to the expert report and courtroom testimony of Dr.

23

24

1  James McClave[54] in *Americans for Prosperity Foundation v. Kamala Harris*, there is

2  clear evidence that the Attorney General has not been able to guarantee either the

3  legal or technical confidentiality of documents with donor-identifying information.  In

4  fact, the IRS instructions for 990 Schedule B caution charities not to include Schedule

5  B with state returns precisely because states "might inadvertently make the schedule

6  available for public inspection along with the rest of the Form 990 or 990-EZ."[55]

7         45.    In his declaration, Thompson explicates the rationale for not making The

8  Center's Schedule B available to the current Attorney General: "It is particularly

9  disturbing because, unlike the IRS, AG Harris is not restricted by law from disclosing

10  the Law Center's donor list to others. Although I understand that there is a 'policy' in

11  place to not do so, policies are not irrevocable and could be changed tomorrow, or by

12  the next Attorney General. The policy could easily be changed after the private donor

13  information is disseminated by the Law Center and in the hands of the AG's office,

14  thus making the private information vulnerable to exposure at the AG's whim to any

15  third party or the public at large. Constitutional rights require far greater protection

16  from an elected official than an 'I promise.'"

17         46.    Indeed, as I understand from Dr. McClave's expert report and court

18  testimony, the Registry has demonstrably failed to keep donor information private in

19  this exact same way:  I understand the Americans For Prosperity Foundation has

20  discovered that more than *1,400* Schedule Bs, complete with donor names and

21

22  [54] [Case No. 2:14-cv-09448-R-FFM **EXPERT REPORT OF DR. JAMES T. MCCLAVE** Trial

23  Date: February 23, 2016, Action Filed: December 9, 2014, Judge: Hon. Manuel L. Real--Signed November 25, 2015 and during the trial beginning February 23, 2016].

24  [55] Schedule B (Form 990, 990-EZ, or 990-PF), Schedule of Contributors, 2012.

1  addresses, were publicly viewable and downloadable from the Registry's website.[56]

2  Testifying on behalf of the Registry, Kevis Foley admitted that in the previous

3  instances of the Registry's failure to keep Schedule Bs confidential, the Attorney

4  General made no effort to notify the non-profits whose donor information was

5  exposed.[57]

6        47.    According to the Center for Responsive Politics, "For the last two years,

7  the IRS has released a set of summary data from all annual tax returns—form 990s—

8  filed by tax-exempt organizations during the previous year.  These 'extracts' provide

9  more extensive data than in previous years.  Containing 245 fields (up from 62 in the

10  2012 extracts) the extracts allow users to perform detailed searches of returns filed in

11  2013 (primarily covering 2012).  Thus, users looking only for the groups that reported

12  spending to influence elections, for instance, or gave out grants to other organizations

13  can do so.  This search function created by the Center for Responsive Politics allows

14  users to find data on specific groups, but it also has a set of pre-determined browsing

15  capabilities for organizations with certain financial characteristics that might be of

16  interest."[58]  This function has recently been curtailed for all 990s because "[t]he

17  organization that provides them, Resource.org, has discontinued public access to

18  protest IRS procedures for providing and cleaning the documents."[59]  If this browsing

19

20        [56]  Foley Dep. 215:19–219:10, Nov. 3, 2015; Exhibit 56: List of Schedule Bs available on Registry Website.

21        [57]  Foley Dep. 128:13–130:1, 137:2–8; Exhibit 15:  Responses and Objections of Defendant Attorney General Kamala D. Harris to Plaintiff Americans for Prosperity Foundation's First Set of Interrogatories at 33, Americans for Prosperity Found. v. Harris, No. 14-09448 (C.D. Cal. Dec. 9, 2014).

22

23        [58]  *2013 IRS 990 Extracts Search*, OPENSECRETS, www.opensecrets.org/outsidespending/nonprof_extracts.php (last accessed Nov. 23, 2015).

24        [59]  *2013 IRS 990 Extracts Search:  Americans for Prosperity*, OPENSECRETS, (footnote continued)

capability becomes available for 990's filed with a state, then the discovery of mistakenly revealed Schedule Bs and the names of contributors would be even more readily accessible than it was to the Plaintiff's attorneys.

### F. **Threatened Disclosure of Schedule B Donors Would Chill Donor Behavior**

48.     In addition to confidentiality concerns about the revelation of their names to the public, the Law Center's donors' have a special reason to be concerned about disclosure of their names and addresses to the State of California.  In particular, they have reason to fear that, because they give to a conservative leaning nonprofit, a liberal leaning state administration may not protect their identities.  Under all of the circumstances, requiring the Law Center to disclose the names and addresses of its donors—who have healthy fear of government and who have witnessed retaliation by government officials to conservative causes—to the Registry would reasonably chill their contributions to the Law Center and truncate their liberty.

49.     I also note that the Attorney General herself is currently running for the Senate.   If nothing else, reasonable questions loom about how a successor Attorney General would approach Schedule Bs and any confidentiality attaching to same, especially in the absence of any on-point provision of California law that addresses this point and in the wake of acknowledgements by the Attorney General's own attorneys that it depends on the exercise of discretion.

50.     It is unambiguously legitimate and reasonable for the Law Center's donors to insist upon a clear, unequivocal assurance that their names will not be

---

https://www.opensecrets.org/outsidespending/nonprof_extracts_ein.php?ein=753148958 (last accessed Nov. 23, 2015).

1   disclosed beyond the IRS to the California Registry and to all other states.  Indeed,

2   other charities that only report donors who give 2% or more of the charity's donations

3   and have a limited number of donors on their Schedule B submitted to the IRS, must

4   protect those donors if they are to curtail a chilling effect on donations and

5   participation.  *A fortiori*, it is even more incumbent upon the Law Center, that reports

6   on Schedule B donors who contributed $5,000 or more, to protect this longer list of

7   vulnerable donors.

8         51.     For these reasons, if Schedule Bs are subject to broader disclosure to

9   California, there will be an unavoidable and widespread resulting chill that would

10  extend even to many donors whom the Law Center is not required to list on Schedule

11  B.  More importantly still, there will predictably be resulting damage to the

12  individuals, including harassment, loss of business revenue due to boycotts, loss of

13  jobs, and in general a clear social and political violation of the right to privacy as a

14  pillar of the freedom of association and free expression of religion.  Such

15  associational freedom protects individuals from what Alexis de Tocqueville

16  documented as the potential for "the tyranny of the majority" in American

17  democracy.[60]  Tocqueville confirms Thomas More Law Center's important function

18  to protect free expression of religion, and why it needs to be protected from chilling.

19  "For as public opinion grows to be more and more the first and most irresistible of

20  existing powers, the religious principle has no external support strong enough to

21  enable it long to resist its attacks."  The Law Center is a religiously motivated and

22

23        [60]  ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA (ASGRP e-text, 1997) (1835), *available
24   at* http://xroads.virginia.edu/~HYPER/DETOC/toc_indx.html.

1  engaged voluntary association that, as Tocqueville explains, enables religion to resist

2  such attacks from public opinion and social policy.  Regarding the legal mission of

3  the Law Center, Tocqueville is prescient: "When the American people are intoxicated

4  by passion or carried away by the impetuosity of their ideas, they are checked and

5  stopped by the almost invisible influence of their legal counselors." Disclosure of

6  donor names to the State of California threatens donors with the very real prospect of

7  public exposure to the majority and its tyranny, and undercuts the mission of The

8  Thomas More Law Center, a charitable organization dedicated to resist this tyranny

9  through legal channels.

10

11                          Respectfully Submitted,

12

13                          *Paul G. Schervish*

14                          Dr. Paul G. Schervish
                            March 30, 2016

15

16

17  4827-8842-6287, v. 1

18

19

20

21

22

23

24

1

2

**PROOF OF SERVICE**

3

***Thomas More Law Center v. Kamala Harris***
UNITED STATES DISTRICT COURT – CENTRAL DISTRICT,
CASE NO. 2:15-cv-03048-R-FFM

4

5

6

I am employed in the County of San Francisco, State of California.  I am
over the age of 18 and not a party to this action.  My business address is 425
California Street, Suite 2100, San Francisco, California, 94104.  On the execution
date below and in the manner stated herein, I served the following documents:

7

8

9

**EXPERT REPORT OF DR. PAUL G. SCHERVISH**

10

11

on all interested parties in this action by placing [  ] the original or [  ] a true copy
of the original thereof enclosed in sealed envelopes addressed as follows:

12

13

14

Kim L. Nguyen, Esq.                    Kevin A. Calia, Esq.
Deputy Attorney General                Deputy Attorney General
Department of Justice                  Department of Justice
Office of the Attorney General         Office of the Attorney General
300 South Spring Street, Suite 1702    1300 I Street, Suite 125
Los Angeles, CA 90013                  Sacramento, CA 95814
kim.nguyen@doj.ca.gov                  kevin.calia@doj.ca.gov

15

16

17

18

19

20

[X]    BY MAIL I deposited such envelope(s) with postage thereon fully prepaid in
the United States mail at a facility regularly maintained by the United States Postal
Service at San Francisco, California.  I am readily familiar with the firm's practice
of collecting and processing correspondence for mailing.  Under the practice it
would be deposited with the U.S. Postal Service on that same day with postage
thereon fully prepaid at San Francisco, California in the ordinary course of
business.  I am aware that on motion of the party served, service is presumed
invalid if postal cancellation date or postage meter date is more than one day after
date of deposit for mailing, pursuant to this affidavit.

21

22

23

24

25

26

27

[X]    I declare under penalty of perjury under the laws of the State of California
that the above is true and correct.

28

- 1 -

PROOF OF SERVICE

1    Executed on March 30, 2016, at San Francisco, California.

2

3

4                              Alexandra Guardado

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE