1   Kamala D. Harris
    Attorney General of California
2   TAMAR PACHTER
    Supervising Deputy Attorney General
3   ALEXANDRA ROBERT GORDON
    State Bar No. 207650
4   KIM L. NGUYEN
    State Bar No. 209524
5   JOSE A. ZELIDON-ZEPEDA
    State Bar No. 227108
6   KEVIN A. CALIA
    State Bar No. 227406
7   Deputy Attorneys General
     1300 I Street
8    Sacramento, CA  945814
     Telephone:  (916) 322-6114
9    Fax:  (916) 324-8835
     E-mail:  Kevin.Calia@doj.ca.gov
10  *Attorneys for Defendant Attorney General Kamala*
    *Harris*

11              IN THE UNITED STATES DISTRICT COURT

12           FOR THE CENTRAL DISTRICT OF CALIFORNIA

13                      WESTERN DIVISION

14

15

16

| | |
|---|---|
| 17  **THOMAS MORE LAW CENTER,** | 2:15-cv-03048-R-FFM |
| 18                              Plaintiff, | **KAMALA D. HARRIS'S REPLY IN SUPPORT OF DEFENDANT'S** |
| 19       **v.** | **CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| 20 | |
| **KAMALA HARRIS, in her Official** | Date:        July 18, 2016 |
| 21  **Capacity as Attorney General of the** | Time:        10:00 a.m. |
| **State of California,** | Courtroom:  8, 2nd Floor |
| 22 | Judge:       The Honorable Manuel |
| | L. Real |
| 23                              Defendant. | Trial Date:  August 9, 2016 |
| | Action Filed: April 23, 2015 |

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................... 1

ARGUMENT ............................................................................................ 1

    I.      Evidence of Actual First Amendment Harm Is Required .................... 2

    II.     The Law Center Must Show That Any First Amendment Harm Is "Due To" or "Flowing From" The Nonpublic Schedule B Reporting Requirement ............................................................................. 7

    III.    The Law Center Has No Evidence That Donors Would Experience Harm Flowing From The Nonpublic Schedule B Reporting Requirement ......................................................................... 8

         A.     The Law Center Has No Evidence That Donors Have Experienced Harm Flowing From The Nonpublic Schedule B Reporting Requirement. ........................................... 9

         B.     Evidence of Harm to The Law Center's Clients Flowing from Their Public Activities Is Not Sufficient. ...................... 12

         C.     The Law Center Has No Evidence of a "Reasonable Probability" That Donors Would Experience Harm Flowing From The Nonpublic Schedule B Reporting Requirement ................................................................................. 13

    IV.    The Attorney General Has Met The Requirements Of Rule 56(a) ..... 16

CONCLUSION ...................................................................................... 19

# TABLE OF AUTHORITIES

**Page**

CASES

*Americans for Prosperity Foundation v. Harris*
    809 F.3d 536 (9th Cir. 2015)........................................................................*passim*

*Brown v. Socialist Workers '74 Campaign Comm.*
    459 U.S. 87 (1982) ...............................................................................3, 4

*Buckley v. Valeo*
    424 U.S. 1 (1976) .................................................................................3, 4

*Carmen v. San Francisco Unified School District*
    237 F.3d 1026 (9th Cir. 2001)...............................................................15

*Chiron Corp. v. Genentech, Inc.*
    268 F. Supp. 2d 1139 (E.D. Cal. 2002).................................................18

*Chula Vista Citizens for Jobs and Fair Competition v. Norris*
    782 F.3d 520 (9th Cir. 2015) (en banc)................................................12

*Citizens United v. Fed. Election Comm'n*
    558 U.S. 310 (2010) ...........................................................................6, 8

*Coca-Cola Co. v. Overland, Inc.*
    692 F.2d 1250 (9th Cir. 1982)...............................................................15

*Community Service Broadcasting of Mid-America., Inc. v. FCC*
    593 F.2d 1102 (D.C. Cir. 1978) ..............................................................5

*Ctr. for Competitive Politics v. Harris*
    784 F.3d 1307 (9th Cir. 2015)...............................................................*passim*

*Davis v. Fed. Election Comm'n*
    554 U.S. 724 (2008) ................................................................................3

*Doe v. Harris*
    772 F.3d 563 (9th Cir. 2014)....................................................................6

*Dole v. Local Union 375, Plumbers Int'l Union of America*
    921 F.2d 969 (9th Cir. 1990)....................................................................4

1

2

**TABLE OF AUTHORITIES**
(continued)

Page

3

4

*Friends Soc. Club v. Sec'y of Labor*
   763 F. Supp. 1386 (E.D. Mich. 1991) ...................................................5

5

6

*Gemini Ins. Co. v. W. Marine Ins. Servs. Corp.*
   No. 21-CV-3172-KJM, 2016 WL 3418413 (E.D. Cal. June 22,
   2016).................................................................................................18

7

8

*Great Am. Assurance Co. v. Liberty Surplus Ins. Corp.*
   669 F. Supp. 2d 1084 (N.D. Cal. 2009)..............................................14

9

10

*Howe v. Varity Corp.*
   36 F.3d 746 (8th Cir. 1994) ................................................................2

11

12

*John Doe No. 1 v. Reed*
   561 U.S. 186 (2013) .........................................................................4, 8

13

14

*John Doe No. 1 v. Reed*
   823 F. Supp. 2d 1195 (W.D. Wash. 2011) ......................................3, 11

15

16

*Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. Waterfront*
   *Comm'n of New York Harbor*
   667 F.2d 267 (2d Cir. 1981) ...............................................................5

17

18

*McIntyre v. Ohio Elections Commission*
   514 U.S. 334 (1995) ...........................................................................6

19

20

*NAACP v. Alabama*
   357 U.S. 449 (1958) ...........................................................................3

21

22

*Ochoa v. McDonald's Corp.*
   133 F. Supp. 3d 1228, 1232 (N.D. Cal. 2015) ..................................16

23

24

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v.*
   *U.S. Dep't of Agr.*
   499 F.3d 1108 (9th Cir. 2007)..............................................................2

25

26

*Riley v. Nat'l Federation of the Blind of North Carolina, Inc.*
   487 U.S. 781 (1988) ...........................................................................8

27

28

*Shelton v. Tucker*
   364 U.S. 479 (1960) .........................................................................4, 5

**TABLE OF AUTHORITIES**
**(continued)**

Page

*State Farm Fire & Cas. Co. v. Geary*
   699 F. Supp. 756 (N.D. Cal. 1987) ................................................................ 16

*Talley v. California*
   362 U.S. 60 (1960) ....................................................................................... 6

*United States v. Cote*
   51 F.3d 178 (9th Cir. 1995) ............................................................................ 2

*United States v. Joy*
   192 F.3d 761 (7th Cir. 1999) ................................................................. 14, 15

*Visser v. Packer Engineering Associates, Inc.*
   924 F.2d 655 (7th Cir. 1991) ...................................................................... 15

*Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*
   860 F. Supp. 1448 (C.D. Cal. 1993) ........................................................... 16

**RULES**

Federal Rules of Civil Procedure
   56 .............................................................................................................. 16

v

**INTRODUCTION**

In response to the Attorney General's motion for partial summary judgment, the Law Center admits key facts demonstrating that it cannot meet its burden to prove First Amendment harm.  The Law Center concedes that it lacks evidence that anyone has ever declined to donate because the Law Center is required to confidentially disclose their identities and donations to a government agency, which would use the information solely for law enforcement purposes.  The Law Center further admits that it lacks evidence that any harm has come to its donors resulting from confidential disclosures to a government agency, including annual disclosures of its Schedule B to the Internal Revenue Service (IRS).  Nor does the Law Center dispute that although at least 18 of its donors have themselves *publicly* disclosed at least 48 separate contributions, it has no evidence that any of these donors suffered any harm as a result.  These admissions demonstrate that there is no substance to the Law Center's claim that donors are reasonably likely to suffer harm from *nonpublic* disclosure.

Instead of offering evidence that would satisfy the governing legal standard, the Law Center argues that it need not demonstrate actual First Amendment harm, and/or that it can do so with evidence of harassment suffered by a few of its *clients* who *publicly* engaged in controversies.  These arguments cannot be squared with controlling Ninth Circuit law and should be rejected.

Because the Law Center offers no evidence of cognizable First Amendment harm, the Court should enter partial summary judgment against it, denying an injunction on the grounds  that the Law Center has failed to show that the Attorney General's *nonpublic* Schedule B reporting requirement would burden First Amendment rights to free speech and association as applied to the Law Center.

**ARGUMENT**

The Law Center's opposition rests on an untenable argument that the Ninth Circuit's prior decision in this case is not binding.  (ECF No. 87 at 4, 8, 12, 15.)

1

Inarguably, the Ninth Circuit's decision does bind the Law Center and this Court on all issues of law. *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agr.*, 499 F.3d 1108, 1114 (9th Cir. 2007) (conclusions from preliminary injunction appeal on "pure issues of law" are binding); *United States v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995) ("The law of the case doctrine states that the decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case."); *see also Howe v. Varity Corp.*, 36 F.3d 746, 752 (8th Cir. 1994) (where appellate court addressing grant or denial of a preliminary injunction reaches legal issues at the heart of a case, these holdings are subsequently binding on remand).

In *Americans for Prosperity Foundation v. Harris*, 809 F.3d 536 (9th Cir. 2015) ("*AFPF*"), the Ninth Circuit explained precisely what the Law Center must show to prevail on its claim that the Attorney General's "nonpublic disclosure requirement is unconstitutional as applied to [it] because it impermissibly burdens First Amendment rights to free speech and association by deterring individuals from financially supporting [the Law Center]." *Id.* at 538. That is, the Law Center must "show a reasonable probability that the compelled disclosure of its contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties that would warrant relief on an as-applied challenge." *Id.* (quoting *Ctr. for Competitive Politics v. Harris*, 784 F.3d 1307, 1311 (9th Cir. 2015)). The Law Center's admissions demonstrate conclusively that it lacks evidence sufficient to meet this standard.

## I.   EVIDENCE OF ACTUAL FIRST AMENDMENT HARM IS REQUIRED

The Law Center rehashes its failed argument that it need not have evidence of actual First Amendment harm, based on what it mistakenly contends is a "long history of cases that have found actual instances of harm to anonymous donors to highly controversial causes to be unnecessary." (ECF No. 87 at 15.) In *Center for*

*Competitive Politics*, the Ninth Circuit squarely rejected this "novel theory" because it is "not supported by our case law or by Supreme Court precedent." *Ctr. for Competitive Politics*, 784 F.3d at 1312; *see also Davis v. Fed. Election Comm'n*, 554 U.S. 724, 744 (2008) (stating that a party must establish an actual burden on its rights caused by the challenged disclosure); *Buckley v. Valeo*, 424 U.S. 1, 74 (1976) (refusing to presume injury from disclosure requirement).  In addition, the Ninth Circuit previously rejected this argument in this case, holding that "[w]ithout showing actual harm, [the Law Center] cannot enjoin the Attorney General from enforcing the disclosure requirement." *AFPF*, 809 F.3d at 541.  This is a holding on a pure issue of law, and it governs in this case.

The Law Center relies on cases that do not support its argument. (ECF No. 87 at 17-18.)[1]  For example, the Law Center cites *Buckley v. Valeo*, 424 U.S. at 74, for the proposition that "minor parties" must be allowed flexibility in the type of proof that is required and that "new parties that have no history upon which to draw may be able to offer evidence of reprisals and threats directed against individuals or organizations holding similar views." (ECF No. 87 at 17.)  *Buckley*, however, does not support the Law Center's position.

The Law Center has not established (and cannot establish) that it is a "minor" or "new" party, much less the type of organization for which disclosure would so chill association that the organization could not survive.  *See, e.g.*, *NAACP v. Alabama*, 357 U.S. 449, 462 (1958); *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 98-101 (1982); *see also John Doe No. 1 v. Reed*, 823 F. Supp. 2d 1195, 1204 (W.D. Wash. 2011) (granting defense motion for summary judgment on as-applied First Amendment claim where plaintiff "has not provided competent

---

[1] As discussed in the Attorney General's Opposition to Plaintiff's Motion for Summary Judgment, the argument that the Law Center need not adduce evidence of actual First Amendment harm is also foreclosed by the Ninth Circuit's ruling in *Center for Competitive Politics* that the Schedule B requirement is facially constitutional.  (*See* ECF No. 86 at 6 (citing *Ctr. for Competitive Politics*, 784 F.3d at 1314, 1317).)

evidence that it is in any material way similar to the organizations, groups, or parties who have received the as-applied exemption in the past").  In *Buckley*, the Supreme Court concluded that a flexible standard of proof is available to minor parties because the "governmental interest in disclosure is diminished when the contribution in question is made to a minor party with little chance of winning an election."  424 U.S. at 70.  Minor parties, as the Court explained, are likely to be financially vulnerable and "fears of reprisal may deter contributions to the point where the movement cannot survive."  *Id.* at 71.  Minor parties have "small constituencies and promot[e] historically unpopular and almost universally-rejected ideas."  *Id.*; *see, e.g.*, *Brown*, 459 U.S. at 88 (Socialist Workers Party was "unpopular, vilified, and historically rejected by the government and the citizenry"); *John Doe No. 1 v. Reed*, 561 U.S. 186, 215 (2013) (Sotomayor, J., concurring) ("Case specific relief may be available . . . in the rare circumstance in which disclosure poses a reasonable probability of serious and widespread harassment that the State is unwilling or unable to control."); *cf. Dole v. Local Union 375, Plumbers Int'l Union of America*, 921 F.2d 969, 973 (9th Cir. 1990) (noting that union was not a minor party because it was not "politically weak, politically unpopular, or politically disadvantaged").

Similarly, the other cases the Law Center cites are inapposite and do not relieve it of the burden of showing of actual First Amendment harm.  In *Shelton v. Tucker,* the Supreme Court held unconstitutional a state statute compelling every teacher, as a condition of employment in a state-supported school or college, to file annually an affidavit listing every organization to which he belonged or regularly contributed within the preceding five years, as to teachers who were hired on a year-to-year basis and who had no job security beyond the end of each school year.  364 U.S. 479, 480 (1960).  There, the Court noted that the "statute does not provide that the information it requires be kept confidential.  Each school board is left free to deal with the information as it wishes."  *Id.* at 486.  It further stated that "[s]uch

4

interference with personal freedom is conspicuously accented when the teacher serves at the absolute will of those to whom the disclosure must be made," and thus, that "[e]ven if there were no disclosure to the general public, the pressure upon a teacher to avoid any ties which might displease those who control his professional destiny would be constant and heavy." *Id.*[2]  Nothing in *Shelton* suggests that the Law Center need not demonstrate First Amendment harm arising from the nonpublic Schedule B disclosure requirement.  *See Friends Soc. Club v. Sec'y of Labor*, 763 F. Supp. 1386, 1397 (E.D. Mich. 1991) (distinguishing *Shelton* and denying First Amendment exemption to disclosure requirement).

In *Community Service Broadcasting of Mid-America., Inc. v. FCC*, 593 F.2d 1102 (D.C. Cir. 1978), the D.C. Circuit considered a direct, content-based regulation of speech.  There, the Federal Communications Commission (FCC) required all noncommercial television and radio stations that received federal funding to record all broadcasts "in which any issue of public importance is discussed" and make these recordings available to the FCC upon request.  *Id.* at 1104-05.  Applying strict scrutiny, the court of appeals invalidated this requirement, finding that it suppressed free expression and addressed no legitimate government interest.  *Id.* at 1111-12, 1122.  This case differs in many significant ways.  The Attorney General's nonpublic Schedule B disclosure requirement does not regulate speech, and does not regulate it based on its content.  In addition, the Ninth Circuit has ruled; 1) that exacting scrutiny, not strict scrutiny, applies to the Schedule B requirement; and 2) that the Attorney General has a compelling government interest in collecting information about donors.  *AFPF*, 809 F.3d at 538-39; *Ctr. for Competitive Politics*, 784 F.3d at 1314.

---

[2] For similar reasons, *Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. Waterfront Comm'n of New York Harbor*, 667 F.2d 267, 271-72 (2d Cir. 1981), which relies heavily on the analysis in *Shelton*, is also inapposite.

1    The Law Center's reliance on cases such as *McIntyre v. Ohio Elections*
2    *Commission*, 514 U.S. 334 (1995), and *Talley v. California*, 362 U.S. 60 (1960), is
3    also misplaced.  Both *McIntyre* and *Talley* involved the "direct regulation of the
4    content of speech" of people wishing to remain anonymous.  *McIntyre*, 514 U.S. at
5    345.  In *McIntyre*, the Supreme Court invalidated an Ohio statute prohibiting the
6    distribution of campaign literature that did not contain the name and address of the
7    person or campaign official issuing the literature.  *Id.* at 357.  In *Talley*, the
8    Supreme Court invalidated as a facial violation of the First Amendment right to free
9    speech an ordinance that prohibited the distribution of "any hand-bill in any place
10   under any circumstances'" that did not have on its face the name and address of the
11   "person who printed, wrote, compiled or manufactured" it, and of the person who
12   distributed it.  362 U.S. at 60-61.  Unlike in those cases, the Schedule B
13   requirement does not compel speech nor  does it "prevent anyone from speaking."
14   *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366 (2010).  Indeed, there
15   is no evidence that the challenged disclosure requirement has any effect on
16   protected expression, let alone that "identification and fear of reprisal might deter
17   perfectly peaceful discussions of public matters of importance."  *Talley*, 362 U.S. at
18   65.

19   Moreover, and unlike in *McIntyre* and *Talley*, the limited amount of donor
20   information disclosed to the state is kept confidential and protected from public
21   disclosure.  *See id; see also Ctr. for Competitive Politics*, 784 F.3d at 1316 n.8
22   (distinguishing *Talley*).  *Doe v. Harris*, on which plaintiff also relies, is similarly
23   inapposite.  772 U.S. 563, 579-80 (9th Cir. 2014) (concluding law "chills
24   anonymous speech because it too freely allows law enforcement to disclose sex
25   offenders' Internet identifying information to the public").

26   In short, the Law Center cannot avoid its burden to establish a showing of
27   actual harm to its First Amendment rights arising from the challenged disclosure
28   requirement.  *See, e.g.*, *AFPF*, 809 F.3d at 540.

1

2

## II.   THE LAW CENTER MUST SHOW THAT ANY FIRST AMENDMENT HARM IS "DUE TO" OR "FLOWING FROM" THE NONPUBLIC SCHEDULE B REPORTING REQUIREMENT

3  In another attempt to avoid the governing legal standard, the Law Center

4  argues that "disclosure [of its Schedule B forms] to the Attorney General would be

5  a 'public disclosure.'  The right to one's anonymity is broken when one's identity is

6  disclosed, whether to an office of 50 regulators or to the Internet."  (ECF No. 87 at

7  4.)  The Law Center argues that the Ninth Circuit "uses the word 'nonpublic' in a

8  particular sense" (ECF No. 87 at 4), and quotes out of context one of the nine times

9  the Ninth Circuit used the word "nonpublic" (ECF No. 87 at 5).

10  This argument lacks any substance.  The Ninth Circuit specifically uses the

11  word "nonpublic" to describe the Attorney General's Schedule B disclosure

12  requirement.  "The Attorney General's Schedule B disclosure requirement seeks

13  only *nonpublic* disclosure of these forms, and she seeks them solely to assist her in

14  enforcing charitable organization laws and ensuring that charities in the Registry

15  are not engaging in unfair business practices."  *AFPF*, 809 F.3d at 538 (emphasis

16  added).  The court distinguished the Attorney General's Schedule B disclosure

17  requirement "from state requirements mandating *public* disclosure—such as those

18  often found in the regulation of elections—that are intended to inform the public

19  and promote transparency."  *Id.* (emphasis added).  It held that it was bound by its

20  prior holding in *Center for Competitive Politics* that "the Attorney General's

21  *nonpublic* Schedule B disclosure regime is facially constitutional."  *Id.* (emphasis

22  added); *see also id.* at 541 ("As we have held, compelled *nonpublic* disclosure of

23  Schedule B forms to the Attorney General is not itself First Amendment injury.")

24  (emphasis added) (citing *Ctr. for Competitive Politics*, 784 F.3d at 1314).

25  It could not be more clear or more settled that the Ninth Circuit considers the

26  Attorney General's Schedule B disclosure requirement to be nonpublic.  Turning to

27  the Law Center's as-applied challenge, the Ninth Circuit described the Law

28  Center's argument that "the Attorney General should be enjoined from collecting

1    [its] Schedule B forms, even for *nonpublic* use in enforcing the law." *Id.* at 539

2    (emphasis added).  The court of appeals concluded that the Law Center had "not

3    shown the demand for *nonpublic* disclosure of their Schedule B forms to the

4    Attorney General has *actually chilled* protected conduct or would be likely to do

5    so." *Id.* at 540 (first emphasis added); *see also id.* at 541 ("In sum, the plaintiffs

6    have failed to demonstrate any actual burden on First Amendment rights flowing

7    from the Attorney General's demand for and collection of their Schedule B forms

8    for *nonpublic* use.") (emphasis added).

9         Thus, the Law Center's argument that the Attorney General's Schedule B

10   disclosure requirement is public, rather than nonpublic, is wholly unconvincing.[3]

11   The Attorney General did not "create[] an artificial distinction" between public and

12   nonpublic use (ECF No. 87 at 3), nor is there anything "false" or "nonsensical"

13   about the "public/nonpublic dichotomy" (ECF No. 87 at 6).  This distinction is

14   Ninth Circuit law.

15   **III.  THE LAW CENTER HAS NO EVIDENCE THAT DONORS**
       **WOULD EXPERIENCE HARM FLOWING FROM THE**
16   **NONPUBLIC SCHEDULE B REPORTING REQUIREMENT**

17        The Law Center submitted a Statement of Genuine Disputes of Material Facts

18   in which it admits it lacks evidence sufficient to show there remains a genuine issue

19   for trial.  (ECF No. 57-2 (disputing only facts numbered 5, 9, 10, 15, 21, 25, and

20   33).)  For example, the Law Center admits that it has "no evidence that anyone has

21   ever declined to donate to the Law Center because their donor status would have to

22   be confidentially disclosed to a government agency which would use the

23   information solely for law enforcement purposes."  (ECF No. 77, No. 1; Calia

24        [3] Even public disclosure requirements do not, standing alone, violate First
25   Amendment rights.  The Supreme Court and the Ninth Circuit have consistently
     upheld regulations that do require public disclosure of donors.  *See, e.g., John Doe*
26   *No. 1*, 561 U.S. at 192-93; *Citizens United*, 558 U.S. at 366-371; *Riley v. Nat'l*
     *Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 800 (1988).  And the
27   Ninth Circuit has already determined that the Law Center's evidence is likely
     inadequate to establish cognizable First Amendment harm, even from public
28   disclosure of its Schedule B donor information.  *See AFPF*, 809 F.3d at 542.

8

Decl.[4] Ex. K [Interrogatory Responses Ex. 22] Nos. 13, 14, and 25; Calia Decl. Ex. A [Thompson Dep.] 89:17-21, 204:15-19.)  The Law Center further admits that it has no evidence that confidential disclosure to a government agency, including its annual disclosures of its Schedule B to the IRS, causes donors any harm.  (ECF No. 77, Nos. 2, 3, 4, 22; ECF No. 57 at ¶¶ 5; 10, 13; Calia Decl. Ex. A [Thompson Dep.] 88:16-89:21.)  The Law Center does not dispute that at least 18 of its donors have publicly disclosed at least 48 separate contributions (ECF No. 77, No. 6; Calia Decl. Ex. A [Thompson Dep.] 58:4-17), and that there is no evidence that any of these donors suffered any harm because of their contributions.  (ECF No. 77, No. 6; Calia Decl. Ex. A [Thompson Dep.] 58:4-17.)  This lack of evidence of cognizable First Amendment harm, even from public disclosure, is fatal to the Law Center's claim that donors are reasonably likely to suffer harm from *nonpublic* disclosure.

**A.**   **The Law Center Has No Evidence That Donors Have Experienced Harm Flowing from the Nonpublic Schedule B Reporting Requirement.**

The scant evidence on which the Law Center relies undermines, rather than supports, its claims.  The Law Center admits that most of its evidence of harm come from clients who are publicly engaged on issues, not from donors who prize their anonymity.  (ECF No. 87 at 10-12.)

The Law Center has evidence that relates only to two donors, none of which demonstrates that a "reasonable probability" of harm is "due to" or "flowing from" the Attorney General's *nonpublic* Schedule B reporting requirement.  *AFPF*, 809 F.3d at 541.  The Law Center makes much of a letter from an potential donor who wished to remain anonymous out of concern that ISIS might break into the Law Center's offices, steal a donor list, and use it to target donors.  (ECF No. 87 at 9.) This evidence does not show that any harm would flow from compliance with the

---

[4] References to the "Calia Decl." are to the Declaration of Kevin A. Calia in Support of Defendant's Cross Motion for Partial Summary Judgment.  (ECF No. 76.)

1  Attorney General's nonpublic Schedule B reporting requirement.  This donor's

2  expressed concern is that ISIS will obtain the Law Center's internal list of donors,

3  not about confidential disclosure to the Attorney General, or for that matter, to the

4  IRS.  The Law Center does not even know the name of this donor, and thus could

5  not possibly disclose the donor's name to the Attorney General or to the IRS.  Even

6  if the donor's name were known to the Law Center, it is undisputed that his or her

7  $25 donation would never have been listed on the Law Center's Schedule B form,

8  and so would not be disclosed to the Attorney General, or the IRS.  The Law

9  Center's Schedule B lists contributions of $5,000 or more, and the Law Center

10  admits it could have used an even higher threshold of as much as $38,000 in some

11  years.  (ECF No. 77, Nos. 19, 20; Calia Decl. Ex. A [Thompson Dep.] at 84:1-

12  88:10, 198:4-7.)

13      The only other donor the Law Center offers is Thomas Monaghan, who is also

14  a member of its board.  But the evidence relating to potential harm to Mr.

15  Monaghan cannot be separated from his public engagement (including as a member

16  of the Law Center's board), and thus is not evidence of harm that might flow from

17  compliance with the Attorney General's nonpublic Schedule B reporting

18  requirement.  The Law Center admits that Mr. Monaghan is "a publicly active

19  advocate for many of the same causes that the Law Center supports" (ECF No. 87

20  at 8), and that at least some of the "harassment" faced by Mr. Monaghan was "for

21  his public beliefs," and was not because of his connection with the Law Center

22  (ECF No. 87 at 8).[5]

---

23      [5] The Law Center also exaggerates Mr. Monaghan's testimony in several key
24  respects.  For example, there is no admissible evidence to support the claim that Mr.
   Monaghan received "hate mail threatening physical violence."  (ECF No. 87 at 9.)
25  Rather, Mr. Monaghan testified:  "I don't see the mail."  (Calia Decl. Ex. E
   [Monaghan Dep.] at 35:17-22.)  In particular, he has never seen any mail that
26  threatened him with physical harm or that referenced his service on the Law
   Center's board in a negative light, and he is not aware of any mail that was ever
27  reported to law enforcement.  (Calia Decl. Ex. E [Monaghan Dep.] at 36:2-37:8,
   49:13-16.)  As for the time his "front gate" was "smashed," Mr. Monaghan testified
28  that he has no reason to think this incident was connected to any relationship he has

(continued…)

1    The Law Center claims that Mr. Monaghan was once "listed as the number-

2    one most antigay person" on some unidentified list, "as a result of his donations to

3    the Law Center" (ECF No. 87 at 8), but to the extent this could even be

4    characterized as harassment arising from his donor status,[6] it would still fail to

5    demonstrate cognizable First Amendment harm.  It is undisputed that Mr.

6    Monaghan did not change the causes to which he chose to give or the method he

7    used to engage in philanthropy as a result of this incident, and he did not take steps

8    to keep his donations secret.  (ECF No. 77, Nos. 12, 13; Calia Decl. Ex. E

9    [Monaghan Dep.] at 39:18-40:5; *see also* Calia Decl. Ex. E [Monaghan Dep.] at

10   23:9-20 (Monaghan "didn't think about" whether his contributions would be

11   disclosed and his donations were not "meant to be a secret"), 41:16-23 (Monaghan

12   hasn't changed his giving based on "critics"), 60:21-61:22 (Monaghan has "lived

13   with [criticism] just fine" because of his attitude inspired by his religious beliefs).)

14   This does not rise to the level of harm that has been required in the few cases that

15   have sustained as-applied challenges to (public) disclosure requirements.  *See, e.g.*,

16   *John Doe No. 1*, 823 F. Supp. 2d at 1204 (granting summary judgment for

17   defendants on as-applied First Amendment claim where party "has not provided

18   competent evidence that it is in any material way similar to the organizations,

19   groups, or parties who have received the as-applied exemption in the past").

20

21

22   _____

23   (…continued)
     with the Law Center, as opposed to other causes such as an accident, vandalism, or
24   an attempt at theft.  (Calia Decl. Ex. E [Monaghan Dep.] at 49:21-50:22.)

25        [6] Mr. Monaghan did not know why he was included on this list; he
     speculated that it "may have been because of the Thomas More [Law Center]"
26   because he did not know for "what other reason [he] would have been on that list."
     (Calia Decl. Ex. E [Monaghan Dep.] at 39:5-17.)  There is no evidence to connect
27   Mr. Monaghan's inclusion on the list to his donations, as opposed to his public
     status as a member of the Law Center's board.  (ECF No. 77, No. 11; Calia Decl.
28   Ex. E [Monaghan Dep.] at 48:9-49:5.)

## B. Evidence of Harm to the Law Center's Clients Flowing from Their Public Activities Is Not Sufficient.

Without any evidence that its donors will suffer First Amendment harm were it to comply with the Schedule B requirement, the Law Center submits evidence that a few of its *clients* have faced harassment after engaging in controversial *public* activities.  (*See* ECF No. 53-1 [Geller Decl.]; ECF No. 54 [Spencer Decl.]; ECF No. 56 [Kern Decl.].)  In particular, the Law Center relies heavily on a "fatwah" issued against one of its clients, Pamela Geller, which states that "[e]veryone who houses her events, gives her a platform to spill her filth are legitimate targets."  (ECF No. 87 at 16.)  The Law Center reasons that because it publicly represents Ms. Geller, who has been the victim of attempted violence, the Law Center's donors, if known, would be "targeted" by jihadists.  (*See* ECF No. 87 at 15-16.)

This is not evidence of cognizable First Amendment harm because it posits harm to a client arising from public engagement, not harm to donors arising from the Attorney General's nonpublic Schedule B disclosure requirement.  As discussed above, the Ninth Circuit has held that evidence "directed not against [plaintiff itself], but against prominent public figures" is inadequate to establish an actual burden on First Amendment rights arising from the Schedule B requirement.  *AFPF*, 809 F.3d at 541; *see also Ctr. for Competitive Politics*, 784 F.3d at 1316 ("In contrast to the *Buckley* plaintiffs, CCP does not claim and produces no evidence to suggest that their significant donors would experience threats, harassment, or other potentially chilling conduct as a result of the Attorney General's disclosure requirement." ); *Chula Vista Citizens for Jobs and Fair Competition v. Norris*, 782 F.3d 520, 537 (9th Cir. 2015) (en banc) (rejecting First Amendment challenge based on "the hypothetical possibility that someone somewhere might be deterred" from the protected activity).[7]

---

[7] Because there is no evidence that, despite its public representation of Ms. Geller, jihadists (or anyone else) have attacked the Law Center, there is even less

(continued…)

12

1    The Law Center tries to avoid this holding, contending that the *AFPF* decision

2 "does not categorically rule out the Law Center's clients as admissible sources to

3 show reasonable fear on donors' parts [*sic*]," because at the preliminary injunction

4 stage, there was no "direct evidence from the Law Center's clients" before the

5 court. (ECF No. 87 at 13.)  But the Ninth Circuit did not fault the Law Center's

6 evidence for being indirect, but because evidence of harm flowing from "*public*

7 *activities*" is categorically inadequate to demonstrate harm arising from

8 "confidential disclosure of [donors'] identifying information to the Attorney

9 General." *AFPF*, 809 F.3d at 539.  The court of appeals specifically rejected

10 evidence of harassment of the Law Center's clients, including the "fatwah" against

11 Ms. Geller, which was referenced in Mr. Thompson's declaration. (ECF No. 19-2

12 at ¶ 16 and Exs. K and J.)  The Law Center's "direct evidence" (ECF No. 87 at 13)

13 is no more sufficient than its indirect evidence of the same harm.

14          **C.    The Law Center Has No Evidence of a "Reasonable**
               **Probability" That Donors Would Experience Harm Flowing**
15             **from the Nonpublic Schedule B Reporting Requirement.**

16    As evidence of a "reasonable probability" that donors would experience harm

17 were the Law Center to comply with the Schedule B disclosure requirement, the

18 Law Center offers only speculation by witnesses who are not donors.  The Law

19 Center admits facts, however, showing that these declarants were in no position to

20 personally observe facts that would give them a basis for any beliefs they may have

21 about what the Law Center's donors would think, feel, or do. (ECF No. 77, Nos.

22 23-24, 26-32.)[8]  Nevertheless, the Law Center argues that this speculation without

23 _____

(…continued)
24 reason to believe that its donors would be so targeted. (Calia Decl. Ex. H [Geller
   Dep.] at 185:11-15; Calia Decl. Ex. A [Thompson Dep.] at 123:14-124:10, 126:2-
25 130:17; Calia Decl. Ex. E [Monaghan Dep.] at 49:13-51:25.)

26          [8] The Law Center also admits that Ms. Morello did not speak with any
   donors about "what motivates them or might dissuade them from donating." (ECF
27 No. 87-2 at 4.)  The Law Center quibbles about whether she might have spoken
   about some other "issues of substance," despite the undisputed evidence that in the
28 very few communications Ms. Morello had with donors she would simply put the
                                                                    (continued…)

                                             13

1    foundation is proof because its declarants have "direct experience with the costs of

2    advocating for controversial or unpopular causes." (ECF No. 87 at 19; see also

3    ECF No. 87 at 12 (touting witnesses' "personal experience and knowledge as

4    advocates of causes supported by the Law Center").)

5          This evidence suffers from inadequacies similar to the evidence of the fatwah

6    against anyone associated with Ms. Geller, and for similar reasons fails to

7    demonstrate cognizable First Amendment harm. The declarants' experiences, as

8    the Law Center admits, are as advocates, not as donors. The cases on which the

9    Law Center relies recognize that "opinions and inferences must be grounded in

10   observations and experience." *Great Am. Assurance Co. v. Liberty Surplus Ins.*

11   *Corp.*, 669 F. Supp. 2d 1084, 1089 (N.D. Cal. 2009) (citing *United States v. Joy*,

12   192 F.3d 761, 767 (7th Cir. 1999)). The declarants' experience as "advocates"

13   gives them no basis to speculate about the experience of donors. Thus, the Law

14   Center's cases do not govern here. The declarants the Law Center offers are unlike

15   an experienced employee testifying about the contents of a corporate policy that she

16   had read and applied, *Great Am. Assurance Co.*, 669 F. Supp. 2d at 1089, or the

17   personal observations in *Joy*, where the witness "saw" a defendant with the gun and

18   stolen jewelry, saw potential buyers coming to the house to inspect jewelry for

19   possible purchase, and knew of the defendant's prior history of burglary because of

20   a family relationship. 192 F.3d at 767-68. Rather, these declarations, when they

21   speak about donors, violate the most basic rule that the testimony be "grounded in

22   observation or other first-hand personal experience." *See, e.g.*, *Visser v. Packer*

23   ───────────────

(…continued)

24   caller on hold and connect them to someone in the development department. (Calia
     Decl. Ex. C [Morello Dep.] at 33:14-35:2.). Given the critical admission, any
25   remaining dispute is not material. The Law Centers also admits that "Dr. Schervish
     said he was not aware of any donor having expressed fears or harassment, or of a
26   donor stopping or reducing his or her donations." (ECF No. 87-2 at 4.) The Law
     Center then argues that maybe Dr. Schervish will review additional materials at
27   some later time. Any such effort would be too little, too late. The Law Center has
     had its chance to put forward evidence regarding any harassment suffered by its
28   donors and has failed to produce any such evidence.

1   *Engineering Associates, Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc).  They

2   are exactly the type of "flights of fancy, speculations, hunches, intuitions, or rumors

3   about matters remote from [personal] experience" that are inadmissible.  *See id.*

4         The waitresses in *Coca-Cola Co. v. Overland, Inc.* were not permitted to

5   testify about what their customers were thinking when they used the word "Coke."

6   692 F.2d 1250, 1254-55 (9th Cir. 1982); *see also Carmen v. San Francisco Unified*

7   *School District*, 237 F.3d 1026, 1028 (9th Cir. 2001) ("It is not enough for a

8   witness to tell all she knows; she must know all she tells.").  Those waitresses could

9   not dodge this rule simply by adding that they had tasted cola many times and that

10  they had used "Coke" in the generic sense, and therefore their customers must think

11  and feel the same way they did.  That kind of raw speculation is not permitted.

12  *Coca-Cola Co.*, 692 F.2d at 1254-55 ; *Visser*, 924 F.2d at 659.  For the same

13  reasons, the Law Center's witnesses cannot use their completely different

14  experiences as "advocates" to guess about how *donors* must think and feel.[9]

15        Finally, the Law Center posits that the Attorney General's website might be

16  hacked or that its Schedule B forms might be inadvertently disclosed.  (ECF No. 87

17  at 5, 21-22.)  The Ninth Circuit, however, has already rejected this argument,

18  holding that "technical failures or cybersecurity breaches are likely to lead to

19  inadvertent public disclosure" of *the Law Center's* Schedule B forms is "too

20  speculative to support issuance of an injunction."  *AFPF*, 809 F.3d at 541.  The

21  unsupported conjecture —that because another organization's Schedule B was

22  inadvertently posted to the public facing website, the Law Center's Schedule B

23  would also be so inadvertently posted —is exactly what the Ninth Circuit rejected

24  as "too speculative to support issuance of an injunction."  *AFPF*, 809 F.3d at 541;

25  *see also Ctr. for Competitive Politics*, 784 F.3d at 1316 ("Such arguments are

---

26       [9] The absence of evidence that the Law Center's donors receive hateful mail
or other harassment, even when their identities are publicly known (Calia Decl. Ex.

27  A [Thompson Dep.] at 58:4-17; Calia Decl. Ex. E [Monaghan Dep.] at 36:2-37:8,
49:13-16), belies the speculation of the Law Center's declarants.

28

speculative, and do not constitute evidence that would support CCP's claim that disclosing its donors to the Attorney General for her confidential use would chill its donors' participation.").

## IV.  THE ATTORNEY GENERAL HAS MET THE REQUIREMENTS OF RULE 56(a)

Federal Rule of Civil Procedure 56(a) provides that: "A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought."  "Upon a showing that there is no genuine issue of material fact as to particular claims, the Court may grant summary judgment in [a party's] favor upon all *or any part thereof*."  *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 860 F. Supp. 1448, 1450 (C.D. Cal. 1993) (emphasis added).

"The current version of Rule 56 changed the federal summary judgment process by authorizing the Court to grant what is sometimes called partial summary judgment to dispose of less than the entire case and even just portions of a claim or defense."  *Ochoa v. McDonald's Corp.*, 133 F. Supp. 3d 1228, 1232 (N.D. Cal. 2015).  Accordingly, "the Court can, when warranted, selectively fillet a claim or defense without dismissing it entirely."  *Id.*; *see also State Farm Fire & Cas. Co. v. Geary*, 699 F. Supp. 756, 759 (N.D. Cal. 1987) ("Partial summary judgment that falls short of a final determination, even of a single claim, is authorized by Rule 56 in order to limit the issues to be tried.").

In its opposition, the Law Center contends that the Attorney General's cross motion for partial summary judgment is procedurally improper because it "does not address any claim or defense pleaded in this case" and "nowhere in the Attorney General's motion does she identify <u>any</u> claim by the Law Center . . .  to be summarily adjudicated."  (ECF No. 87 at 3 (original emphasis).)

However, the Attorney General has indicated, on multiple occasions, that she is moving for partial summary judgment on the Law Center's claim that the

1  Schedule B disclosure requirement burdens its First Amendment rights to free

2  speech and association.  First, in her Notice of Motion for Partial Summary

3  Judgment, the Attorney General stated:

4      the Attorney General seeks summary judgment on the Thomas More Law
       Center's ('Law Center') claim that the Attorney General's nonpublic Schedule
5      B reporting requirement is unconstitutional as applied to the Law Center
       because it allegedly burdens First Amendment rights to free speech and
6      association.

7  (ECF No. 75 at i.)  Likewise, in her Memorandum of Points and Authorities, the

8  Attorney General again identified the Law Center's First Amendment claim as the

9  claim on which she seeks partial summary judgment, stating:

10     The Law Center has failed to produce any evidence to meet its burden to show
       actual First Amendment harm to its donors (or potential donors).  This failure
11     of proof is fatal to the Law Center's claim and warrants partial summary
       judgment in favor of the Attorney General.
12

13  (ECF No. 75 at 3.)  And, in the memorandum's conclusion, the Attorney General

14  reiterated her request that this Court grant partial summary judgment on the Law

15  Center's claim that the Schedule B reporting requirement burdens its "First

16  Amendment rights to free speech and association as applied to the Law Center."

17  (ECF No. 75 at 15.)  There is no credible argument that the Attorney General has

18  failed to identify a claim on which she seeks partial summary judgment.

19      In addition, the Law Center has asserted throughout this litigation that alleged

20  infringement of its First Amendment rights to free speech and association is the

21  primary basis for its request for injunctive relief.  (*See, e.g.*, ECF No. 10-1 at 5

22  (Plaintiff's Memo. of Points and Authorities ISO Application for Temporary

23  Restraining Order: "Permitting AG Harris to obtain such confidential and protected

24  [Schedule B] information would violate these individuals' freedom of speech and

25  association, among other rights secured by the First Amendment.").)  The Law

26  Center's motion for summary judgment asserts that "the material facts of this case

27  have already been decided in the case of Americans for Prosperity Found. v. Harris,

28  No. CV 14-9448-R, 2016 WL 1610591 (C.D. Cal. Apr. 21,2016)," a case that only

17

1    raised claims for infringement of the First Amendment rights to free speech and

2    association.  (ECF No. 52 at Notice of Motion; *see also* ECF No. 52 at 1.)

3         Nevertheless, the Law Center now argues that granting partial summary

4    judgment on those dispositive issues in favor of the Attorney General would "waste

5    rather than preserve judicial resources[.]"  (ECF No. 87 at 7).  The Law Center,

6    however, does not explain how resolving issues it has identified as dispositive on

7    summary judgment and streamlining trial on its remaining claims would waste

8    judicial resources.[10]  It would not.

9         The Law Center has listed two sets of claims that it intends to pursue at trial:

10   First Amendment claims based on freedom of speech, association, petition, and

11   religious liberty; and Fourth Amendment claims.[11]  (ECF No. 79 at 3-7.)  The Law

12   Center's First Amendment claims based on freedom of speech and freedom of

13   association would be resolved by this motion.  A trial limited to the petition, free

14   exercise, and Fourth Amendment claims would be far narrower than one addressing

15   all of the Law Center's claims, and would save, not waste judicial and party

16   resources.

17

18

19        [10] In its opposition, the Law Center cites to two cases where courts have
     declined to grant partial summary judgment motions based on preservation of
20   judicial resources.  Neither case, however, provides useful guidance here.  In
     *Gemini Ins. Co. v. W. Marine Ins. Servs. Corp.*, No. 21-CV-3172-KJM, 2016 WL
21   3418413, at *16 (E.D. Cal. June 22, 2016), the moving party sought partial
     summary judgment "on twenty separate portions of its breach of contract claim,"
22   which the court determined would only result in piecemeal resolution of the case.
     The Attorney General, on the other hand, has sought summary judgment on only
23   two, and indeed the two most critical portions, of the Law Center's First
     Amendment claim.  Likewise, in *Chiron Corp. v. Genentech, Inc.*, 268 F. Supp. 2d
24   1139, 1148 (E.D. Cal. 2002), the court exercised its discretion against partial
     summary judgment because doing so would make "trial more difficult and complex
25   as opposed to streamlined."  In contrast, eliminating the Law Center's claim that the
     Schedule B reporting infringes on its First Amendment rights to free speech and
26   association would significantly narrow and streamline the remaining issues to be
     tried.

27        [11] The Law Center does not intend to pursue its preemption claim at trial.
     (ECF No. 79 at 7.)
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For these reasons, and the reasons stated in the Attorney General's opening brief, the Court should grant partial summary judgment for the Attorney General. Accordingly, the Court should enter an order denying an injunction on the grounds that the Attorney General's *nonpublic* Schedule B reporting requirement would burden First Amendment rights to free speech and association as applied to the Law Center.

Dated:  July 5, 2016                                  Respectfully submitted,

KAMALA D. HARRIS
Attorney General of California
TAMAR PACHTER
Supervising Deputy Attorney
General
ALEXANDRA ROBERT GORDON
KIM L. NGUYEN
JOSE A. ZELIDON-ZEPEDA
Deputy Attorneys General

*/s/ Kevin A. Calia*
KEVIN A. CALIA
Deputy Attorney General
*Attorneys for Defendant Attorney
General Kamala Harris*