UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE

PRESIDING

THOMAS MORE LAW CENTER,      )
                             )
         Plaintiff,          )
                             )
    vs.                      )      No. CV 15-3048-R
                             )
                             )
KAMALA HARRIS,               )
                             )
         Defendant.          )
_____)

REPORTER'S TRANSCRIPT OF DAILY TRIAL PROCEEDINGS

LOS ANGELES, CALIFORNIA

WEDNESDAY, SEPTEMBER 14, 2016

VOLUME II

**PAGES 1 – 83**

_____

DEBORAH K. GACKLE, CSR, RPR
United States Courthouse
312 North Spring Street, Room 402A
Los Angeles, California 90012
(213) 620-1149

1    **APPEARANCES OF COUNSEL:**

2

3

4        **For the Plaintiff:**

5

6            Louie Harrison Castoria
             Marion V Cruz
7            Ian Johnston
             Kaufman Dolowich and Voluck LLP
8            425 California Street Suite 2100
             San Francisco, CA 94104
9            415-926-7600.
             Lcastoria@kdvlaw.com
10

11

12       **For the Defendant:**

13

14           Kevin A Calia
             Department of Justice
15           Office of the Attorney General
             Civil Division
16           Govenrment Law Section
             1300 I Street
17           Sacramento, CA 95814
             916-322-6114
18           Fax: 916-324-8835
             Email: Kevin.Calia@doj.ca.gov
19

20

21           Kim L Nguyen
             Department of Justice
22           Office of the Attorney General
             300 S. Spring St., Suite 1702
23           Los Angeles, CA 90013
             213-897-5677.
24           Fax: 213-897-5775.
             Email: kim.nguyen@doj.ca.gov
25

1    **APPEARANCES (CONTINUED):**

2

3         For the Defendant:

4

5              Jose A Zelidon Zepeda
               Alexandra Robert Gordon
6              CAAG -California Attorney General
               455 Golden Gate Avenue Suite 11000
7              San Francisco, CA 94102-7004
               415-703-5509
8              Fax: 415-703-1234
               Email: alexandra.robertgordon@doj.ca.gov

9

10

11

12

13                          – – – – –

14

15

16

17

18

19

20

21

22

23

24

25

# I N D E X

| DEFENSE WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| IBANEZ, TANIA | 16 | 40 | | |
| MADOFF, RAY | 50 | | | |
| ZIMRING, JOSEPH | 63 | 75 | | |

# E X H I B I T S

| NUMBER | RECEIVED |
|---|---|
| 900 – 927 | 5 |

```
 1        LOS ANGELES, CALIFORNIA; WEDNESDAY, SEPTEMBER 14, 2016;

 2                            1:40 P.M.

 3                          - - - - -

 4

 5        THE COURT:  Yes, sir.

 6        MR. CASTORIA:  Your Honor, during the lunch break, I

 7   conferred with Mr. Calia, and we had agreed to stipulate a

 8   number of exhibits into evidence, which are the binders of

 9   marked prior testimony, both depositions and trial testimony of

10   a number of witnesses.  Those are designated as Exhibit Nos.

11   900 through 927.

12        If the court wishes, I could read the names of the

13   witnesses, but they're in sequence and that 900 to 927 --

14        THE COURT:  Nine hundred to 927, yes.

15        (Exhibit 900- 927 received in evidence.)

16        MR. CASTORIA:  And subject to our joint stipulation,

17   we would both move that these be admitted into evidence subject

18   to the objections that each party has made to the designations.

19        THE COURT:  All right.

20        MR. CASTORIA:  Thank you.

21        THE COURT:  I'll hear the opening statement of

22   the ...

23        MR. CALIA:  Good afternoon, Your Honor.  This

24   afternoon, and for part of the day tomorrow, the attorney

25   general plans to call four witnesses:  Ms. Tania Ibanez, who is
```

 1    the assistant attorney general in charge of the charitable

 2    trust section; Professor Ray Madoff, who is our expert witness

 3    rebutting Dr. Schervish's testimony; Joe Zimring, who is the

 4    deputy attorney general working in the charitable trust

 5    section, who has used Schedule B in investigations that he

 6    personally worked on; and Mr. David Eller, the registrar, who

 7    is responsible for receiving forms into the registry and

 8    scanning them and uploading them so that they are available to

 9    the attorneys and investigators in the charitable trust

10    section.  We will also rely on the deposition testimony from a

11    number of witnesses from the law center, including Mr. Thomas

12    Monaghan, who the court has heard some things about, who is a

13    donor and a major early funder of the law center.  He's also a

14    member of the board of directors of the the law center.  We

15    will also rely on deposition testimony from several of the law

16    center's witnesses, who are employees of the law center and

17    dealt with the mail that the law center receives and things

18    like that.

19              THE COURT:  You mean the defendant -- the persons

20    again to testify here?

21              MR. CALIA:  So, Your Honor, the witnesses are beyond

22    the subpoena power.  Mr. Monaghan resides in Michigan and has

23    not come; Ms. Morello --

24              THE COURT:  The names of the witnesses who are going

25    to appear here again.

1          MR. CALIA:  Yes.  The names of the witness who will

2    appear here are Ms. Tania Ibanez --

3          THE COURT:  Just a minute.  She's not on your witness

4    list.

5          MR. CALIA:  Your Honor, there are two separate

6    witness lists, one for the plaintiff and one for the defendant.

7          THE COURT:  Defendant trial witness list.  Tania

8    Ibanez, all right.

9          MR. CALIA:  The next witness that I mentioned is

10   Professor Ray Madoff.

11         THE COURT:  All right.

12         MR. CALIA:  The next witness who I mentioned is

13   Mr. Joseph Zimring.

14         THE COURT:  All right.

15         MR. CALIA:  And the final witness that I mentioned is

16   Mr. David Eller.

17         What the evidence will show, Your Honor -- and the

18   bulk of it will go to the central question in this case, which

19   is whether the law center can show a reasonable probability

20   that the compelled disclosure of its contributors' names will

21   subject those donors to threats, harassment or reprisals from

22   either the government or the public.  Your Honor has already

23   heard plaintiff's evidence, and we would submit that that

24   evidence does not meet the test as a matter of law; but to be

25   clear, the record will show there is no evidence that anyone

| | |
|---|---|
| 1 | has been harmed flowing from a confidential disclosure to the |
| 2 | government.  There's no evidence that any potential donor to |
| 3 | the law center has ever declined to donate to the law center |
| 4 | because they feared their donor status would be revealed |
| 5 | confidentially to a government agency. |
| 6 | The court has already heard that the law center |
| 7 | submits its unredacted Schedule B every year to the Internal |
| 8 | Revenue Service, and that the law center's president is not |
| 9 | aware of anyone who has ever been harmed or complained about |
| 10 | that disclosure. |
| 11 | The law center admits that its Schedule B forms have |
| 12 | not, to date, been disclosed to any other government agency, |
| 13 | not to any state.  They have steadfastly refused to provide |
| 14 | them to the State of California in response to their requests |
| 15 | that have come since 2011, and they haven't provided them to |
| 16 | any other state.  So any of the things that -- the evidence |
| 17 | that the court has heard so far of clients who faced harassment |
| 18 | or threatening email, none of those things came from disclosure |
| 19 | of the Schedule B information to a government agency. |
| 20 | The court heard a lot about the fatwa law against |
| 21 | Pamela Geller, and the fact that it says anyone who houses her |
| 22 | events or gives her a platform is a legitimate target, but the |
| 23 | representation -- |
| 24 | THE COURT:  No, that's argument.  That's not what |
| 25 | you're going to present. |

1          MR. CALIA:  We are going to present this testimony,

2    Your Honor, through the designations of Pamela Geller.

3          THE COURT:  What testimony are you to present?  It's

4    against that, but what's the testimony that you're going to

5    present?  That's the opening statement and what you're going to

6    present, not an argument of the case.

7          MR. CALIA:  Your Honor --

8          THE COURT:  What you've been doing has been arguing

9    the case.

10          MR. CALIA:  Your Honor, Ms. Geller is beyond the

11    subpoena power, and we were not permitted to cross-examine her

12    in response to the video clips.  So as part of our case, we

13    will present designations from her deposition testimony that

14    made clear that the law center has represented her for many

15    years and that that representation has been known to the public

16    for all of those years.

17          THE COURT:  That's argument, Counsel.

18          MR. CALIA:  Your Honor --

19          THE COURT:  I wanted what you're going to present to

20    me, what evidence you're going to present to me, not what the

21    result of that evidence is.

22          MR. CALIA:  I understand --

23          THE COURT:  That's argument.

24          MR. CALIA:  And I take the court's comment to mean

25    that you would also not like me to tell you about

```
 1    Mr. Monaghan's deposition testimony because he will not appear

 2    to us, and he is also beyond the subpoena power.

 3              THE COURT:  I want to know what the attorney general

 4    wants to present evidence; she's the defendant here.

 5              MR. CALIA:  And I'm just making sure that I'm clear

 6    that some of the evidence we will present is from witnesses who

 7    will not appear live because they are not available to us, and

 8    they are beyond this court's subpoena power.

 9              But with that, I'd be happy to revisit these issues

10    as part of a closing argument.

11              THE COURT:  All right.

12              MR. CALIA:  As far as the secondary issues in this

13    case, which need not be reached if the law center doesn't show

14    harm, we will present testimony from employees who work in the

15    charitable trust section regarding the ways in which they've

16    used the Schedule B forms in investigations.  Some of those

17    investigations can be publicly disclosed because they are

18    public.  Complaints have been filed, and things like that, for

19    other of the investigations that are ongoing or that started

20    since the last trial.  Our witnesses are not able to reveal the

21    names of the charity that is under investigation because it

22    would compromise the investigation, potentially, and because

23    they have a very real and serious just concern about naming

24    charities when there are just allegations and not yet findings

25    or lawsuits.  So these witnesses will testify about the ways in
```

 1   which they've used Schedule B, including in the case of L.B.

 2   Research, which Your Honor heard about previously, which

 3   involved a donation to a university, and then that that

 4   donation was later used to provide a benefit that was not for a

 5   charitable purpose.  The Schedule B was used in uncovering that

 6   information, and considering what further investigation was

 7   necessary and what should be done to remedy the situation,

 8   witnesses will also talk about how Schedule B was used in the

 9   Cancer Fund of America investigation, which was the subject of

10   testimony in the last trial, as well; and Mr. Zimring will

11   testify about how Schedule B was used in an investigation of

12   the Dodger Dream Foundation.

13            Our witnesses will testify that protecting the public

14   from charitable fraud is an important part of their job.  It's

15   one of the main things that the charitable trust section does,

16   and it's a big job because there are many, many charities

17   registered in the state of California, more than 100,000 of

18   them, and more that should be registered but have failed to

19   register that also require time from the charitable trust

20   section and that they have limited resources to fulfill these

21   important objectives, that there are only 14 lawyers and eight

22   auditors who work in the charitable trust section to deal with

23   all of these charities and the complaints that are received

24   from the public, reports that are received through media

25   sources about issues that may warrant investigation for those

1   charities among the other duties that the section fulfills.

2            You will also hear about the requirement that

3   charities who register with the State of California submit

4   their Schedule B.  You'll hear about the source of that

5   requirement, which is in the supervision of Trustees and

6   Fundraisers for Charitable Purposes Act; and you will hear

7   about how that requirement has been uniformly applied to the

8   charities that register with us.  And about the recently

9   enacted regulation designed to ensure that the Schedule Bs that

10  are submitted pursuant to that requirement are kept

11  confidential.  That regulation went effective on July 8th of

12  this year, and you will hear about that from Ms. Ibanez.

13           You will hear about how the charity trust section

14  considers the entire 990, including all of the schedules and

15  attachments, to be part of the same document and to be a source

16  of useful information and the first thing they go to when

17  they're looking at an investigation.  They will describe how

18  using the different parts of the 990 and checking them against

19  one another can yield useful information and can lead to

20  determinations about whether the investigation should proceed

21  and whether there was wrongdoing.

22           And most charities are complying with this

23  requirement and submitting their Schedule B.  When a charity

24  does not submit the Schedule B, there are staff in the registry

25  who look through the filings to see if there are forms that are

1    missing, documents that should be filed that are not, someone

2    who forgot to send in the check with the renewal fee but sent

3    the other documents, someone who sent only the check but didn't

4    send a copy of the 990 at all.  And when those errors are made,

5    the registry has a series of form letters that are sent to the

6    charities describing what is missing and requesting that it be

7    supplied.

8           The court has seen some of those form letters that

9    related specifically to the Schedule B of the Thomas More Law

10   Center.  There are many others, and there's testimony that we

11   will submit from the designations of Dr. McClave that says

12   8,000 letters for -- asking for Schedule Bs from different

13   charities have been sent out to a wide range of charitable

14   organizations, including Little Leagues, 4-H foundations and

15   elementary school funds, among other types of charities.  The

16   testimony will show it is just a form letter that is sent out

17   when it is noticed that a document is missing.

18          You will also hear about the relationship between the

19   registry and the lawyers and auditors at the charitable trust

20   section.  The registry is in some ways like the clerk's office

21   for the court system.  They collect the forms, but they don't

22   review the forms --

23          THE COURT:  That's argument, Counsel.

24          MR. CALIA:  The witness will testify as to what the

25   registry does and does not on do.  Mr. Eller will come to the

1   stand, and he will explain what his staff reviews, the kinds of

2   letters they send out about deficiencies, and the ways in which

3   they do not use those materials.

4         He will also explain the very large volume of paper

5   that is mailed to the registry and the seasonality what leads

6   to that volume spiking at two particular times in the year,

7   depending on the fiscal years of charities so that carts and

8   carts of mail get delivered and processed in the registry

9   during those periods.

10        When the registry processes those materials, they

11  scan them in, and they make most of the material available to

12  the public through their publicly available website where the

13  public can research charities before deciding to make a

14  charitable contribution; but they do not make the Schedule B

15  and certain other documents public pursuant to a longstanding

16  policy that has now been written down in a regulation that

17  became effective earlier this year.

18        You will also hear that there are other ways for the

19  charitable trust section to obtain Schedule Bs.  For example,

20  by sending audit letters or subpoenas, but you will hear

21  testimony from Ms. Ibanez and Mr. Zimring showing that this is

22  a less desirable system and a less efficient system because it

23  can because delay, and it has sometimes resulted in alteration

24  of documents or coaching of witnesses who might later be

25  contacted in the investigation.

```
 1          Finally, you will hear about some inadvertent
 2   disclosures of Schedule B that were brought to the court's
 3   attention during the last trial and the steps that the registry
 4   took in response to learning of those inadvertent disclosures:
 5   First, to take them down immediately so that they were no
 6   longer available to the public; and second, to institute new
 7   procedures designed to make it less likely that those Schedule
 8   Bs would be posted publicly in violation of our confidentiality
 9   policy; and those primarily involve telling -- making sure that
10   people within the registry know about the requirement, which
11   they always have but re-enforcing that, and implementing a new
12   computer-based tool to search the documents before they're
13   uploaded, which can detect when a document has been scanned
14   when it shouldn't have been scanned and allow it to be pulled
15   out of the system before it gets uploaded to the website.
16          Finally, you will hear about the alterative ways that
17   there are for donors who care about anonymity to remain
18   anonymous, including by giving less than the $5,000 threshold
19   or the higher threshold that the law center could have used or
20   by using alternative methods of making contributions, including
21   donor-advised funds, limited liability companies, or revocable
22   trusts.  That testimony will come through our expert witness,
23   Professor Ray Madoff.
24          At end of the evidence, we'll ask the court to deny
25   the request for the permanent injunction because the plaintiff
```

 1   can't show harm and because the collection of Schedule B is a

 2   reasonable and uniform collection of information that the A.G.

 3   purposes.

 4          Thank you, Your Honor.

 5          THE COURT:  Call your first witness.

 6          MR. CALIA:  The defense calls Tania Ibanez, and we're

 7   getting her from the witness room.

 8          THE CLERK:  Please raise your right hand.

 9          (Witness sworn.)

10          THE WITNESS:  I do.

11          THE CLERK:  Thank you.  Please take a seat.

12          THE WITNESS:  Thank you.

13          THE CLERK:  Please state your full name for the

14   record, spelling your last name.

15          THE WITNESS:  Tania Melanie Delores Ibanez Virnig.

16   The last name that I go through work is Ibanez, and that's

17   I-b-a-n-e-z.

18          THE REPORTER:  Could I have the spelling of Virnig.

19          THE WITNESS:  V-i-r-n-i-g.

20      **TANIA IBANEZ, DEFENSE WITNESS, SWORN, TESTIFIED:**

21                    **DIRECT EXAMINATION**

22   BY MS. GORDON:

23   Q.   Good afternoon, Ms. Ibanez.

24          Ms. Ibanez, could you tell us what you do for a

25   living, please.

1   A.    Yes.  I'm an attorney with the state attorney general's

2   office, charitable trust section.

3   Q.    Do you have a title?

4   A.    Yes, my title is senior assistant attorney general.

5   Q.    And how long have you held that position?

6   A.    Little over two years.

7   Q.    How long have you been in the charitable trust section?

8   A.    I started in 2002 as a deputy attorney general.

9   Q.    And in between being a deputy attorney general and senior

10  assistant attorney general, did you have any other roles?

11  A.    Yes.  I was also a supervising deputy attorney general.

12  Q.    When did you become a supervising deputy attorney general?

13  A.    I was promoted in February of 2012.

14  Q.    When did you become the senior assistant attorney general?

15  A.    I was promoted January of 2014.

16  Q.    Could you give us, Ms. Ibanez, a very brief overview of

17  what the charitable trust section does, please.

18  A.    The charitable trust section is mandated by the

19  legislature to protect charitable assets, to investigate

20  charitable abuses.  The charitable trust section also

21  responsible for the registry of charitable trusts in which

22  charities and trustees and commercial fundraisers and other

23  people that are involved in the whole charity business are

24  required to register and report.

25  Q.    Thank you.

```
1              And could you also give us, briefly, sort of an
2    overview of the types of cases that the charitable trust
3    section does bring.
4    A.   Yes.  We basically are involved in four different types of
5    charity abuse, types of situations:  One are cases that feel
6    with fiscal mismanagement or fiscal abuse.  The other types of
7    cases that we use deal with solicitation practices.  The other
8    types of cases that we get involved in deal with reporting
9    violations and registration violations.
10   Q.   What were your responsibilities as a deputy attorney
11   general?
12   A.   My responsibility was basically to investigate fiscal
13   mismanagement, reporting violations, solicitation violations,
14   and registration violations.  So I would review complaints that
15   were assigned to me, I would conduct investigations, and I
16   would also get involved in prosecution, if we weren't able to
17   settle with the charities or the commercial fundraisers.
18   Q.   And about how many investigations did you conduct when you
19   were a deputy attorney general?
20   A.   Just in the charitable fiscal abuse and the solicitation
21   practices, registration and reporting violations, I would do
22   about ten cases a year, ten investigations a year, but we also
23   did some probate matters, and we also did nonprofit
24   transactions.
25   Q.   Okay.
```

1          So if that was ten investigations a year --

2          THE COURT:  I heard that, Counsel.

3          MS. GORDON:  I'm sorry.  I'm just bad at math, Your

4    Honor.

5    Q.   How many over the entire time that you were a deputy

6    attorney general?

7    A.   Hundreds.

8    Q.   Hundreds.  Thank you.

9          Was that hundreds --

10   A.   Hundreds.

11   Q.   Thank you.

12         So I've asked you to be brief, and I'm going to hold

13   you to that, but you've been saying things like you did

14   investigations of fiscal abuse and reporting requirements.

15         Could you give a little more specificity on that,

16   please.

17   A.   When we're talking about fiscal abuse, what we're looking

18   for is self-dealing transactions, improper loans, waste,

19   diversion of restricted assets, mismanagement.  Basically

20   breach of fiduciary duty that results in loss of charity

21   assets.  Usually those types of investigations depend on the

22   corporation's code and to certain extent, the revenue, taxation

23   codes.

24   Q.   Just quickly, when you say reporting violations, what does

25   that mean?

1  A.    Reporting violations is -- we're looking to see whether or

2  not the charity has filed false reports with us.  So charities

3  that are operating in the state of California are required to

4  provide us with true and correct records.  When they're filing

5  their 990s with us, they're filing it under penalty of perjury.

6  When they're filing their registration forms with us, they're

7  also filing under penalty of perjury.  So what we're looking at

8  is are they reporting accurate information.

9  Q.    How much of your time was spent as a deputy attorney

10 general investigating charitable abuse?

11 A.    I would say roughly 75 percent was charity-related

12 investigations, whether it be fiscal abuse, solicitation abuse,

13 reporting abuse or registration abuse.

14 Q.    What was the other 25 percent?

15 A.    The other 25 would have been the probate and nonprofit

16 transactions.

17 Q.    What were your responsibilities as a supervising deputy

18 attorney general?

19 A.    As a supervising deputy attorney general, I was assigned

20 to the L.A. office, and I basically reviewed all of the

21 complaints that came in, to assign them to my deputies.  I

22 would also participate in some of the cases.  I kept some of my

23 case load.  I also led investigations that were conducted by

24 other deputies in the office.  I provided training.  I provided

25 direction.  I was there basically to review pleadings, to

1    review audit letters.  I was involved in investigations, but

2    not quite as much as when I was a deputy.

3    Q.   What are your responsibilities now as a senior assistant

4    attorney general?

5    A.   As a senior assistant now, I have the L.A. office

6    basically under my supervision, as well as the San Francisco

7    office.  That's the legal and auditors.  And I also have the

8    registry of charitable trust under me, and I'm still involved

9    in reviewing complaints and getting involved in investigations,

10   but because I have more moving parts, it's not as active as

11   when I was a deputy.

12   Q.   Okay.

13        Do you meet with your staff, Ms. Ibanez?

14   A.   Yes.

15   Q.   How often do you meet with your staff in formal meetings?

16   A.   I usually have formal meetings with both the San Francisco

17   and the L.A. legal and audit at least four times a year, video

18   conferencing.

19   Q.   Do you have informal meetings?

20   A.   Every day.

21   Q.   Every day?

22   A.   Every day.

23   Q.   With whom do you meet?

24   A.   I have an open-door policy so pretty much any attorney can

25   come to me directly:  Emails, telephone, visit.  They don't

```
 1    have do go through their supervisor.

 2    Q.    Do people use that open-door policy?

 3    A.    Yes, they do.

 4    Q.    How many people currently work for the charitable trust

 5    section?

 6    A.    In the legal and audit unit there's 23, plus me -- that

 7    includes me, and then in the registry of charitable trust

 8    section, about 40 employees.

 9    Q.    Okay.

10          Could you just give -- for the legal and audit unit,

11    could you give us a breakdown by function, please.

12    A.    Yes.

13          I have 11 deputy attorney generals; two supervising

14    deputy attorney generals; seven auditors; one supervising

15    auditor; and two paralegals and me.

16    Q.    Ms. Ibanez, how many charities are there in California?

17    A.    There's probably over 300,000 charities or charitable

18    trustees.

19    Q.    Do you have a breakdown of those charities -- strike that.

20          Are all of those charities registered with the

21    Registry of Charitable Trusts?

22    A.    The last number that we received was 122,000 charities or

23    charitable trustees were registered with us.

24    Q.    I should have probably asked this first, but what is

25    briefly the registry of charitable trusts?
```

A.    The registry of charitable trusts, which is under me, is
basically is in charge of registering charities, registering
trustees, registering commercial fundraisers and fundraising
counsel.  Anything that has to do with the registry -- with
charity -- of a charity, whether it be local charity or foreign
charity, if they want to solicit donations, they have to
register first with the charity -- the registry of charitable
trust, and they also have to provide annual reporting.

Q.    I think you started to get at this.

      What does registration entail?

A.    Okay.

      I was going to -- I wasn't done yet.

Q.    I'm sorry.  Please finish.

A.    It not only collects the information from the charities
and the trustees and the fundraisers, but it also makes that
information available to the public at large and with the legal
and audit unit.

Q.    Okay.

      So briefly, can you explain the relationship between
the charitable trust section and the registry.

A.    The registry collects the information and makes it
available to the public, and it also collects the information
and makes it available to the legal and the audit unit.

      So if we have an investigation or a complaint, the
first thing I would do, either as a supervisor or a DAG or a

```
 1    SAG, is I would go to the registry of charitable trusts with --
 2    you know, we call it "my license" -- and I would do my review
 3    of the charity's filings with the registry.
 4    Q.   Okay.  We'll get back to that, but I just -- I want to
 5    understand what goes into --
 6              THE COURT:  Please just ask your questions, Counsel.
 7              MS. GORDON:  Sorry, Your Honor.
 8    Q.   Can you please explain what's required for a charity for
 9    registration.
10    A.   When a charity wants to operate in the state of
11    California, they have to file with the registry of charitable
12    trusts, what is known as the CT1 form.  They also have to give
13    us copies of their by-laws, of their articles of incorporation,
14    their IRS tax-exempt letter, their application to the Internal
15    Revenue Service to become tax exempt.  The CT1 form has
16    information about the directors, the officers, their business
17    address.  If it's a foreign corporation, they have to notify
18    the registry of charitable trusts what kind of programs are
19    they going to do here in California.  So it's valuable
20    information in terms of okay, what is this nonprofit doing
21    here.
22    Q.   Ms. Ibanez, is a charity required to file its form 990?
23    A.   Yes.  So after they've done their initial registration,
24    then they have their annual reporting requirements, and that's
25    when they're required to give us their RRF1 form, the
```

1  registration renewal form, and a copy of their 990 and all of

2  the schedules that they filed with the risk.

3  Q.   What happens if a charity doesn't fulfill all of its

4  registration requirements?

5  A.   They will get several notifications by the registry, they

6  will be listed as delinquent at some point, and if they fail to

7  comply, they may be suspended.   Perhaps --

8  Q.   How --

9  A.   -- registration would be suspended.

10 Q.   I see.

11              How many notifications would they receive?

12 A.   For the suspension?

13 Q.   Before suspension.

14 A.   Usually -- typically it's two delinquency notices and then

15 a suspension notice.

16 Q.   How long does that process take?

17 A.   It takes months.

18 Q.   Who decides what charities the charity trust section is

19 going to investigate?

20 A.   It's a decision that's made by the supervising deputy

21 attorney general and me.

22 Q.   And what is the process for making that decision?

23 A.   Well, we get the complaints, usually from the registry,

24 and then, as a supervising deputy attorney general, they would

25 review the complaint, they would also search the registry's

1  database, they would review 990s that are available in the

2  database, including all schedules, they would review all prior

3  complaints, they would review founding records, by-laws,

4  articles of incorporation, and then they would make an

5  evaluation on whether or not it should be assigned for

6  investigation and further review.

7  Q.   How many complaints does the charitable trust section

8  receive per month?

9  A.   Anywhere between 40 to 80 a month.

10  Q.   Where do the complaints come from?

11  A.   The complaints come from a variety of different sources:

12  It can be ex-employees; current employees; directors; officers;

13  competitors; vendors.  It can be from -- usually the complaints

14  are sent to the registry of charitable trusts.  They intake it,

15  but there's a variety of sources where we get complaints.  It

16  can be from another charity.

17  Q.   And when you get a complaint, what are the possible

18  outcomes that follow from that?

19           MR. CASTORIA:  Objection, Your Honor.

20           THE COURT:  The objection is sustained.

21  BY MS. GORDON:

22  Q.   Ms. Ibanez, what happens after you get a complaint and

23  after that determination is made whether further investigation

24  is required?

25           MR. CASTORIA:  Objection, Your Honor.

1          THE COURT:  Objection is sustained.

2    BY MS. GORDON:

3    Q.    I'll move on.

4          Ms. Ibanez, you testified that you would look at the

5    990 when you get a complaint, including all schedules.

6          Does that include Schedule B?

7    A.    Yes.

8    Q.    So based on your over 14 years in charitable trusts, could

9    you please explain how -- first of all, what information is

10   provided on Schedule B?

11   A.    Schedule B contains a list of donors that made donations

12   of $5,000 or two percent grows revenue.  It lists the donor; it

13   lists information on the donation type, whether it be cash or

14   gift in kind is donated goods.

15   Q.    And how do you use that information in your work?

16          MR. CASTORIA:  Objection, Your Honor, cumulative of

17   the --

18          THE COURT:  Objection is overruled.

19          THE WITNESS:  Okay.

20          As a deputy attorney general, I use the Schedule B

21   for -- to evaluate whether or not there was diversion of

22   charitable assets, fiscal abuse; to evaluate whether the

23   charity was being used as a bypass; to evaluate whether or not

24   the charity was engaging in solicitation fraud; to evaluate

25   whether or not there was reporting violations and the charity

```
 1   was improperly listing gift in kind donations.

 2           As a supervisor, I looked at Schedule Bs routinely in

 3   order to evaluate of whether or not we were going to conduct an

 4   investigation, and if we we're going to assign the matter for

 5   investigation, what areas were we going to pursue; and that

 6   role has remained as a senior assistant.  I still look at

 7   Schedule Bs to evaluate of how we're going to do the

 8   investigation, what areas should being explored; and sometimes

 9   a Schedule B is also used for a supervisor, as a SAG, to

10   evaluate whether or not a complaint has merit.

11   Q.   Can you say a little bit more about that evaluation

12   please, about whether or not a complaint has merit.

13   A.   Yes.

14           Sometimes someone will say the donor is controlling

15   the charity or the charity doesn't need to sell its assets if

16   they were to solicit more from this one particular donor that

17   in the past donated a ton of money to the charity.

18           So you would look at the Schedule B, and sometimes

19   we'll find out that the donor never donated anything and

20   certainly nothing to put them on the Schedule B.  So in that

21   situation, I probably would not assign that for investigation.

22   Q.   Okay.

23           How do you keep track of what evidence you use in

24   your investigations, Ms. Ibanez?

25   A.   We don't -- I mean, in terms of the steps that we take?
```

```
 1   We don't.

 2   Q.   Do you keep track of what evidence you considered?

 3   A.   No.  We don't -- I don't have a checklist for my attorneys

 4   or my auditors to, like, say, Oh, I looked at this schedule; I

 5   looked at this schedule.  There's professionals.

 6   Q.   How do you know, then, that you used Schedule B?

 7   A.   Because I use it.

 8   Q.   Okay.

 9        Could you please give, Ms. Ibanez, some specific

10   examples of investigations where you have used Schedule B.

11        MR. CASTORIA:  Your Honor, I do object to this on the

12   basis that it is cumulative of the documents that have been

13   stipulated into evidence through the prior testimony and the

14   evidence --

15        THE COURT:  I don't have that.  The objection is

16   overruled.

17        THE WITNESS:  When I was a deputy attorney general,

18   one of the cases that I was assigned that led to litigation was

19   the Cancer Fund Charity litigation that we were involved in,

20   and I used Schedule B in that matter.

21   BY MS. GORDON:

22   Q.   Can you tell me a little bit just about the cancer case,

23   what was involved in it.

24   A.   We started the investigation in 2010; we filed the lawsuit

25   in 2015 against four charities.
```

```
 1   Q.   Who is "we"?

 2   A.   "We" involved the State of California, plus all 50 states,

 3   plus the FT -- FTC, Federal Trade Commission.

 4   Q.   Okay.

 5        What was the case about?

 6   A.   The case was about a lot of different abuse of practices,

 7   from nepotism, to self-dealing transactions, to misuse and

 8   diversion of charitable assets, to not even having, really, a

 9   charitable program.  I think of every dollar that came in, only

10   two percent was used to assist cancer patients and their

11   families; but gift in kind was also a very significant portion

12   of the lieutenant, and basically the charities were all run by

13   the same family, and they were abusing gift in kind to

14   artificially inflate their revenues and expenses.

15   Q.   Ms. Ibanez, can you explain what gift in kind means.

16   A.   Gift in kind is basically -- is a noncash donation.  So it

17   could be food; it can be pharmaceuticals; it can be building

18   equipment; it can be closing.  That's considered a gift in kind

19   donation.  So it's not cash.

20   Q.   What was the gift in kind element of the Cancer Fund case?

21   A.   The problem with the Cancer Fund cases -- and there were

22   four charities:  One was the Cancer Fund of America; Breast

23   Cancer Society; Children's Cancer Fund of America; and Cancer

24   Support Services; and all of these charities were basically

25   reporting that they had received millions and millions and
```

1    millions of donations in gift in kind when they were not

2    allowed to report those gifts.  It was a reporting violation;

3    they were filing false 990s.

4    Q.   Why weren't they allowed to report those gifts?

5    A.   Well, as part of part of our investigation, when we looked

6    at Schedule Bs of the donating charities -- because that's

7    happens here.  You'll have one charity donating gift in kind to

8    another charity.  So you have "A" charity donating gift in kind

9    to "B" charity and then "B" charity donating gift in kind --

10   the same gift in kind to "C"charity, "D" charity and down the

11   line.

12           And in order to do that, in order to accurately

13   report the gift in kind, the charity that receives it has to

14   have what is known as variance power, and they also have to

15   have the risk and reward power; and the Cancer Fund charities

16   didn't have that.  So they never should have booked those

17   donations as donations, and because they falsely reported

18   revenue, they look like they were much more successful in their

19   business endeavors.  They looked like they were bringing in

20   millions of dollars in donations, and then the minute they

21   would give those donations to another charity, they looked on

22   paper like they were giving millions of dollars' worth of

23   services.  So it's a big scam.

24   Q.   Okay.

25           You mentioned two terms that I would just like you to

```
 1    briefly explain.

 2              What is variance power?

 3    A.    A charity can book a gift in kind donation if they can

 4    decide who the ultimate recipient is.  So that's variance

 5    power.  You have to be able to show where it's going to go.

 6    Q.    What's risk and reward?

 7    A.    That is basically the charity also has -- is taking the

 8    risk of the donation and is getting the reward from the

 9    donation.  So risk would be insurance.  So, for example, if a

10    charity is accepting millions of dollars in pharmaceuticals,

11    are they -- where are the drugs being kept?  Are they paying

12    for storage?  Are they paying for insurance?  That's what we

13    mean by that.

14    Q.    Did the charities involved in the Cancer Fund case not

15    have variance power or risk reward?

16    A.    They did not.  Reviewing the Schedule B and in reviewing

17    other schedules that are related to this issue, which I think

18    it was schedules F and I, we found out that some of the

19    charities that donated -- one of them was World Help -- had

20    basically disavowed their donation to the Cancer fund

21    Charities, and World Help amended their 990.  So they were

22    doing the right thing.  When they realized they didn't have

23    variance power, they amended their 990s, but the Cancer Fund

24    didn't.  They continued to defraud the public and my office,

25    plus the IRS and everyone that received a copy of their 990
```

1    with a reporting violation.

2    Q.    What's the status of the Cancer Fund cases?

3    A.    It settled.  We obtained stipulated judgments.  All four

4    charities are under receivership, and the directors and

5    officers have been removed and barred from ever serving on any

6    charity ever again.

7    Q.    Okay.

8          Are there other examples of -- especially recent

9    cases, Ms. Ibanez, in which you have used Schedule B?

10   A.    We're seeing a lot of gift in kind abuse in the office; so

11   I've been look at Schedule B in connection with investigations

12   that I've recently assigned to deputies.

13   Q.    Can you give us examples of those, please.

14         MR. CASTORIA:  Your Honor, I object on the basis that

15   none of these recent examples --

16         THE COURT:  Sustained.  We're not talking about

17   everybody else, we're talking about the person here who is the

18   plaintiff; that's what we're talking about, application to the

19   plaintiff.

20         MS. GORDON:  I understand that --

21         THE COURT:  Not to somebody else.

22         MS. GORDON:  Part of the analysis is abuse of

23   Schedule B --

24         THE COURT:  There's no part of the analysis that does

25   that.  Schedule B is a Schedule B, or whatever it is.  We're

 1  talking here about the Schedule B to this plaintiff.

 2        MS. GORDON:  I'm sorry, Your Honor.  Just to be

 3  clear:  If these example don't involve plaintiff, you would --

 4  I should not ask about them?

 5        THE COURT:  That's right.

 6        MS. GORDON:  All right.

 7        MR. CASTORIA:  Your Honor, I also --

 8        MS. GORDON:  I'll move to.

 9        MR. CASTORIA:  I further object on the basis that

10  this evidence was not produced to us in discovery or referred

11  to the answers to interrogatories, requested identity of other

12  cases in which Schedule Bs were used.

13        MS. GORDON:  Your Honor, the only case that

14  Ms. Ibanez has testified to, Cancer Fund, is already part of

15  the record.  Plaintiff itself has designated testimony in that.

16  So it is incorrect that he's not been provided information

17  about Cancer Fund of America.  It's also publicly known.

18        MR. CASTORIA:  My objection was to the new evidence

19  that was about to be submitted --

20        MS. GORDON:  We're not submitting it.

21        THE COURT:  It's not submitted.

22        MR. CASTORIA:  Thank you.

23  BY MS. GORDON:

24  Q.   Ms. Ibanez, how does the charity trust section obtain

25  information about charities?

```
1    A.   From the Registry of Charitable Trusts.

2    Q.   How, specifically?

3    A.   Well, as I mentioned, we go into the registry's charitable

4    trust's database through my license, and all of the records

5    that have been filed by the charity are available for our use.

6    So the 990s are posted there, all confidential records, such as

7    Schedule B are posted there.  We also have historical

8    complaints, and we have founding records.  It's all there for

9    our use.

10   Q.   Aside from compliance with your registration or reporting

11   requirements, are there other ways the charitable trust section

12   can obtain information about charities?

13   A.   That's the main way without doing a full-blown audit.

14   Q.   A full-audit is another way you can?

15   A.   Yes.

16            THE COURT:  Don't lead the witness, Counsel.

17            THE WITNESS:  Yes.

18            MS. GORDON:  Thank you.

19   Q.   Have you been involved in audits, Ms. Ibanez?

20   A.   Yes.

21   Q.   How many times roughly?

22   A.   Hundreds.

23   Q.   Why doesn't the charitable trust section just use the

24   audit process all the time instead of registration reporting?

25   A.   We have too many complaints, and I don't have enough
```

```
 1   bodies, and I don't have enough room.  I only have 23 people in

 2   the legal and audit division, and just this year, we received

 3   523 complaints.

 4   Q.   Okay.

 5          Ms. Ibanez, have you ever issued a subpoena?

 6   A.   Yes.

 7   Q.   How many times?

 8   A.   I'm assuming you mean investigation subpoena, not trial

 9   or --

10   Q.   I do.  Yes.  Thank you.

11   A.   Three times.

12   Q.   Why not just subpoena information when you need it?

13   A.   Because it is -- has to go through multiple layers of

14   review.  It takes longer, and if the issue is addressing fiscal

15   abuse, you're wasting time while you're trying to get authority

16   to serve the subpoena, the charity could be doing all kinds of

17   things that they shouldn't be doing.

18   Q.   Ms. Ibanez, is the form 990 a public or private document?

19   A.   It's a public document.

20   Q.   How about Schedule B?

21   A.   Depends if you're a private foundation or a public

22   charity.

23   Q.   What if you're a public charity?

24   A.   If you're a public charity, it's a confidential document.

25   Q.   When you say "confidential," what does mean?
```

1    A.   Means the charity does not have to disclose it to the

2    public at large.  They can disclose just a redacted copy.  And

3    it's also confidential in the sense that the IRS considers it

4    confidential, and my office considers it confidential.

5    Q.   So as a matter of policy that it's confidential?

6    A.   Well, the IRS considers it confidential under its

7    statutory scheme, and we consider it confidential both at

8    policy and in response to ERISA regulations that we enacted.

9    Q.   Ms. Ibanez, you should have a binder in front of you, and

10   it should be open to Exhibit 862.

11        Do you see that?

12   A.   I do.

13        MS. GORDON:  I would like to show the witness what's

14   previously been admitted as Exhibit 862.

15   Q.   Ms. Ibanez, have you seen this exhibit before?

16   A.   Yes.

17   Q.   What is it?

18   A.   This is -- the regulation that we enacted in order to

19   clarify that Schedule Bs will be treated as confidential by the

20   attorney general.

21   Q.   Okay.

22        And Ms. Ibanez, I'd like you to turn to -- actually

23   the third page of the document, and it says on the bottom

24   footer, "page one of three."

25        THE COURT:  I don't have that document, Counsel.

```
1              MS. GORDON:  I'm sorry, Your Honor.

2              THE CLERK:  862.  Exhibit 862.

3    BY MS. GORDON:

4    Q.   It was the third page of the exhibit, and it says "page

5    one of three."

6              And Ms. Ibanez, I'd just like to direct your

7    attention to what comes after where it says,

8    "Section 310, public inspection of charitable trust records,"

9    and specifically subsection B.  I do not need you to read it.

10             I just want to know what is your understanding of

11   this regulation?

12             MR. CASTORIA:  We object, Your Honor.  We've

13   stipulated to the admission of the regulation itself, but the

14   interpretation of the regulation is a matter of law for the

15   court, and we have not agreed that external evidence should

16   come in as to what it means.

17             MS. GORDON:  That's fine, Your Honor.  I'll withdraw

18   the question.

19   Q.   Ms. Ibanez, could you just go to the first page --

20   sorry -- it's actually the second page of the exhibit, and it's

21   the bottom right-hand corner.

22   A.   Yes.

23   Q.   Do you see where it says "endorsed approved"?

24   A.   Yes.

25   Q.   Can you just tell me what the date is, please.
```

1    A.   This was approved on July 8 by the Office of

2    Administrative Law.

3    Q.   Okay.

4         So we've been talking about confidentiality, but I

5    think you're aware that there have been times when Schedule Bs

6    have not been kept confidential by the registry, correct?

7    A.   Yes.

8    Q.   And when did you become aware of Schedule Bs being

9    incorrectly housed on the registry website?

10        MR. CASTORIA:  Your Honor, I again object on the

11   basis of this is cumulative of the prior testimony that's

12   already in the record now, and it's essentially relitigating

13   the AFPF case.

14        MS. GORDON:  Your Honor, I have very few questions.

15        THE COURT:  No.  Few that are violations, the answer

16   is no.  All right.

17        MS. GORDON:  I'm sorry.  So?

18        THE COURT:  Sustained.

19        MS. GORDON:  Sustained.  Okay.

20   Q.   Ms. Ibanez, since the time of the Americans for Prosperity

21   trial, has your office done anything to address inadvertent

22   disclosures?

23   A.   Yes.

24   Q.   What have you done?

25   A.   We've beefed up the review process by the registry staff.

```
 1   Q.   How have you done that?

 2   A.   They are conducting inspections of soft-filed documents to

 3   make sure that the proper face sheets are put on Schedule Bs to

 4   ensure that they are kept as confidential and scanned as

 5   confidential, and so that's basically a manual process, and

 6   then they're also doing daily searches through the computer to

 7   ensure that no Schedule Bs are improperly uploaded.

 8   Q.   What do those searches entail?

 9        MR. CASTORIA:  Your Honor, I will object to the

10   remedial measures in that none of them have been disclosed to

11   us in discovery prior to trial.

12        THE COURT:  The objection is sustained.

13   BY MS. GORDON:

14   Q.   Just one last question, Ms. Ibanez:  Are you aware of any

15   inadvertent disclosures to the registry website occurring in

16   2016?

17   A.   No.

18        MS. GORDON:  Thank you.

19        I have nothing further.

20        THE COURT:  Cross-examination.

21                   **CROSS-EXAMINATION**

22   BY MR. CASTORIA:

23   Q.   Ms. Ibanez, you're -- I should say the attorney general's

24   investigation of the Cancer Fund of America's cases was the

25   subject that came up during the prior case, American's for
```

```
 1   Prosperity; isn't that correct?

 2   A.   I believe that Sonia Berndt testified about.

 3   Q.   Who is Ms. Berndt?

 4   A.   She is the deputy who took the case over and worked with

 5   me while I was a supervisor.

 6   Q.   Was your earlier testimony about the case based in part on

 7   information you received from Ms. Berndt?

 8   A.   No.

 9   Q.   And on a day-to-day basis, who was handling the Cancer

10   Fund of America cases, yourself, Ms. Berndt or anyone else?

11   A.   From 2010 until the end of 2013, I handled it, and then

12   when I became overwhelmed with health problems, it was assigned

13   to Sonia Berndt as lead; but I continued to be involved as a

14   supervisor and the senior assistant.

15             I'm sorry.

16   Q.   I'm sorry.  I didn't hear.

17   A.   And as the senior assistant.

18   Q.   Okay.

19             You mentioned that there were other states involved

20   in this investigation; is that correct?

21   A.   Yes.

22   Q.   How many others?

23   A.   Well, there was an executive committee that involved a

24   smaller group, but all 50 states eventually became involved in

25   the litigation in the filing of the lawsuit.
```

```
 1   Q.   And the investigation that the states initiated, came to

 2   the attention through media reports; isn't that right?

 3   A.   I'm not sure about that.

 4   Q.   You don't know?

 5   A.   No, because I think we were investigating it before the

 6   media found out.  I'm pretty sure we were.

 7   Q.   Okay.  Did the state of California share with other states

 8   involved in that process the Schedule Bs of any of the Cancer

 9   Fund of America entities?

10   A.   Not in the beginning.

11   Q.   I take it that means later they did?

12   A.   After the litigation was initiated.

13   Q.   Did the California Attorney General's office seek the

14   permission of the charities to share their confidential

15   Schedule Bs with anyone else?

16   A.   Again, I'm not sure I understand your question, but after

17   litigation was initiated, no.  We didn't share the Schedule B

18   with anyone before litigation was initiated.

19   Q.   And after the litigation, it was shared, correct?

20   A.   It was shared with everyone, including the defendants and

21   their experts.

22   Q.   Do you recall that there was extensive media reporting

23   about the so-called scam of the Cancer Fund of America?

24   A.   I didn't keep track of the media attention.  So I'm not

25   the best person to ask this.
```

1   Q.   As you sit here today, can you testify under oath that the

2   Cancer Fund of America investigations by the California

3   Attorney General's office came to the office's attention

4   through the review of Schedule B of any entity?

5   A.   I'm not sure I understand what you're saying.

6   Q.   Okay.  I'll try it again.

7        Can you tell us whether or not the Cancer Fund of

8   America investigations were commenced because someone at the

9   California Attorney General's office reviewed a Schedule B and

10  first learned of the problem that way?

11  A.   No.  I think that the original complaint raised other

12  issues, not Schedule-B related issues.

13  Q.   You used the word "complaint" earlier in your testimony.

14       Pardon me for looking at my notes.

15       You mentioned that if we have a complaint, the first

16  thing you would do would be to go to the registry to review

17  filings; is that approximately what you said?

18  A.   I think so.

19  Q.   Okay.

20       So when do you have a complaint?  When did you get a

21  complaint that would cause you to do that?

22  A.   Well, usually what will happen is the complaint is with

23  the Registry of Charitable Trusts; so they have the physical

24  complaint.  We get a list of all the complaints that came in,

25  and then as deputy attorney generals, as supervisors, as senior

```
 1   assistant, we have to go into the registry.  Its computer -- my
 2   license, in order to actually read the complaint.
 3   Q.   You mentioned a couple of sources that could be bringing
 4   complaints to the registry attention.
 5        Did I hear you correctly they could be ex-employees
 6   or directors and officers?
 7   A.   Yes.
 8   Q.   You recall any of the Cancer Fund of America cases where
 9   the source of the original complaint was found in a Schedule B
10   of any organization?
11   A.   I believe that most of the complaints that we had for the
12   cancer funds came from their solicitation practices.
13   Q.   And those don't appear on Schedule B, do they?
14   A.   No.  That would not be a schedule B-related issue.
15   Q.   Okay.
16        Do you recall testifying -- and it might have been
17   Ms. Berndt.  Strike that.
18        Do you recall whether the use of Schedule B in the
19   Cancer Fund of America cases commenced five years after the
20   investigation started?
21   A.   I remember looking at Schedule B when I was the DAG
22   assigned to Cancer Fund, and I remember looking at gift in kind
23   schemes where we figured out who was donating what to where.
24   Q.   Ms. Ibanez, you may recall during your deposition I asked
25   questions about any incidents you had in which you would have
```

```
 1    been -- your status as a donor to a charity had been made

 2    public against your will.

 3             Do you recall that?

 4    A.   Yes.

 5             MS. GORDON:  Objection, exceeds the scope of direct,

 6    irrelevant.

 7             THE COURT:  The objection is overruled.

 8    BY MR. CASTORIA:

 9    Q.   And what did you, without divulging the donation you made

10    or whom it was to, what happened to you in that instance?

11    A.   Well, one of the things that we investigate is coercive

12    solicitation practices, and that is basically when someone,

13    such as me, donates to a charity and oftentimes their name,

14    their donation amount, the frequency in which they donate and

15    who they donate to, is sold by the charity to other charities;

16    and before you know it, you're inundated with solicitation

17    materials.  So our office investigates these practices, but

18    I've also been the victim of these practices.  My name, my

19    donation amount, was sold by a few charities, and to this day I

20    get solicitation materials in the mail.

21    Q.   And you're upset by that, aren't you?

22    A.   I don't like it.

23    Q.   Couple of questions.  To your knowledge is there any

24    current investigation by the attorney general, including its

25    different sections, against Thomas More Law Center?
```

1    A.    There is not.

2    Q.    Has anyone to your knowledge made a complaint -- as you've

3    used that term -- of any type against the Thomas More Law

4    Center?

5    A.    No complaints have been received by the Registry of

6    Charitable Trust.

7    Q.    Apart from the fact that the law center has not filed its

8    Schedule Bs together with its form 990s, to the registry, to

9    your knowledge, does the attorney general's office have any

10   issues with the Thomas More Law Center about its compliance

11   with California law?

12   A.    No, I don't have any evidence that the Thomas More Law

13   Center is violating any California statutes other than the

14   Schedule B reporting requirement.

15   Q.    When you do look at a form 990 in your decision-making

16   process about a complaint that has come in, do you look only at

17   Schedule B or at the entire form?

18   A.    I look at the 990 and all of the schedules.

19   Q.    That would include Schedule L about interested-party

20   transactions, correct?

21   A.    If they filed one, yes, I would look at it.

22   Q.    And the financial statements that are enclosed as well,

23   correct?

24   A.    Yes.  I would look at all of the schedules, everything.

25   Q.    Is it also your practice to look at the annual filing that

1    the charity makes its annual report, which is accompanied by an

2    audit?

3    A.   You mean the audited financial statements?

4    Q.   Yes, ma'am.

5    A.   Yes.  If they're required to file audited financial

6    statements, I would look at them.

7    Q.   Has review of the audited financial statements ever

8    provided to you information about potential misuse of money or

9    gift in kind or any of the other financial irregularities that

10   you've been discussing?

11   A.   Yes.  Sometimes there's interesting notes in the audited

12   financial statements.  Not all charities are required to file

13   audit and financial statements, only charities that receive

14   over $2 million in revenue every year.  So it's not a resource

15   that I can use with most charities.

16   Q.   Do you recall whether in your review of the Thomas More

17   Law Center's 990 and attached filings in this case, whether the

18   relationship with the law center to Tom Monaghan was disclosed?

19   A.   It's all a blur.  I know that I reviewed the 990s for two

20   years; I reviewed the audited financial statements and the

21   deposition, and I don't know if the -- I don't know if Tom

22   Monaghan was reported in the audited financial statements or if

23   that was something I obtained through reviewing the depo.

24   Q.   Ms. Ibanez, is there a document in front of you?

25   A.   No.

```
 1   Q.   Okay.

 2   A.   I'm sorry.  Just water.

 3            MR. CASTORIA:  If I may have a moment to check my

 4   notes, please.

 5   Q.   Ms. Ibanez, were you involved in the public comment

 6   process that led to the regulation which is Exhibit 862?

 7   A.   Yes.

 8   Q.   Do you recall whether you received public comments from

 9   counsel for the American for Prosperities Foundation?

10   A.   Yes.

11   Q.   Do you recall whether you made any changes as a result of

12   receiving those comments?

13   A.   I don't know.

14            MS. GORDON:  Objection, Your Honor, exceeds the

15   scope.

16            THE COURT:  Objection is overruled.

17            THE WITNESS:  I don't remember, Counsel.

18            There were comments from other entities that we

19   received.  So I don't ...

20   BY MR. CASTORIA:

21   Q.   Did you participate in any discussions about whether the

22   proposed regulation should include specific penalties for

23   anyone who discloses a confidential Schedule B against the

24   confidentiality -- the regulation.

25            MS. GORDON:  Objection, Your Honor, exceeds the scope
```

1    of direct.

2              THE COURT:  The objection is sustained on that

3    question.

4              MR. CASTORIA:  Nothing further, Your Honor.

5              THE COURT:  Redirect?

6              MS. GORDON:  I have noting further, Your Honor.

7              Thank you Ms. Ibanez.

8              THE COURT:  Ms. Ibanez, was there a complaint which

9    was being investigated when the attorney general demanded the

10   Schedule B from the Thomas More Law Center?

11             THE WITNESS:  No, Your Honor.

12             THE COURT:  Any complaint against the Thomas More Law

13   Center?

14             THE WITNESS:  No.  The Schedule B requirement --

15             THE COURT:  What was the reason for the demands of

16   the Schedule B in the matter of Thomas More Law Center?

17             THE WITNESS:  We demand Schedule B of all charities,

18   not just Thomas More Law Center, Your Honor.

19             THE COURT:  You told me that you looked at Schedule B

20   for complaints from the registry.  Was there a complaint in the

21   registry against Thomas More Law Center that required the

22   Thomas More Law Center to provide a Schedule B?

23             THE WITNESS:  The Schedule B has to be filed by all

24   charities, and it doesn't --

25             THE COURT:  No --

```
 1              THE WITNESS:  -- it's not complaint driven, Your

 2    Honor.

 3              THE COURT:  Would you read the question to the

 4    witness.

 5              (Question read.)

 6              THE WITNESS:  No.

 7              THE COURT:  That's what this lawsuit is all about.

 8              You may step down.

 9              THE WITNESS:  Thank you.

10              THE COURT:  Call your next witness.

11              MR. ZEDPDA:  Your Honor, defendants call Professor

12    Ray Madoff to the stand.

13              THE CLERK:  Please raise your right hand.

14              (Witness sworn.)

15              THE WITNESS:  I do.

16              THE CLERK:  Thank you.

17              Please state your true and full name, spelling your

18    last name.

19              THE WITNESS:  Ray Dietz Madoff, M-a-d-o-f-f.  The

20    middle name is D-i-e-t-z, R-a-y.

21         RAY MADOFF; DEFENSE WITNESS, SWORN, TESTIFIED:

22                        DIRECT EXAMINATION

23    BY MR. ZEDPDA:

24    Q.   Good afternoon.

25              Are you currently employed?
```

```
1    A.   Yes, I am.

2    Q.   What is your current employment?

3    A.   I'm a professor at Boston College Law School.

4    Q.   How long have you been a professor?

5    A.   Twenty-three years.

6    Q.   What subject areas do you teach?

7    A.   I teach estate planning, wills and trusts, estate and gift

8    tax and policies about the laws governing the dead.

9    Q.   And do you have any other responsibilities, professional

10   responsibilities?

11   A.   Yes.  I'm also the founder and director of the Boston

12   College Law School forum on philanthropy and the public good.

13   Q.   And what is that forum?

14   A.   That's a public interest think tank that has been formed

15   to consider questions of public policy and philanthropy.

16   Q.   And what activities does the forum undertake?

17   A.   We primarily hold conferences and publish papers, support

18   research.

19   Q.   Could you briefly provide examples of some of the past

20   activities of the forum.

21   A.   Sure.

22        MR. CASTORIA:  Pardon we.  We've objected to

23   Professor Madoff being called as a rebuttal witness to a

24   sociologists and have pending as ECF No. 69 a motion in limine

25   to preclude her from testifying as a rebuttal witness as
```

1    unqualified.

2           MR. ZEDPDA:  Your Honor, as we explained in our

3    opposition to the motion in limine, Professor Madoff has

4    extensive experience on the areas of philanthropy and

5    charitable giving and is providing testimony to respond

6    directly to the opinions set forth by Dr. Schervish.  The fact

7    that Professor Madoff is not in the same discipline is not

8    determinative of that particular issue.  The focus is whether

9    she has the expertise and reviewed his report and is ready to

10   go ahead and respond to it, which she is.

11          If I may be allowed, I can further explore her

12   qualifications to respond to Dr. Schervish's --

13          THE COURT:  I'll let do you that, but I'll reserve

14   ruling on that.

15   BY MR. ZEDPDA:

16   Q.   Professor Madoff, if you would, please briefly describe

17   some of the activities of the forum on philanthropy in the

18   public good.

19   A.   Sure.

20          So we've held a number of conferences on matters of

21   charitable giving and the rules governing charities.  We held a

22   conference in Washington D.C. on the rise of donor advise funds

23   and should Congress responds.  We held a conference with the

24   Stanford Philanthropy and Civil Society, PACS Center, on issues

25   of giving and time.  We've held a philanthropy boot camp for

```
 1   journalists educating them on the matter of philanthropy rules,
 2   philanthropy policy.  We're holding scholars conference next
 3   week at Boston College where scholars from a variety of
 4   disciplines are coming together to discuss matters of
 5   philanthropic giving and policies related to that.
 6   Q.   And how is the forum funded?
 7   A.   We received funding from a number of foundations,
 8   including the Ford Foundation; the Carnegie Corporation;
 9   Hewlett Foundation, the Atlantic Philanthropies --
10            THE REPORTER:  Please slow down.
11            THE WITNESS:  I'm so sorry.
12            Hewlett Foundation, Atlantic Philanthropies.  About
13   ten different foundations have funded our work.
14            MR. ZEDPDA:
15   Q.   Do you hold any graduate degrees?
16   A.   Yes, I do.  I have J.D. from NYU Law School, and I have an
17   LLM taxation from NYU Law School.
18   Q.   Are you currently a practicing attorney?
19   A.   No, I'm in inactive status.
20   Q.   Did you ever practice law?
21   A.   Yes, I did.  I practiced for nine years in New York and
22   Boston.
23   Q.   What subject areas did you practice in?
24   A.   I was a practicing tax attorney.
25   Q.   Have you authorized any publications?
```

```
 1   A.   Yes, I have.  I've written numerous law review articles
 2   and two books.  I am the lead author of the book Practical
 3   Guide to Estate Planning, which is one of the leading treatises
 4   on estate planning, including a section on charitable giving;
 5   and that has been published every single year since, I think,
 6   2001 was our first year of publication.
 7            I'm also the author of book called Immortality and
 8   the Law:  The Rising Power of the American Dead that has a
 9   chapter devoted to chartable giving, rules governing charitable
10   giving and how charitable giving expresses individual's desires
11   to carry forth their wishes during life and after death.
12   Q.   Do you have any specialization in subject areas?
13   A.   In terms of charitable giving?
14   Q.   You mentioned that have you some experience in estate
15   planning.
16            What is that?
17   A.   Thank you.
18            Estate planning is basically assisting people in the
19   distribution of their wealth during life and at death to
20   fulfill their desires and plans, and that includes charitable;
21   giving; that's a significant portion of estate planning.  And
22   I've been teaching estate planning for 23 years, and I speak a
23   lot about matters of estate planing and particularly with
24   respect to charitable giving.  I advise charities about how to
25   reach out to their donors; I speak frequently to groups of
```

```
 1   fundraisers about how to structure charitable donations; I
 2   speak to donors directly; and I do a lot of work about forms of
 3   charitable giving.
 4   Q.   And your work specifically on the philanthropy side, what
 5   does that involve?
 6   A.   So philanthropy side, again, is these questions about
 7   philanthropy and how people can commit their wealth to the
 8   causes that they believe in.  I also write a lot about the
 9   policies governing philanthropy.
10   Q.   Are you a member of any professional organizations?
11   A.   I am.  I'm a fellow, academic fellow, of the American
12   College of Trust and Estates Counsel.  That's called ACTEC; I'm
13   the member of the trust and estates division of the AALS.
14   That's the American Association of Law Schools.  I was the past
15   president of that section.  I'm a member of the American Law
16   Institute.  That's the leading group of lawyers and judges
17   involved in matters of policy, writing the restatement,
18   et cetera.
19   Q.   Have you ever provided testimony before any government
20   entity?
21   A.   I have.  I have provided testimony to Congress about the
22   estate tax and how that fits into wealth planning in general.
23   I've also provided testimony to Treasury on regulations, but
24   that was a long time ago.
25   Q.   When you say "Treasury," do you meant the Department of
```

```
 1   Treasury?

 2   A.   The Department of the Treasury, yes.

 3   Q.   You mentioned two books that you have published.

 4          Have you published any other works?

 5   A.   Yes, I published lots of articles in a variety of

 6   different areas, but several of the articles involved

 7   charitable giving and policies related to charitable giving.

 8   Q.   Could you just briefly describe -- or name some of

 9   publications in which you have been published.

10   A.   It's going to be very hard to name them without my C.V.

11   before me, but they always have a colon in them; and I can't

12   remember the names of them off the top of my head.

13   Q.   That's fine.

14          Have you also written opinion pieces?

15   A.   Yes, I've written quite a few opinion.  I've published --

16   actually, my testimony I said -- on my C.V. it says seven, but

17   I've actually published nine op-eds in the *New York Times*; I've

18   also published in the *Washington Post*, in the *L.A. Times*, in

19   the *Chicago Tribune*, in the *Boston Globe* and a variety of

20   papers.

21   Q.   And you've mentions your C.V.

22          Does the court have two documents that have been

23   previously marked as Exhibits 78 and 79, which I believe have

24   been stipulated to?

25          THE CLERK:  Seventy-eight and 79 should be here.
```

```
 1          MR. ZEDPDA:  Yes.  Thank you.

 2          THE CLERK:  Exhibits 78 and 79 are placed before the

 3   witness.

 4          THE COURT:  All right.  Go ahead.

 5          THE WITNESS:  So I've published articles:  What Leona

 6   Helmsley Can Teach Us About the Charitable Deduction, and a --

 7   does this have my most -- there's an article -- I guess it's

 8   not included this one -- and --

 9   BY MR. ZEDPDA:

10   Q.   If I may, you're looking at Exhibit 78, correct?  It's

11   marked at the front of it.

12   A.   Exhibit 78.  Yes.

13   Q.   Okay.  Is that -- you could look at it briefly.

14          Is this an accurate and true copy of your C.V.?

15   A.   Well, it's definitely a copy of my C.V., but it does --

16   not updated to include everything that I've done.

17   Q.   Okay.  So it's a little bit out of date, but it's your

18   C.V.?

19   A.   Yes.

20   Q.   Could you look at Exhibit No. 79, please.

21   A.   Yep, yes.

22   Q.   Do you recognize this document?

23   A.   Yes.  This is the web page at Boston College Law School

24   that has a description of me and my work.

25   Q.   Thank you.
```

```
 1            Is that a true and accurate copy of the
 2   bio-information that appears in the website for your --
 3   A.   Yes, it is.
 4            MR. ZEDPDA:  Your Honor, defendants move Exhibit 78
 5   and 79 into evidence.  They've been stipulated to, I believe.
 6            THE COURT:  Do you want to question her?
 7            MR. CASTORIA:  Yes, I do.  I have no objection to the
 8   two exhibits, however.
 9            May I do it from here, Your Honor?
10            THE COURT:  Yes, you may do it from there.
11                      VOIR DIRE EXAMINATION
12   BY MR. CASTORIA:
13   Q.   Ms. Madoff, have you -- do you have any degrees in
14   sociology?
15   A.   No, I do not.
16   Q.   Have you ever taken a class in sociology?
17   A.   Not that I'm aware of.
18   Q.   You've been designated as a rebuttal witness in this case?
19   A.   Yes, I have.
20   Q.   Have you, from your legal background, reached any
21   conclusions as to the validity of the sociological methods
22   employed by Dr. Schervish in reaching his analysis of this
23   case?
24   A.   I'm sorry.  Could you repeat the question, please.
25   Q.   Yes.
```

```
 1              Have you based, on your legal background, made any
 2    analysis of the sociological validity of the methods used by
 3    Professor Schervish in reaching his opinions in this case?
 4    A.    In reading Dr. Schervish's opinion, I have come to the
 5    conclusion that his things that he wrote about did not support
 6    his conclusions.
 7              MR. CASTORIA:  Object as nonresponsive, Your Honor.
 8              THE COURT:  The objection is sustained.  It will go
 9    out.
10              MR. CASTORIA:  Perhaps I can ask it one more time to
11    see if we can get an answer.
12    Q.    Ms. Madoff, have you as a lawyer found any legal authority
13    that indicates to you that the methodology provided in the case
14    by Professor -- Dr. Schervish -- getting my titles mixed up --
15    were improper as a matter of law?
16    A.    I'm so sorry.  I literally don't understand the question.
17    Please forgive me.  Try again?  I don't understand --
18    Q.    Okay.
19              Are you stating legal opinion here today?
20    A.    I'm giving an opinion about forms of charitable giving.
21    So that includes matters of law, legal ways that somebody can
22    give charitably and give anonymously; so law is involved.
23    Q.    As a rebuttal witness, do you have any legal authority or
24    legal opinion that Dr. Schervish's opinions, which you were
25    here and heard earlier in this case, are legally incorrect?
```

1  A.  That his opinions are legally incorrect?

2  Q.  Yes.

3       Is that your opinion?

4  A.  I don't know the difference between being incorrect and

5  being legally incorrect.  I believe they are incorrect.  I

6  believe it's related to the law governing anonymous giving.

7  Q.  And as a matter of sociology, you can't say whether

8  they're correct or incorrect, can you.

9  A.  Not as a matter of sociology, no.  I'm not a sociologists.

10 Q.  Have you conducted any interviews of Thomas More Law

11 Center donors?

12 A.  I have not.

13 Q.  Have you interviewed anybody connected with the Thomas

14 More Law Center?

15 A.  Have I interviewed anybody?

16 Q.  Yes.

17 A.  No.

18 Q.  Do you know any donors to the Thomas More Law Center?

19 A.  I have read the report of Tom Monaghan.

20      MR. CASTORIA:  Your Honor, we resubmit our motion in

21 limine and move to strike Professor Madoff as a rebuttal

22 witness.  She is providing her own affirmative testimony but

23 not rebutting our experts testimony.

24      THE COURT:  I am sorry to say that --

25      MR. ZEDPDA:  Your Honor --

```
 1              THE COURT:  -- that I have to rule that Ms. Madoff is
 2    not an expert in the field in which we are concerned in this
 3    case.
 4              MR. ZEDPDA:  Your Honor, if I may be heard briefly?
 5              I just wanted to point out that there is no case law
 6    that has been brought to the attention of the court that a
 7    rebuttal expert is limited to testify, can only be on the same
 8    subject area.  We're not offering Professor Madoff solely on
 9    legal aspects.  She has spoken at length about her experience
10    regarding philanthropy and the broader topic of the regulation,
11    which are --
12              THE COURT:  It's something else.
13              MR. ZEDPDA:  -- which are topics --
14              THE COURT:  She's not qualified in that area,
15    Counsel --
16              MR. ZEDPDA:  In that case, Your Honor, the motion in
17    limine that plaintiffs brought only covered two of three of Dr.
18    Madoff's opinions, not the third one, and therefore we'd ask
19    for permission to --
20              THE COURT:  No, she's not an expert in the field in
21    which we are concerned in this lawsuit.
22              All right.  Don't keep playing games with me,
23    Counsel.
24              MR. ZEDPDA:  Your Honor, if I may, if we could just
25    make an offer of proof very quickly about what she would
```

1   testify to if she were --

2           THE COURT:  No.  Get her on the basis of what she is

3   as an expert, not what she would testify to.  Has nothing to do

4   with it.

5           MR. ZEDPDA:  So just to be clear, the court's ruling

6   is that it doesn't --

7           THE COURT:  She's not an expert in the area in which

8   we are dealing within this lawsuit.

9           MR. ZEDPDA:  Thank you, Your Honor.

10          In that case, with the court's permission, we'd like

11  to excuse Ms. Madoff.

12          THE COURT:  Ms. Madoff, you are excused.  Thanks for

13  coming, but I'm sorry.

14          THE WITNESS:  Thank you, Your Honor.

15          THE COURT:  No.  You may -- you're excused.

16          MR. CASTORIA:  Your Honor, in light of the court's

17  ruling --

18          THE COURT:  Call your next witness.

19          MS. NGUYEN:  Yes, Your Honor.  Defense calls Joseph

20  Zimring, who we'll bring right now.

21          MR. CASTORIA:  Your Honor, in light of the court's

22  ruling, I'd like an opportunity to move that the exhibits

23  previously entered from Professor Madoff also be stricken.

24          THE COURT:  They are stricken.  They're not relevant.

25          THE CLERK:  Please raise your right hand.

```
 1              (Witness sworn.)

 2              THE WITNESS:  I do.

 3              THE CLERK:  Thank you.  Please take a seat.

 4              Please state your full and true name for the record

 5   and spell your last name.

 6              THE WITNESS:  My name is Joseph Noah Zimring.

 7   Z-i-m-r-i-n-g.

 8        JOSEPH ZIMRING; DEFENSE WITNESS, SWORN, TESTIFIED:

 9                        DIRECT EXAMINATION

10   BY MS. NGUYEN:

11   Q.   Good afternoon, Mr. Zimring.

12   A.   Good afternoon.

13   Q.   Are you currently employed?

14   A.   I am.

15   Q.   What do you do for work?

16   A.   I am currently employed as a deputy attorney general in

17   the charity and trust section of the California Attorney

18   General's office.

19   Q.   How long have you worked as a deputy attorney general for

20   the charitable trust section?

21   A.   Approximately nine years.

22   Q.   Briefly, can you please tell us your job duties.

23   A.   My primary duties are conducting investigations related to

24   misuse, misappropriation, and diversion of charitable assets

25   and protection of prospective donors from false and misleading
```

1    charitable solicitations and improper activities by charities

2    soliciting charitable donations.

3    Q.   How much of your time approximately is spent on

4    investigations?

5    A.   It can vary, but the bulk of my time is spent on

6    investigations.  I would estimate typically about 75 percent.

7    Q.   And when you conduct your investigations, are there

8    documents that you typically review?

9    A.   Yes.  Typically we will review the IRS form 990, its

10   attached schedules, including Schedule B filed by the

11   organization; the annual registration renewal reports; any

12   other documents or filings filed with the attorney general's

13   office; and any supplemental information that may have been

14   provided with a complaint.

15   Q.   Have you used Schedule B in any of the investigations that

16   you have personally conducted?

17        MR. CASTORIA:  Your Honor, I'm going to object at

18   time that this is cumulative of the prior investigations that

19   are already in the record in the stipulated designations of

20   testimony and in the prior case as well.

21        THE COURT:  I don't -- and I can determine the credit

22   to be given to it.

23        MR. CASTORIA:  Very well.

24        MS. NGUYEN:  Thank you, Your Honor.

25        THE WITNESS:  I have used Schedule B in the

1    investigations I've conducted.

2    BY MS. NGUYEN:

3    Q.   Focusing only on those investigations that you've

4    personally conducted, can you please give us a specific example

5    of how you have used Schedule B.

6    A.   One example was an investigation of the Dodgers Dream

7    Foundation related to allegations of misuse of charitable

8    assets in order to provide compensation to an executive with

9    the Dodgers team.  The Schedule B provided information that the

10   Dodgers Dream Foundation was receiving donations not just from

11   the Dodgers organization, but have the public including, other

12   charitable foundations, individuals and at some point local

13   governments as well.

14         MR. CASTORIA:  Objection, Your Honor.

15   BY MS. NGUYEN:

16   Q.   Is it important for you to know that the donations are

17   coming from the public.

18         MR. CASTORIA:  Your Honor, I have an objection --

19         THE COURT:  Yes.

20         MR. CASTORIA:  -- which is the *Dodger* case that's

21   referred to was never disclosed to us in discovery prior to

22   trial.

23         MS. NGUYEN:  That's not true, Your Honor.  They

24   designated material from Mr. Zimring's testimony about this

25   precise example; this is not new material to them.

```
 1              THE COURT:  Counsel?

 2              MR. CASTORIA:  We have no documents about it.  We

 3    have no exhibits about it.

 4              THE COURT:  What documents were given to the

 5    plaintiff?

 6              MS. NGUYEN:  They --

 7              THE COURT:  What document was given to the plaintiff?

 8              MS. NGUYEN:  The transcript of Mr. Zimring's

 9    deposition testimony in Americans for Prosperity, which, again,

10    they designated.

11              THE COURT:  That's not the document.  What document

12    was given to the plaintiff?

13              MS. NGUYEN:  The documents that we have are --

14              THE COURT:  He is testifying to, the Dodger matter.

15              MS. NGUYEN:  Yes, the Dodger matter, Your Honor.

16              THE COURT:  What document was produced to the

17    plaintiff?

18              MS. NGUYEN:  We have confidential investigative

19    reports, which we informed the plaintiff that we would not turn

20    over because of their confidentiality; moreover, plaintiff was

21    well aware of this example, and plaintiff, Your Honor, chose

22    not to depose Mr. Zimring.

23              THE COURT:  What did you give him?  What did you give

24    him?  That's what I've said.

25              MS. NGUYEN:  Specifically, about the Dodger
```

```
 1    foundation, nothing, Your Honor; but he did have the

 2    opportunity to depose Mr. Zimring, and he chose not to, Your

 3    Honor.

 4              THE COURT:  That's not the answer, Counsel.  Don't

 5    play games.

 6              MS. NGUYEN:  Yes, Your Honor.

 7              THE COURT:  All right.  We'll not deal with that

 8    subject matter.

 9              MS. NGUYEN:  Yes, Your Honor.

10              THE COURT:  Go ahead.

11              MS. NGUYEN:  Thank you, Your Honor.

12    Q.   Moving on, Mr. Zimring.

13              Can you please give us another specific example -- I

14    beg your pardon.

15              Are there other specific examples that you can share

16    with the worth in which you have used Schedule B in an

17    investigation you have personally conducted?

18    A.   Yes.  I was involved in an investigation of an animal

19    rescue organization, an animal sanctuary, that operated in

20    connection with a for-profit entity performing similar

21    functions that was owned by the person who was running the

22    charity.

23              The allegations were that the charity was misusing

24    assets to subsidize the related for-profit entity.

25    Q.   How did Schedule B assist you with your investigation?
```

1  A.   In conducting the investigation, we saw payments from the

2  charity to the for-profit entity.   The charity claimed that the

3  for-profit entity was subsidizing the charity, and if that was

4  the case, we would have expected to see the nature and amounts

5  of the subsidies being reported by the for-profit foundation

6  listed on the charity's Schedule B reports.

7       There was nothing from the for-profit business that

8  was disclosed in the Schedule B.   So that was inconsistent with

9  the charity's claims that it was being subsidized by the

10  for-profit entity and was more consistent with the information

11  we were seeing that the charitable assets were being misused

12  for the benefit of the related for-profit entity.

13  Q.   Are there other specific examples you could tell us where

14  you used Schedule B for your investigations?

15  A.   Yes.   I have an investigation pending of another animal

16  rescue, animal sanctuary organization, related to allegations

17  that the people running the charity were misusing charitable

18  assets, including using charitable assets for their own

19  personal purposes, like first-class trips to Hawaii and travel

20  to Las Vegas and a number of other things.

21       In response to our investigation, the founders -- the

22  people operating the charity were claiming that any use of the

23  charitable assets were really repayment for funds that had been

24  loaned or advanced to the charity by them, that they were owed.

25  We were not able to find any information that corroborated the

1    amounts that they were saying they were entitled to.  We did

2    see in the Schedule B that members of the family of the people

3    who were running the charity were making donations to the

4    charity, and so that clearly would not have been money that

5    they were entitled to repayment on.

6           MR. CASTORIA:  Your Honor, I'd like to object on the

7    basis I cannot tell from the description if this is an

8    investigation that was previously disclosed to us in discovery.

9    Mr. Zimring is named in several investigations that in

10   discovery the attorney general noted.  I can't tell which one.

11          MS. NGUYEN:  Yes.  This is No. 4, Mr. Castoria, and

12   you designated portions of his deposition testimony on this

13   exact example.

14          MR. CASTORIA:  Thank you.

15          THE COURT:  All right.

16   BY MS. NGUYEN:

17   Q.   Were there other ways to get the donor information that

18   you just testified about?

19   A.   Sometimes there are other ways.  Sometimes the charity

20   will be able to -- is willing to voluntarily produce it.

21   Sometimes we can compel the production of that information, but

22   in other cases we have been unable to get such information from

23   the charity.

24   Q.   Why not just go to the charity directly then?

25   A.   In some cases we're using the Schedule B to identify

```
 1   whether this is an investigation worth pursuing, whether we
 2   want to spend time and resources to investigate the
 3   organization.  There are consequences to the charity when we do
 4   that because the charity is going to need to retain counsel,
 5   it's going to incur expenses responding to the requests we've
 6   made, and that is going to be using up charitable assets as
 7   well.  So the Schedule B can be efficient tool that provides
 8   useful information early on in assisting us to determine
 9   whether or not we want to pursue an investigation.
10           In other cases we've had difficulty where the charity
11   won't provide information or it takes a lengthy amount of time
12   and resources to get that same information which may already be
13   available in this Schedule B.
14   Q.   Are there other drawbacks in going directly to the
15   charity?
16   A.   Well, you're also tipping the charity off that you may be
17   conducting an investigation, and I've had cases where the
18   charity has been -- once it's aware that we are investigating,
19   it has altered or destroyed information.
20   Q.   Without using any --
21           MR. CASTORIA:  Objection, relevance, Your Honor.
22           THE COURT:  Relevancy, yes.  The objection is
23   sustained as to relevancy on that statement.
24   BY MS. NGUYEN:
25   Q.   When you -- as an investigator, have there been times when
```

1  you've contacted a charity to directly -- for their donor

2  information?

3  A.   Yes.

4  Q.   And when you do so, do you consider the consequences of

5  doing so?

6  A.   Yes.  If the charity or the people supporting the charity

7  become aware of an investigation, it can have an adverse affect

8  on a charity that may ultimately not have done anything wrong,

9  and when an investigation becomes known, the ability of the

10  charity to raise funds and continue operating can be

11  compromised as well.

12         MR. CASTORIA:  Again, object on relevancy, Your

13  Honor.

14         THE COURT:  The objection is sustained.

15         MS. NGUYEN:  Yes, Your Honor.  I'll move on.

16  Q.   Mr. Zimring, is Schedule B useful to you in your job as a

17  deputy attorney general?

18  A.   Yes.

19         MR. CASTORIA:  Objection, overbroad.

20         THE COURT:  The objection is sustained.

21  BY MS. NGUYEN:

22  Q.   Mr. Zimring, can you identify for us specific ways in

23  which Schedule B has been useful to you as a deputy attorney

24  general.

25  A.   The Schedule B to the 990 can be useful in any number of

1    ways, and it has been useful in a number of my investigations.

2    The Schedule B provides specific information about revenue

3    that's coming in to the charity that's not available elsewhere

4    in the 990.   It provides identifiable information about

5    significant donors who may ultimately be witnesses or victims

6    in any given case.

7         The information also is useful in connection with

8    other either contractors or individuals affiliated with the

9    organization because if you see a person or entity on both

10   sides who's both giving to the organization and then receiving

11   assets from the organization, that may suggest there's an

12   improper relationship or misuse of donors assets.

13        MR. CASTORIA:   Lacks foundation and object on

14   relevancy.

15        THE COURT:   The objection is sustained on foundation.

16   BY MS. NGUYEN:

17   Q.   As a deputy attorney general, do you conduct

18   investigations of charities?

19   A.   I do.

20   Q.   And in those investigations, have there been times in

21   which you've used Schedule B?

22   A.   There have been times I regularly use Schedule B when it's

23   available in the form 990.

24   Q.   And do you have an understanding of how that -- how use of

25   the Schedule B assists you in performing your job duties?

```
 1              MR. CASTORIA:  Objection, overbroad.

 2              THE COURT:  Sustained.

 3  BY MS. NGUYEN:

 4  Q.   Do you have an understanding how Schedule B is

 5  specifically useful to you in conducting your investigation?

 6              MR. CASTORIA:  Same objection, Your Honor.

 7              THE COURT:  The objection is sustained.

 8              MS. NGUYEN:  Yes, Your Honor.

 9  Q.   Going back to specific uses of Schedule B, is there an

10  example without -- keeping in mine the court's admonition that

11  we discuss examples already disclosed to the plaintiff --

12              THE COURT:  Ask him how many times he's used it in

13  the last year.

14              MS. NGUYEN:  Yes, Your Honor.

15              THE COURT:  Schedule B.

16  BY MS. NGUYEN:

17  Q.   How many times have you used Schedule B in the last year?

18  A.   I don't know that I could quantify it in the last year.

19  My time has been primary spent litigating a matter in which

20  there were no 990 issues.  I know I have some open

21  investigations in which the Schedule B has been useful, but I

22  can't quantify how many times I've looked at it in the past

23  year specifically.

24  Q.   You just testified that you've -- that you have found

25  Schedule B useful.
```

```
 1   A.    That's correct.

 2   Q.    And how is it useful to you?

 3             MR. CASTORIA:  Objection, Your Honor, same as before,

 4   Your Honor.

 5             THE COURT:  The objection is sustained.

 6   BY MS. NGUYEN:

 7   Q.    Is there one more specific example you can share with the

 8   court regarding your use of Schedule B involving a private

 9   foundation?

10             MR. CASTORIA:  Objection, Your Honor.  Relevancy,

11   Your Honor.  We're not a private foundation.

12             THE COURT:  Objection.

13   BY MS. NGUYEN:

14   Q.    You do you have to file your Schedule B, just as private

15   foundations do.

16             MR. CASTORIA:  Same objection, Your Honor.

17             THE COURT:  The objection is sustained.

18   BY MS. NGUYEN:

19   Q.    In your current duties as deputy attorney general --

20             THE COURT:  We're dealing with Thomas More Law

21   Center.  That's what we're dealing with in this litigation.

22             MS. NGUYEN:  Yes, Your Honor.

23             No more questions.

24             THE COURT:  Cross-examination.

25             MR. CASTORIA:  Take two minutes, Your Honor?
```

```
 1                THE COURT:  All right.

 2                MR. CASTORIA:  Organize things.

 3                I'm ready, Your Honor.

 4                THE COURT:  All right.

 5                MR. CASTORIA:  Thank you.
```

**CROSS-EXAMINATION**

```
 7    BY MR. CASTORIA:

 8    Q.   Mr. Zimring, good afternoon.

 9    A.   Good afternoon.

10    Q.   My name is Louie Castoria, and I represent the plaintiff,

11    Thomas More Law Center; we have not met before.

12                I have a few questions for you based on your direct

13    testimony.

14                First, you said something along with the lines of

15    contacting a charity to determine whether an investigation

16    should go forward.

17                Is that correct?

18    A.   I don't believe so.

19    Q.   What did you say in that regard?  It was close.

20                MS. NGUYEN:  Objection, overbroad, Your Honor.

21                THE COURT:  The objection is sustained.

22    BY MR. CASTORIA:

23    Q.   Is it your testimony that is -- sorry.

24                Is it is your testimony that the attorney general's

25    office sometimes does contact a charity directly before making
```

U.S. DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
COURT REPORTER DEBORAH K. GACKLE

1    a determination to go forward with an investigation?

2    A.    I don't believe that was my testimony.  It's possible when

3    we're reviewing a complaint or information that before we make

4    a decision as to how to allocate resources or whether to fully

5    go forward with an investigation, we may require additional

6    information as part of that threshold determination.

7    Q.    And are you familiar with whether the attorney general's

8    office or registry had written communications with the Thomas

9    More Law Center in this case?

10   A.    I am not --

11          MS. NGUYEN:  Objection, exceeds the scope of direct.

12          THE COURT:  Overruled.

13          THE WITNESS:  I am not familiar.

14          MR. CASTORIA:  Then I won't ask you about them.

15   Q.    You mentioned the risk of tipping charity off by

16   contacting them in an investigation process.

17          Have you any information that that occurred with

18   respect to the Thomas More Law Center?

19   A.    I have no information about the Thomas More Law Center.

20   Q.    Have you conducted an investigation that you can testify

21   about regarding any religiously based charity organization that

22   is a public foundation?

23   A.    As I sit here, I can't think of a specific example.  I'm

24   sure I have been involved in investigations with organizations

25   that are religiously affiliated and are also public charities,

```
 1   but I don't have a specific recollection sitting here.
 2   Q.   Thank you.
 3            In your review of -- let me ask a foundational
 4   question.
 5            You sometimes review documents that are filed with
 6   the registry by a charity in the course of your work, correct?
 7   A.   Typically that will be one of the first things we do in
 8   evaluating a case to determine whether we're going to conduct
 9   an investigation.
10   Q.   Do you also review other forms that a charity files with
11   the attorney general's office, such as its annual registration
12   and audit report?
13   A.   Yes.
14   Q.   Do you review those documents at the same time as the form
15   990 or separately?
16   A.   Well, the audit reports typically are not filed with our
17   office; so that's something we would have to affirmatively seek
18   out in most cases.
19            The registration renewal forms are something that we
20   would routinely review.
21   Q.   Where would you go to get the audits reports?
22   A.   The charities are required to maintain them.  Some
23   maintain them on-site; some will direct us to their accountants
24   or attorneys.
25   Q.   Do some charities file their annual audit reports together
```

```
 1   with their annual registration renewals?

 2   A.    It's possible.

 3   Q.    Do you know whether the Thomas More Law Center has done

 4   so?

 5   A.    That, I don't know.

 6   Q.    So as you sit here today, do you know any fact that is

 7   missing from what the attorney general needs to conduct an

 8   investigation of the Thomas More Law Center if it looked at

 9   both its redacted form 990 without the donor list and also

10   looked at its annual registration and audit report?

11   A.    Well, it would completely depend on the nature of the

12   investigation, and the type of information can vary from

13   investigation to investigation.  The information in the form

14   990, including the Schedule B, is very useful to us in many

15   investigations.  There are investigations where it's not

16   sufficient or additional information is needed.

17   Q.    As you sit here today, do you know whether reviewing the

18   information available about Thomas More Law Center in the

19   registry would be sufficient to determine that Tom Monaghan was

20   the founder and initially the funder of the Thomas More Law

21   Center?

22         MS. NGUYEN:  Objection, exceeds the scope of direct.

23         THE COURT:  Objection is overruled.

24         THE WITNESS:  I don't know the answer to that.

25         MR. CASTORIA:  Okay.
```

1   Q.   You mentioned a couple of specific cases, and I understand

2   you're not -- for matters in investigation, we're not using

3   proper names.

4        There was one that counsel helped identify as No. 4

5   in a series of interrogatory responses.  That was the one about

6   use of restricted funds and loans listed as contributions.

7        Do you have that one in mind?

8   A.   I believe so.

9   Q.   And you were at the deputy attorney general on that case?

10  A.   That's an open matter; so I'm still the assigned attorney.

11  Q.   And who is the auditor assigned?

12  A.   Currently I believe it's Martha Gallardo.

13  Q.   How did that investigation -- strike that.

14       Was that investigation initiated by receipt of a

15  complaint?

16  A.   Yes.

17  Q.   Who was the complainter?  Not by name but by description.

18  A.   An insider with the organization.

19  Q.   Is it fair to say that there was nothing about the

20  Schedule B filing of that organization that gave rise to the

21  investigation?

22  A.   The Schedule B, along with the 990, would have been part

23  of the information we used to evaluate the complaint to make

24  the determine to go forward with an investigation.

25  Q.   Understood.

```
 1              But the complaint came first; is that right, the

 2    insider's complaint?

 3    A.   Yes.

 4    Q.   Did the complainant give the identity of the donor who was

 5    involved?  I'm not asking for the name, just did they identify

 6    the donor?

 7    A.   I believe that the complainant did not have the full

 8    information of the donor.  There was an individual affiliated

 9    with the donor, but the donor was identified as a foundation

10    based in the Virgin Islands.

11    Q.   What did the trust section do to determine the identity of

12    the donor?

13    A.   Well, the Schedule B, in part, helped us determine the

14    identity of the significant donor.

15    Q.   Okay.

16              In part, you said?  Did the trust section also ask

17    the complainant who the identity was?

18    A.   Yes.

19    Q.   Did the attorney general's office already have the

20    unredacted Schedule B of the charity at the time it started the

21    investigation?

22    A.   I believe we had unredacted Schedule Bs for a number of

23    years; I don't know if we had them for every year.  I think ...

24    Q.   Had you finished your answer?

25    A.   My recollection is we had the unredacted Schedule B for a
```

1    number of years.

2    Q.   Okay.

3         And in the rest of the form 990 filings, there's also

4    a Schedule L; is that right?

5    A.   There may be.  I don't know.  I don't recall if the

6    organization had a Schedule L with every filing.

7    Q.   Okay.

8         But that's a standard part of a form 990 filing,

9    isn't it?

10   A.   To be honest with you, as I sit here, I don't recall which

11   Schedule L is.

12   Q.   If I say loans to and from interested persons, would that

13   ring a bell?

14   A.   Yes.

15   Q.   And for financial improprieties of the type you're

16   suggesting, isn't it possible Schedule L would reveal the

17   information you were looking for?

18   A.   It's possible Schedule L will provide information related

19   to the loans.  There were issues whether or not the

20   organization was providing accurate information, and so there

21   were inconsistencies with Schedule L and other information we

22   had; and that's one of the reasons Schedule B was relevant.

23   Q.   There was one other investigation you mentioned.  It

24   was -- turned out it was No. 5 on that list.

25        The for-profit business that was not on the charity's

```
 1   Schedule B and the relationship with the for-profit business.
 2          Do you remember that one?
 3   A.   Yes.
 4   Q.   Okay.
 5          You were the deputy attorney general on that?
 6   A.   I still am.
 7   Q.   Still am.
 8          That's still pending obviously?
 9   A.   That is still pending.
10   Q.   Okay.  Who initialed -- who initially made the complaint
11   that started that file?
12   A.   My recollection is it was an independent contractor who
13   had been hired by the organization and became aware of some of
14   the information.
15   Q.   Once again, was a Schedule B the source of information
16   that the attorney general or the registry used in even knowing
17   there was there something to investigate, or was it the
18   complaint?
19   A.   My recollection is the complaint would have started us
20   looking at the organization, and then the IRS form 990,
21   including the Schedule B, would have been information we used
22   to evaluate the complaint and make a determination as to
23   whether or not to pursue an investigation.
24   Q.   Have you of personally successfully audited a charity
25   without having its Schedule B?
```

1    A.    There are organizations who properly are not required to

2    file Schedule Bs depending on the nature of the activities and

3    the nature of the donations, and so my expectation is it's very

4    likely that I would have successfully completed an audit or an

5    investigation of an organization without having a Schedule B,

6    assuming the organization was not required to file one.

7    Q.    Thank you, Mr. Zimring.

8             I have no further questions for you.

9             THE COURT:  Redirect?

10            MS. NGUYEN:  No redirect, Your Honor.  Thank you.

11            THE COURT:  All right.  You may step down.

12            THE WITNESS:  Thank you, Your Honor.

13            THE COURT:  Call your next witness.

14            MR. CALIA:  Your Honor, things have proceeded a

15   little more quickly this afternoon than we expected.  We're

16   trying to reach our next witness, but I'm not sure how quickly

17   he can be in court.  He could be available first thing tomorrow

18   morning, and we will not take too much time with him.

19            Is that acceptable to the court?

20            THE COURT:  Ten o'clock tomorrow morning.

21            (Proceedings concluded at 3:33 p.m.)

22                       - - - - -

23

24              C E R T I F I C A T E

25

U.S. DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
COURT REPORTER DEBORAH K. GACKLE

1          I hereby certify that pursuant to Section 753,

2    Title 18, United States Code, the foregoing is a true and

3    correct transcript of the stenographically reported proceedings

4    held in the above-entitled matter and that the transcript page

5    format is in conformance with the regulations of the Judicial

6    Conference of the United States.

7

8     Date:  September 15, 2016

9

10                    /S/_____

11                        Deborah K. Gackle
                           CSR No. 7106
12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. CASTORIA: [6] 40/21 45/7 48/19 58/11 75/6 75/21
BY MR. ZEDPDA: [3] 50/22 52/14 57/8
BY MS. GORDON: [7] 16/21 26/20 27/1 29/20 34/22 38/2 40/12
BY MS. NGUYEN: [12] 63/9 65/1 65/14 69/15 70/23 71/20 72/15 73/2 73/15 74/5 74/12 74/17
MR. CALIA: [18] 5/22 6/20 6/25 7/4 7/8 7/11 7/14 8/25 9/6 9/9 9/17 9/21 9/23 10/4 10/11 13/23 16/5 83/13
MR. CASTORIA: [46] 5/5 5/15 5/19 26/18 26/24 27/15 29/10 33/13 34/6 34/8 34/17 34/21 38/11 39/9 40/8 48/2 49/3 51/21 58/6 59/6 59/9 60/19 62/15 62/20 64/16 64/22 65/13 65/17 65/19 66/1 69/5 69/13 70/20 71/11 71/18 72/12 72/25 73/5 74/2 74/9 74/15 74/24 75/1 75/4 76/13 78/24
MR. ZEDPDA: [12] 50/10 52/1 53/13 56/25 58/3 60/24 61/3 61/12 61/15 61/23 62/4 62/8
MS. GORDON: [21] 19/2 24/6 33/19 33/21 34/1 34/5 34/7 34/12 34/19 35/17 37/12 37/25 38/16 39/13 39/16 39/18 40/17 45/4 48/13 48/24 49/5
MS. NGUYEN: [21] 62/18 64/23 65/22 66/5 66/7 66/12 66/14 66/17 66/24 67/5 67/8 67/10 69/10 71/14 73/7 73/13 74/21 75/19 76/10 78/21 83/9
THE CLERK: [10] 16/7 16/10 16/12 38/1 50/12 50/15 56/24 57/1 62/24 63/2
THE COURT: [100]
THE REPORTER: [2] 16/17 53/9

THE WITNESS: [26] 16/9 16/11 16/14 16/18 27/18 29/16 35/16 48/16 49/10 49/13 49/16 49/22 49/25 50/5 50/8 50/14 50/18 53/10 57/4 62/13 63/1 63/5 64/24 76/12 78/23 83/11

**$**
$2 [1] 47/14
$5,000 [2] 15/18 27/12

**-**
-California [1] 3/6

**/**
/S [1] 84/10

**1**
100,000 [1] 11/17
11 [1] 22/13
11000 [1] 3/6
1149 [1] 1/25
122,000 [1] 22/22
1234 [1] 3/8
1300 [1] 2/16
14 [4] 1/18 5/1 11/21 27/8
15 [1] 84/8
15-3048-R [1] 1/10
16 [1] 4/5
1702 [1] 2/22
18 [1] 84/2
1:40 P.M [1] 5/2

**2**
2001 [1] 54/6
2002 [1] 17/8
2010 [2] 29/24 41/11
2011 [1] 8/15
2012 [1] 17/13
2013 [1] 41/11
2014 [1] 17/15
2015 [1] 29/25
2016 [4] 1/18 5/1 40/16 84/8
2100 [1] 2/8
213 [1] 1/25
213-897-5677 [1] 2/23
213-897-5775 [1] 2/24
23 [3] 22/6 36/1 54/22
25 [2] 20/14 20/15

**3**
300 [1] 2/22
300,000 [1] 22/17
310 [1] 38/8
312 [1] 1/24
3:33 [1] 83/21

**4**
4-H [1] 13/14
40 [3] 4/5 22/8 26/9
402A [1] 1/24
415-703-1234 [1] 3/8
415-703-5509 [1] 3/7
415-926-7600 [1] 2/9
425 [1] 2/8
455 [1] 3/6

**5**
50 [3] 4/6 30/2 41/24
523 [1] 36/3
5509 [1] 3/7
5677 [1] 2/23
5775 [1] 2/24

**6**
6114 [1] 2/17
620-1149 [1] 1/25
63 [1] 4/7
69 [1] 51/24

**7**
7004 [1] 3/7
7106 [1] 84/11
75 [3] 4/7 20/1 64/6
753 [1] 84/1
7600 [1] 2/9
78 [5] 56/23 57/2 57/10 57/12 58/4
79 [5] 56/23 56/25 57/2 57/20 58/5

**8**
8,000 [1] 13/12
80 [1] 26/9
83 [1] 1/21
862 [5] 37/10 37/14 38/2 38/2 48/6
8835 [1] 2/18
8th [1] 12/11

**9**
900 [4] 4/19 5/11 5/13 5/15
90012 [1] 1/24
90013 [1] 2/23
916-322-6114 [1] 2/17
916-324-8835 [1] 2/18
927 [5] 4/19 5/11 5/13 5/14 5/15
94102-7004 [1] 3/7
94104 [1] 2/8
95814 [1] 2/17
990 [24] 12/14 12/18 13/4 24/22 25/1 27/5 32/21 32/25 36/18 46/15 46/18 47/17 64/9 71/25 72/4 72/23 73/20 77/15 78/9 78/14 79/22 81/3 81/8

82/20
990s [7] 20/5 26/1 31/3 32/23 35/6 46/8 47/19

**A**
A.G [1] 16/2
AALS [1] 55/13
ability [1] 71/9
able [5] 10/20 18/16 32/5 68/25 69/20
above [1] 84/4
above-entitled [1] 84/4
abuse [15] 18/5 18/6 18/20 19/14 19/17 20/10 20/12 20/12 20/13 20/13 27/22 30/6 33/10 33/22 36/15
abuses [1] 17/20
abusing [1] 30/13
academic [1] 55/11
acceptable [1] 83/19
accepting [1] 32/10
accompanied [1] 47/1
accountants [1] 77/23
accurate [4] 20/8 57/14 58/1 81/20
accurately [1] 31/12
Act [1] 12/6
ACTEC [1] 55/12
active [1] 21/10
activities [5] 51/16 51/20 52/17 64/1 83/2
actually [5] 37/22 38/20 44/2 56/16 56/17
additional [2] 76/5 78/16
address [2] 24/17 39/21
addressing [1] 36/14
Administrative [1] 39/2
admission [1] 38/13
admits [1] 8/11
admitted [2] 5/17 37/14
admonition [1] 73/10
advanced [1] 68/24
adverse [1] 71/7
advise [2] 52/22 54/24
advised [1] 15/21
affect [1] 71/7
affiliated [3] 72/8 76/25 80/8
affirmative [1] 60/22
affirmatively [1] 77/17
AFPF [1] 39/13
after [9] 24/23 26/22 26/23 38/7 42/12

42/16 42/19 44/19 54/11
afternoon [9] 5/23 5/24 16/23 50/24 63/11 63/12 75/8 75/9 83/15
again [11] 6/20 6/25 33/6 39/10 42/16 43/6 55/6 59/17 66/9 71/12 82/15
against [10] 8/20 9/4 12/18 29/25 45/2 45/25 46/3 48/23 49/12 49/21
agency [3] 8/5 8/12 8/19
ago [1] 55/24
agreed [2] 5/7 38/15
ahead [3] 52/10 57/4 67/10
Alexandra [1] 3/5
alexandra.robertgord on [1] 3/8
all [44] 5/19 7/8 7/11 7/14 9/16 10/11 11/23 11/24 13/4 20/20 22/20 25/1 25/3 26/2 26/2 27/5 27/9 30/2 30/12 30/24 33/3 34/6 36/16 39/16 41/24 43/24 46/18 46/24 47/12 47/19 49/17 49/23 50/7 57/4 61/22 67/7 69/15 75/1 75/4 83/11
allegations [4] 10/24 65/7 67/23 68/16
allocate [1] 76/4
allow [1] 15/14
allowed [3] 31/2 31/4 52/11
along [2] 75/14 79/22
already [8] 7/22 8/6 34/14 39/12 64/19 70/12 73/11 80/19
also [51] 6/10 6/13 6/15 9/25 10/2 11/8 11/19 12/2 13/18 14/4 14/18 17/11 17/20 18/1 18/16 18/22 18/23 20/7 20/22 20/23 21/7 23/8 23/15 23/22 24/12 25/25 28/9 30/11 31/14 32/7 34/7 34/17 35/7 37/3 40/6 45/18 46/25 51/11 54/7 55/8 55/23 56/14 56/18 62/23 70/16 72/7 76/25 77/10 78/9 80/16 81/3
alteration [1] 14/23

## A

**alterative [1]** 15/16
**altered [1]** 70/19
**alternative [1]** 15/20
**always [2]** 15/11
56/11
**am [10]** 51/1 54/2
55/11 60/24 63/14
63/16 76/10 76/13
82/6 82/7
**amended [2]** 32/21
32/23
**America [11]** 11/9
30/22 30/23 34/17
41/10 42/9 42/23 43/2
43/8 44/8 44/19
**America's [1]** 40/24
**American [5]** 48/9
54/8 55/11 55/14
55/15
**American's [1]** 40/25
**Americans [2]** 39/20
66/9
**among [2]** 12/1 13/15
**amount [3]** 45/14
45/19 70/11
**amounts [2]** 68/4 69/1
**analysis [4]** 33/22
33/24 58/22 59/2
**ANGELES [4]** 1/17
1/24 2/23 5/1
**animal [4]** 67/18 67/19
68/15 68/16
**annual [9]** 23/8 24/24
46/25 47/1 64/11
77/11 77/25 78/1
78/10
**anonymity [1]** 15/17
**anonymous [2]** 15/18
60/6
**anonymously [1]**
59/22
**answer [5]** 39/15
59/11 67/4 78/24
80/24
**answers [1]** 34/11
**any [48]** 8/2 8/12 8/13
8/16 8/16 17/10 21/24
33/5 40/14 42/8 43/4
44/8 44/10 44/25
45/23 46/3 46/9 46/12
46/13 47/9 48/11
48/21 49/12 51/9
53/15 53/25 54/12
55/10 55/19 56/4
58/13 58/20 59/1
59/12 59/23 60/10
60/18 64/11 64/13
64/15 68/22 68/25
70/20 71/25 72/6
76/17 76/21 78/6

**anybody [2]** 60/13
60/15
**anyone [8]** 7/25 8/9
8/21 41/10 42/15
42/18 46/2 48/23
**anything [4]** 23/4
28/19 39/21 71/8
**Anywhere [1]** 26/9
**Apart [1]** 46/7
**appear [5]** 6/25 7/2
10/1 10/7 44/13
**APPEARANCES [2]**
2/1 3/1
**appears [1]** 58/2
**application [2]** 24/14
33/18
**applied [1]** 12/7
**approved [2]** 38/23
39/1
**approximately [3]**
43/17 63/21 64/3
**are [103]**
**area [3]** 61/8 61/14
62/7
**areas [7]** 28/5 28/8
51/6 52/4 53/23 54/12
56/6
**aren't [1]** 45/21
**arguing [1]** 9/8
**argument [6]** 8/24 9/6
9/17 9/23 10/10 13/23
**article [1]** 57/7
**articles [6]** 24/13 26/4
54/1 56/5 56/6 57/5
**artificially [1]** 30/14
**as [95]**
**Aside [1]** 35/10
**ask [10]** 15/24 24/6
34/4 42/25 59/10
61/18 73/12 76/14
77/3 80/16
**asked [3]** 19/12 22/24
44/24
**asking [2]** 13/12 80/5
**aspects [1]** 61/9
**assets [16]** 17/19
19/19 19/21 27/22
28/15 30/8 63/24 65/8
67/24 68/11 68/18
68/18 68/23 70/6
72/11 72/12
**assign [3]** 20/21 28/4
28/21
**assigned [9]** 18/15
20/19 26/5 29/18
33/12 41/12 44/22
79/10 79/11
**assist [2]** 30/10 67/25
**assistant [10]** 6/1
17/4 17/10 17/14 21/3
21/5 28/6 41/14 41/17
44/1

**assisting [2]** 54/18
70/8
**assists [1]** 72/25
**Association [1]** 55/14
**assuming [2]** 36/8
83/6
**at [53]** 12/17 13/4
13/19 14/6 15/24 19/3
20/7 21/17 23/9 23/16
25/6 27/4 28/2 28/6
28/18 29/4 29/5 31/6
33/11 37/2 37/7 43/8
43/14 44/21 44/22
46/15 46/16 46/17
46/18 46/21 46/24
46/25 47/6 49/19 51/3
53/3 54/19 57/10
57/11 57/13 57/20
57/23 61/9 64/17
65/12 73/22 77/14
78/8 78/10 79/9 80/20
82/20 83/21
**Atlantic [2]** 53/9 53/12
**attached [2]** 47/17
64/10
**attachments [1]** 12/15
**attention [7]** 15/3 38/7
42/2 42/24 43/3 44/4
61/6
**attorney [58]** 2/15
2/22 3/6 5/24 6/1 6/4
10/3 17/1 17/4 17/8
17/9 17/10 17/11
17/12 17/14 18/10
18/19 19/6 20/9 20/18
20/19 21/4 21/24
22/13 22/14 25/21
25/24 27/20 29/17
37/20 40/23 42/13
43/3 43/9 43/25 45/24
46/9 49/9 53/18 53/24
63/16 63/17 63/19
64/12 69/10 71/17
71/23 72/17 74/19
75/24 76/7 77/11 78/7
79/9 79/10 80/19 82/5
82/16
**attorneys [3]** 6/9 29/3
77/24
**attorny [1]** 17/1
**audit [18]** 14/20 21/1
21/17 22/6 22/10
23/17 23/23 35/13
35/14 35/24 36/2 47/2
47/13 77/12 77/16
77/25 78/10 83/9
**audited [7]** 47/3 47/5
47/7 47/11 47/20
47/22 82/24
**auditor [2]** 22/15
79/11
**auditors [5]** 11/22

13/19 21/7 22/14 29/4
**audits [2]** 35/19 77/21
**author [2]** 54/2 54/7
**authority [3]** 36/15
59/12 59/23
**authorized [1]** 53/25
**available [15]** 6/8 10/7
14/11 14/12 15/6
23/16 23/22 23/23
26/1 35/5 70/13 72/3
72/23 78/18 83/17
**Avenue [1]** 3/6
**aware [9]** 8/9 39/5
39/8 40/14 58/17
66/21 70/18 71/7
82/13

## B

**B-related [1]** 44/14
**back [2]** 24/4 73/9
**background [2]** 58/20
59/1
**bad [1]** 19/3
**barred [1]** 33/5
**based [7]** 15/12 27/8
41/6 59/1 75/12 76/21
80/10
**basically [15]** 18/4
18/12 19/19 20/20
20/25 21/6 23/2 30/12
30/16 30/24 32/7
32/20 40/5 45/12
54/18
**basis [7]** 29/12 33/14
34/9 39/11 41/9 62/2
69/7
**became [4]** 14/17
41/12 41/24 82/13
**because [21]** 8/4 10/1
10/7 10/17 10/21
10/22 11/16 14/22
14/23 15/25 16/1
21/10 29/7 31/6 31/17
36/13 42/5 43/8 66/20
70/4 72/9
**become [5]** 17/12
17/14 24/15 39/8 71/7
**becomes [1]** 71/9
**beefed [1]** 39/25
**beg [1]** 67/14
**beginning [1]** 42/10
**believe [13]** 41/2
44/11 55/8 56/23 58/5
60/5 60/6 75/18 76/2
79/8 79/12 80/7 80/22
**bell [1]** 81/13
**benefit [2]** 11/4 68/12
**Berndt [6]** 41/2 41/3
41/7 41/10 41/13
44/17
**best [1]** 42/25
**between [1]** 13/18

17/9 23/19 26/9 60/4
10/2 10/8
**big [2]** 11/16 31/23
**binder [1]** 37/9
**binders [1]** 5/8
**bio [1]** 58/2
**bio-information [1]**
58/2
**bit [3]** 28/11 29/22
57/17
**blown [1]** 35/13
**blur [1]** 47/19
**board [1]** 6/14
**bodies [1]** 36/1
**book [3]** 32/3 54/2
54/7
**booked [1]** 31/16
**books [2]** 54/2 56/3
**boot [1]** 52/25
**Boston [6]** 51/3 51/11
53/3 53/22 56/19
57/23
**both [7]** 5/9 5/17
21/16 37/7 72/9 72/10
78/9
**bottom [2]** 37/23
38/21
**breach [1]** 19/20
**break [1]** 5/6
**breakdown [2]** 22/11
22/19
**Breast [1]** 30/22
**brief [2]** 17/16 19/12
**briefly [10]** 18/1 22/25
22/23 32/1 51/19
52/16 56/8 57/13 61/4
63/22
**bring [2]** 18/3 62/20
**bringing [2]** 31/19
44/3
**broader [1]** 61/10
**brought [3]** 15/2 61/6
61/17
**Bs [18]** 12/9 13/12
14/19 15/8 28/2 28/7
31/6 34/12 37/19 39/5
39/8 40/3 40/7 42/8
42/15 46/8 80/22 83/2
**building [1]** 30/17
**bulk [2]** 7/18 64/5
**business [6]** 17/23
24/16 31/19 68/7
81/25 82/1
**by-laws [2]** 24/13 26/3
**bypass [1]** 27/23

## C

**C.V [6]** 56/10 56/16
56/21 57/14 57/15
57/18
**CA [4]** 2/8 2/17 2/23

**C**

**CA...** [1] 3/7
**CAAG** [1] 3/6
**Calia** [2] 2/14 5/7
**CALIFORNIA** [21] 1/2
1/17 1/24 2/8 3/6 5/1
8/14 11/17 12/3 20/3
22/16 24/11 24/19
30/2 42/7 42/13 43/2
43/9 46/11 46/13
63/17
**call** [7] 5/25 16/5 24/2
50/10 50/11 62/18
83/13
**called** [4] 42/23 51/23
54/7 55/12
**calls** [2] 16/6 62/19
**came** [9] 8/18 20/21
30/9 40/25 42/1 43/3
43/24 44/12 80/1
**camp** [1] 52/25
**can** [53] 7/19 10/17
12/19 12/19 14/13
14/23 15/13 21/24
23/19 24/8 26/12
26/13 26/16 28/11
29/22 30/15 30/17
30/17 30/18 32/3 32/3
33/13 35/12 35/14
37/2 38/25 43/1 43/7
47/15 52/11 55/7 57/6
59/10 59/11 59/21
60/8 61/7 63/22 64/5
64/21 65/4 67/13
67/15 69/21 70/7 71/7
71/10 71/22 71/25
74/7 76/20 78/12
83/17
**can't** [6] 16/1 56/11
60/7 69/10 73/22
76/23
**cancer** [27] 11/9
29/19 29/22 30/10
30/20 30/21 30/22
30/23 30/23 30/23
31/15 32/14 32/20
32/23 33/2 34/14
34/17 40/24 41/9 42/8
42/23 43/2 43/7 44/8
44/12 44/19 44/22
**cannot** [1] 69/7
**care** [1] 15/17
**Carnegie** [1] 53/8
**carry** [1] 54/11
**carts** [2] 14/7 14/8
**case** [34] 7/18 9/6 9/9
9/12 10/13 11/1 20/23
29/22 30/5 30/6 30/20
32/14 34/13 39/13
40/25 41/4 41/6 47/17
58/18 58/23 59/3

59/13 59/25 61/3 61/5
61/16 62/10 64/20
65/20 68/4 72/6 76/9
77/8 79/9
**cases** [21] 18/2 18/5
18/7 18/8 18/22 20/22
29/18 30/21 33/2 33/9
34/12 40/24 41/10
44/8 44/19 69/22
69/25 70/10 70/17
77/18 79/1
**cash** [2] 27/13 30/19
**Castoria** [3] 2/6 69/11
75/10
**cause** [1] 43/21
**causes** [1] 55/8
**center** [40] 1/8 6/11
6/13 6/14 6/16 6/17
7/19 8/3 8/3 8/6 8/11
9/14 10/13 13/10
15/19 45/25 46/4 46/7
46/10 46/13 47/18
49/10 49/13 49/16
49/18 49/21 49/22
52/24 60/11 60/14
60/18 74/21 75/11
76/9 76/18 76/19 78/3
78/8 78/18 78/21
**center's** [3] 6/16 8/8
47/17
**central** [2] 1/2 7/18
**certain** [2] 14/15
19/22
**certainly** [1] 28/20
**certify** [1] 84/1
**cetera** [1] 55/18
**changes** [1] 48/11
**chapter** [1] 54/9
**charge** [2] 6/1 23/2
**charitable** [76] 6/1 6/4
6/9 10/15 11/5 11/14
11/15 11/19 11/22
12/6 13/13 13/19
14/14 14/19 17/2 17/7
17/17 17/18 17/19
17/20 17/20 17/21
18/2 18/20 20/10 21/8
22/4 22/7 22/17 22/21
22/23 22/25 23/1 23/7
23/20 24/1 24/11
24/18 26/7 26/14 27/8
27/22 30/8 30/9 35/1
35/3 35/11 35/23 38/8
43/23 46/6 52/5 52/21
54/4 54/9 54/10 54/13
54/20 54/24 55/1 55/3
56/7 56/7 57/6 59/20
63/20 63/24 64/1 64/2
65/7 65/12 68/11
68/17 68/18 68/23
70/6
**charitably** [1] 59/22

**charities** [50] 10/24
11/16 11/23 12/1 12/3
12/8 12/22 13/6 13/13
13/15 14/7 14/13
17/22 18/17 20/2
22/16 22/17 22/19
22/20 22/22 23/2
23/14 25/18 29/25
30/12 30/22 30/24
31/6 31/15 32/14
32/19 32/21 33/4
34/25 35/12 42/14
45/15 45/19 47/12
47/13 47/15 49/17
49/24 52/21 54/24
64/1 72/18 76/25
77/22 77/25
**charity** [84] 10/21
12/13 12/23 17/23
18/5 19/20 20/2 20/11
23/5 23/5 23/5 23/6
23/7 24/8 24/10 24/22
25/3 25/18 26/16
27/23 27/24 27/25
28/15 28/15 28/17
29/19 31/7 31/8 31/8
31/9 31/9 31/10 31/10
31/13 31/21 32/3 32/7
32/10 33/6 34/24 35/5
36/16 36/22 36/23
36/24 37/1 45/1 45/13
45/15 47/1 63/17
67/22 67/23 68/2 68/2
68/3 68/17 68/22
68/24 69/3 69/4 69/19
69/23 69/24 70/3 70/4
70/10 70/15 70/16
70/18 71/1 71/6 71/6
71/8 71/10 72/3 75/15
75/25 76/15 76/21
77/6 77/10 80/20
82/24
**charity's** [4] 24/3 68/6
68/9 81/25
**charity-related** [1]
20/11
**chartable** [1] 54/9
**check** [3] 13/2 13/3
48/3
**checking** [1] 12/18
**checklist** [1] 29/3
**Chicago** [1] 56/19
**Children's** [1] 30/23
**chose** [2] 66/21 67/2
**Civil** [2] 2/15 52/24
**claimed** [1] 68/2
**claiming** [1] 68/22
**claims** [1] 68/9
**clarify** [1] 37/19
**class** [2] 58/16 68/19
**clear** [5] 7/25 9/14
10/5 34/3 62/5

**clearly** [1] 69/4
**clerk's** [1] 13/20
**clients** [1] 8/17
**clips** [1] 9/12
**close** [1] 75/19
**closing** [2] 10/10
30/18
**coaching** [1] 14/24
**code** [2] 19/22 84/2
**codes** [1] 19/23
**coercive** [1] 45/11
**collect** [1] 13/21
**collection** [2] 16/1
16/2
**collects** [3] 23/14
23/21 23/22
**College** [5] 51/3 51/12
53/3 55/12 57/23
**colon** [1] 56/11
**come** [10] 6/23 8/15
13/25 15/22 21/25
26/10 26/11 38/16
46/16 59/4
**comes** [1] 38/7
**coming** [4] 53/4 62/13
65/17 72/3
**commenced** [2] 43/8
44/19
**comment** [2] 9/24
48/5
**comments** [3] 48/8
48/12 48/18
**commercial** [3] 17/22
18/17 23/3
**Commission** [1] 30/3
**commit** [1] 55/7
**committee** [1] 41/23
**communications** [1]
76/8
**companies** [1] 15/21
**compel** [1] 69/21
**compelled** [1] 7/20
**compensation** [1]
65/8
**competitors** [1] 26/13
**complainant** [3] 80/4
80/7 80/17
**complained** [1] 8/9
**complaint** [32] 23/24
25/25 26/17 26/22
27/5 28/10 28/12
43/11 43/13 43/15
43/20 43/21 43/22
43/24 44/2 44/9 46/2
46/16 49/8 49/12
49/20 50/1 64/14 76/3
79/15 79/23 80/1 80/2
82/10 82/18 82/19
82/22
**complainter** [1] 79/17
**complaints** [20] 10/18
11/23 18/14 20/21

**21/9 25/23 26/3 26/7
26/10 26/11 26/13
26/15 35/8 35/25 36/3
43/24 44/4 44/11 46/5
49/20
**completed** [1] 83/4
**completely** [1] 78/11
**compliance** [2] 35/10
46/10
**comply** [1] 25/7
**complying** [1] 12/22
**compromise** [1] 10/22
**compromised** [1]
71/11
**computer** [3] 15/12
40/6 44/1
**computer-based** [1]
15/12
**concern** [1] 10/23
**concerned** [2] 61/2
61/21
**concluded** [1] 83/21
**conclusion** [1] 59/5
**conclusions** [2] 58/21
59/6
**conduct** [7] 18/15
18/18 28/3 64/7 72/17
77/8 78/7
**conducted** [7] 20/23
60/10 64/16 65/1 65/4
67/17 76/20
**conducting** [5] 40/2
63/23 68/1 70/17 73/5
**conference** [4] 52/22
52/23 53/2 84/6
**conferences** [2] 51/17
52/20
**conferencing** [1]
21/18
**conferred** [1] 5/7
**confidential** [18] 8/1
12/11 35/6 36/24
36/25 37/3 37/4 37/4
37/5 37/6 37/7 37/19
39/6 40/4 40/5 42/14
48/23 66/18
**confidentiality** [4]
15/8 39/4 48/24 66/20
**confidentially** [1] 8/5
**conformance** [1] 84/5
**Congress** [2] 52/23
55/21
**connected** [1] 60/13
**connection** [3] 33/11
67/20 72/7
**consequences** [2]
70/3 71/4
**consider** [3] 37/7
51/15 71/4
**considered** [2] 29/2
30/18
**considering** [1] 11/6

**C**

considers [4]  12/14 37/3 37/4 37/6
consistent [1]  68/10
contact [1]  75/25
contacted [2]  14/25 71/1
contacting [2]  75/15 76/16
contains [1]  27/11
continue [1]  71/10
continued [3]  3/1 32/24 41/13
contractor [1]  82/12
contractors [1]  72/8
contribution [1]  14/14
contributions [2]  15/20 79/6
contributors' [1]  7/20
controlling [1]  28/14
copies [1]  24/13
copy [7]  13/4 25/1 32/25 37/2 57/14 57/15 58/1
corner [1]  38/21
corporation [2]  24/17 53/8
corporation's [1]  19/22
correct [13]  20/4 39/6 41/1 41/20 42/19 46/20 46/23 57/10 60/8 74/1 75/17 77/6 84/3
correctly [1]  44/5
corroborated [1]  68/25
could [25]  5/12 15/19 16/18 16/24 17/16 18/1 19/15 22/10 22/11 27/8 29/9 30/17 36/16 38/19 44/3 44/5 51/19 56/8 57/13 57/20 58/24 61/24 68/13 73/18 83/17
counsel [17]  2/1 9/17 13/23 19/2 23/4 24/6 35/16 37/25 48/9 48/17 55/12 61/15 61/23 66/1 67/4 70/4 79/4
couple [3]  44/3 45/23 79/1
course [1]  77/6
court [15]  1/1 5/12 6/12 8/6 8/17 8/20 13/8 13/21 15/24 38/15 56/22 61/6 74/8 83/17 83/19
court's [8]  9/24 10/8 15/2 62/5 62/10 62/16

62/21 73/10
Courthouse [1]  1/23
covered [1]  61/17
credit [1]  64/21
cross [6]  4/3 9/11 40/20 40/21 74/24 75/6
Cross-examination [4]  40/20 40/21 74/24 75/6
cross-examine [1]  9/11
Cruz [1]  2/6
CSR [2]  1/23 84/11
CT1 [2]  24/12 24/15
cumulative [4]  27/16 29/12 39/11 64/18
current [4]  26/12 45/24 51/2 74/19
currently [6]  22/4 50/25 53/18 63/13 63/16 79/12
CV [1]  1/10

**D**

D-i-e-t-z [1]  50/20
D.C [1]  52/22
DAG [2]  23/25 44/21
daily [2]  1/16 40/6
database [3]  26/1 26/2 35/4
date [4]  8/12 38/25 57/17 84/8
David [2]  6/6 7/16
day [7]  5/24 21/20 21/21 21/22 41/9 41/9 45/19
day-to-day [1]  41/9
dead [2]  51/8 54/8
deal [4]  11/22 18/7 18/8 67/7
dealing [5]  19/18 30/7 62/8 74/20 74/21
dealt [1]  6/17
death [2]  54/11 54/19
DEBORAH [2]  1/23 84/11
decide [1]  32/4
decides [1]  25/18
deciding [1]  14/13
decision [4]  25/20 25/22 46/15 76/4
decision-making [1]  46/15
declined [1]  8/3
Deduction [1]  57/6
defendants [3]  42/20 50/11 58/4
defense [6]  4/3 16/6 16/20 50/21 62/19 63/8
deficiencies [1]  14/2

definitely [1]  57/15
defraud [1]  32/24
degrees [2]  53/15 58/13
delay [1]  14/23
delinquency [1]  25/14
delinquent [1]  25/6
delivered [1]  14/8
Delores [1]  16/15
demand [1]  49/17
demanded [1]  49/9
demands [1]  49/15
deny [1]  15/24
Department [4]  2/14 2/21 55/25 56/2
depend [2]  19/21 78/11
depending [2]  14/7 83/2
Depends [1]  36/21
depo [1]  47/23
depose [2]  66/22 67/2
deposition [8]  6/10 6/15 9/13 10/1 44/24 47/21 66/9 69/12
depositions [1]  5/9
deputies [3]  20/21 20/24 33/12
deputy [29]  6/4 17/8 17/9 17/11 17/12 18/10 18/19 19/5 20/9 20/17 20/19 21/2 21/11 22/13 22/14 25/20 25/24 27/20 29/17 41/4 43/25 63/16 63/19 71/17 71/23 72/17 74/19 79/9 82/5
describe [3]  12/17 52/16 56/8
describing [1]  13/6
description [3]  57/24 69/7 79/17
designated [6]  5/10 34/15 58/18 65/24 66/10 69/12
designations [5]  5/18 9/2 9/13 13/11 64/19
designed [2]  12/9 15/7
desirable [1]  14/22
desires [2]  54/10 54/20
destroyed [1]  70/19
detect [1]  15/13
determination [4]  26/23 76/1 76/6 82/22
determinations [1]  12/20
determinative [1]  52/8
determine [8]  64/21 70/8 75/15 77/8 78/19

79/24 80/11 80/13
devoted [1]  54/9
did [34]  17/10 17/12 17/14 18/18 18/23 18/23 19/13 32/14 32/16 39/8 42/7 42/11 42/13 43/20 44/5 45/9 48/21 53/20 53/21 53/23 59/5 66/23 66/23 67/1 67/25 69/1 75/19 79/13 80/4 80/5 80/7 80/11 80/16 80/19
didn't [7]  13/3 31/16 32/22 32/24 41/16 42/17 42/24
Dietz [1]  50/19
difference [1]  60/4
different [8]  12/18 13/12 18/4 26/11 30/6 45/25 53/13 56/6
difficulty [1]  70/10
DIRE [1]  58/11
direct [11]  4/3 16/21 38/6 45/5 49/1 50/22 63/9 75/12 76/11 77/23 78/22
direction [1]  20/23
directly [7]  21/25 52/6 55/2 69/24 70/14 71/1 75/25
director [1]  51/11
directors [5]  6/14 24/16 26/12 33/4 44/6
disavowed [1]  32/20
discipline [1]  52/7
disciplines [1]  53/4
disclose [2]  37/1 37/2
disclosed [8]  8/12 10/17 40/10 47/18 65/21 68/8 69/8 73/11
discloses [1]  48/23
disclosure [4]  7/20 8/1 8/10 8/18
disclosures [4]  15/2 15/4 39/22 40/15
discovery [5]  34/10 40/11 65/21 69/8 69/10
discuss [2]  53/4 73/11
discussing [1]  47/10
discussions [1]  48/21
distribution [1]  54/19
DISTRICT [3]  1/1 1/2 1/5
diversion [1]  19/19 27/21 30/8 63/24
division [3]  2/15 36/2 55/13
divulging [1]  45/9
do [87]
document [14]  12/15

13/17 15/13 36/18 36/19 36/24 37/23 37/25 47/24 57/22 66/7 66/11 66/11 66/16
documents [15]  13/1 13/3 14/15 14/24 15/12 29/12 40/2 56/22 64/8 64/12 66/2 66/4 66/13 77/5 77/14
Dodger [5]  11/12 65/20 66/14 66/15 66/25
Dodgers [4]  65/6 65/9 65/10 65/11
does [23]  7/24 11/15 12/24 13/25 13/25 17/17 18/3 19/24 23/10 25/16 26/7 27/6 33/24 34/24 36/25 37/1 46/9 51/16 55/5 56/22 57/7 57/15 75/25
doesn't [6]  10/13 25/3 28/15 35/23 49/24 62/6
doing [8]  9/8 24/20 32/22 35/13 36/16 36/17 40/6 71/5
doj.ca.gov [3]  2/18 2/24 3/8
dollar [1]  30/9
dollars [2]  31/20 32/10
dollars' [1]  31/22
Dolowich [1]  2/7
don't [37]  13/21 21/25 28/25 29/1 29/3 29/3 29/15 34/3 35/16 35/25 36/1 37/25 42/4 44/13 45/22 46/12 47/21 47/21 48/13 48/17 48/19 59/16 59/17 60/4 61/22 64/21 67/4 73/18 75/18 76/2 77/1 78/5 78/24 80/23 81/5 81/5 81/10
donate [3]  8/3 45/14 45/15
donated [4]  27/14 28/17 28/19 32/19
donates [1]  45/13
donating [5]  31/6 31/7 31/8 31/9 44/23
donation [11]  11/3 11/4 27/13 30/16 30/19 32/3 32/8 32/9 32/20 45/9 45/14 45/19
donations [14]  23/6 27/11 28/1 31/1 31/17

**D**

**donations... [9]** 31/17 31/20 31/21 55/1 64/2 65/10 65/16 69/3 83/3
**done [9]** 11/7 23/12 24/23 39/21 39/24 40/1 57/16 71/8 78/3
**donor [20]** 6/13 8/2 8/4 15/21 27/12 28/14 28/16 28/19 45/1 52/22 69/17 71/1 78/9 80/4 80/6 80/8 80/9 80/9 80/12 80/14
**donor-advised [1]** 15/21
**donors [10]** 7/21 15/17 27/11 54/25 55/2 60/11 60/18 63/25 72/5 72/12
**door [2]** 21/24 22/2
**Dr [9]** 6/3 13/11 52/6 52/12 58/22 59/4 59/14 59/24 61/17
**drawbacks [1]** 70/14
**Dream [3]** 11/12 65/6 65/10
**driven [1]** 50/1
**drugs [1]** 32/11
**during [7]** 5/6 14/9 15/3 40/25 44/24 54/11 54/19
**duties [5]** 12/1 63/22 63/23 72/25 74/19
**duty [1]** 19/20

**E**

**each [1]** 5/18
**earlier [4]** 14/17 41/6 43/13 59/25
**early [2]** 6/13 70/8
**ECF [1]** 51/24
**eds [1]** 56/17
**educating [1]** 53/1
**effective [2]** 12/11 14/17
**efficient [2]** 14/22 70/7
**eight [2]** 11/21 56/25
**either [3]** 7/22 23/25 72/8
**element [1]** 30/20
**elementary [1]** 13/15
**Eller [3]** 6/6 7/16 13/25
**else [5]** 33/17 33/21 41/10 42/15 61/12
**elsewhere [1]** 42/20
**email [4]** 2/18 2/24 3/8 8/18
**Emails [1]** 21/25
**employed [4]** 50/25

**employees [6]** 6/16 10/14 22/8 26/12 26/12 44/5
**employment [1]** 51/2
**enacted [3]** 12/9 37/8 37/18
**enclosed [1]** 46/22
**end [2]** 15/24 41/11
**endeavors [1]** 31/19
**endorsed [1]** 38/23
**enforcing [1]** 15/11
**engaging [1]** 27/24
**enough [2]** 35/25 36/1
**ensure [3]** 12/9 40/4 40/7
**entail [2]** 23/10 40/8
**entered [1]** 62/23
**entire [3]** 12/14 19/5 46/17
**entities [2]** 42/9 48/18
**entitled [3]** 69/1 69/5 84/4
**entity [9]** 43/4 55/20 67/20 67/24 68/2 68/3 68/10 68/12 72/9
**equipment [1]** 30/18
**ERISA [1]** 37/8
**errors [1]** 13/4
**especially [1]** 33/8
**essentially [1]** 39/12
**estate [10]** 51/7 51/7 54/3 54/4 54/14 54/18 54/21 54/22 54/23 55/22
**estates [2]** 55/12 55/13
**estimate [1]** 64/6
**et [1]** 55/18
**et cetera [1]** 55/18
**evaluate [9]** 27/21 27/22 27/23 27/24 28/3 28/7 28/10 79/23 82/22
**evaluating [1]** 77/8
**evaluation [2]** 26/5 28/11
**even [2]** 30/8 82/16
**events [1]** 8/22
**eventually [1]** 41/24
**ever [9]** 8/3 8/9 33/5 33/6 36/5 47/7 53/20 55/19 58/16
**every [9]** 8/7 21/20 21/21 21/22 30/9 47/14 54/5 80/23 81/6
**everybody [1]** 33/17
**everyone [2]** 32/25 42/20
**everything [2]** 46/24 57/16
**evidence [23]** 5/8 5/15

**5/17 7/17 7/23 7/24 7/25 8/2 8/16 9/20 9/21 10/4 10/6 15/24 28/23 29/2 29/13 29/14 34/10 34/18 38/15 46/12 58/5
**ex [2]** 26/12 44/5
**ex-employees [2]** 26/12 44/5
**exact [1]** 69/13
**examination [8]** 16/21 40/20 40/21 50/22 58/11 63/9 74/24 75/6
**examine [1]** 9/11
**example [12]** 14/19 32/9 34/3 65/4 65/6 65/25 66/21 67/13 69/13 73/10 74/7 76/23
**examples [8]** 29/10 33/8 33/13 33/15 51/19 67/15 68/13 73/11
**exceeds [5]** 45/5 48/14 48/25 76/11 78/22
**excuse [1]** 62/11
**excused [2]** 62/12 62/15
**executive [2]** 41/23 65/8
**exempt [2]** 24/14 24/15
**exhibit [13]** 5/10 5/15 37/10 37/14 37/15 38/2 38/4 38/20 48/6 57/10 57/12 57/20 58/4
**Exhibit 862 [4]** 37/10 37/14 38/2 48/6
**exhibits [6]** 5/8 56/23 57/2 58/8 62/22 66/3
**expectation [1]** 83/3
**expected [2]** 68/4 83/15
**expenses [2]** 30/14 70/5
**experience [3]** 52/4 54/14 61/9
**expert [7]** 6/2 15/22 61/2 61/7 61/20 62/3 62/7
**expertise [1]** 52/9
**experts [2]** 42/21 60/23
**explain [7]** 14/1 14/4 23/19 24/8 27/9 30/15 32/1
**explain how [1]** 27/9
**explained [1]** 52/2
**explore [1]** 52/11
**explored [1]** 28/8

**expresses [1]** 54/10
**extensive [2]** 42/22 52/4
**extent [1]** 19/22
**external [1]** 38/15

**F**

**face [1]** 40/3
**faced [1]** 8/17
**fact [4]** 8/21 46/7 52/6 78/6
**fail [1]** 25/6
**failed [1]** 11/18
**fair [1]** 79/19
**false [3]** 20/2 31/3 63/25
**falsely [1]** 31/17
**familiar [2]** 76/7 76/13
**families [1]** 30/11
**family [2]** 30/13 69/2
**far [2]** 8/17 10/12
**fatwa [1]** 8/20
**Fax [3]** 2/18 2/24 3/8
**feared [1]** 8/4
**February [1]** 17/13
**Federal [1]** 30/3
**fee [1]** 13/2
**feel [1]** 18/5
**fellow [2]** 55/11 55/11
**few [5]** 39/14 39/15 45/19 56/15 75/12
**fiduciary [1]** 19/20
**field [2]** 61/2 61/20
**figured [1]** 44/23
**file [9]** 24/11 24/22 47/5 47/12 74/14 77/25 82/11 83/2 83/6
**filed [14]** 10/18 13/1 20/2 25/2 29/24 35/5 40/2 46/7 46/21 49/23 64/10 64/12 77/5 77/16
**files [1]** 77/10
**filing [10]** 20/4 20/5 20/6 20/7 31/3 41/25 46/25 79/20 81/6 81/8
**filings [6]** 12/25 24/3 43/17 47/17 64/12 81/3
**final [1]** 7/15
**Finally [2]** 15/1 15/16
**financial [10]** 46/22 47/3 47/5 47/7 47/9 47/12 47/13 47/20 47/22 81/15
**find [2]** 28/19 68/25
**findings [1]** 10/24
**fine [2]** 38/17 56/13
**finish [1]** 23/13
**finished [1]** 80/24
**first [16]** 12/16 15/5 16/5 22/24 23/7 23/25

**27/9 38/19 43/10 43/15 54/6 68/19 75/14 77/7 80/1 83/17
**first-class [1]** 68/19
**fiscal [10]** 14/7 18/6 18/6 18/12 18/20 19/14 19/17 20/12 27/22 36/14
**fits [1]** 55/22
**five [1]** 44/19
**flowing [1]** 8/1
**focus [1]** 52/8
**Focusing [1]** 65/3
**follow [1]** 26/18
**food [1]** 30/17
**footer [1]** 37/24
**for-profit [10]** 67/20 67/24 68/2 68/3 68/5 68/7 68/10 68/12 81/25 82/1
**Ford [1]** 53/8
**foregoing [1]** 84/2
**foreign [2]** 23/5 24/17
**forgive [1]** 59/17
**forgot [1]** 13/2
**form [20]** 13/5 13/8 13/16 24/12 24/15 24/22 24/25 25/1 36/18 46/8 46/15 46/17 64/9 72/23 77/14 78/9 78/13 81/3 81/8 82/20
**formal [2]** 21/15 21/16
**format [1]** 84/5
**formed [1]** 51/14
**forms [1]** 6/7 8/11 10/16 12/25 13/21 13/22 20/6 55/2 59/20 77/10 77/19
**forth [2]** 52/6 54/11
**forum [6]** 51/12 51/13 51/16 51/20 52/17 53/6
**forward [4]** 75/16 76/1 76/5 79/24
**found [5]** 32/18 42/6 44/9 59/12 73/24
**foundation [16]** 11/12 36/21 48/9 53/8 53/9 53/12 65/7 65/10 67/1 68/5 72/13 72/15 74/9 74/11 76/22 80/9
**foundational [1]** 77/3
**foundations [5]** 13/14 53/7 53/13 65/12 74/15
**founder [2]** 51/11 78/20
**founders [1]** 68/21
**founding [2]** 26/3 35/8
**four [6]** 5/25 18/4

{PLAINTIFF} v.
{DEFENDANT}

{WITNESSNAME}
{DATE}

**F**

**four... [4]** 21/17 29/25 30/22 33/3
**Francisco [4]** 2/8 3/7 21/6 21/16
**fraud [2]** 11/14 27/24
**frequency [1]** 45/14
**frequently [1]** 54/25
**front [3]** 37/9 47/24 57/11
**FT [1]** 30/3
**FTC [1]** 30/3
**fulfill [3]** 11/20 25/3 54/20
**fulfills [1]** 12/1
**full [6]** 16/13 35/13 35/14 50/17 63/4 80/7
**full-audit [1]** 35/14
**full-blown [1]** 35/13
**fully [1]** 76/4
**function [1]** 22/11
**functions [1]** 67/21
**fund [22]** 11/9 29/19 30/20 30/21 30/22 30/23 31/15 32/14 32/20 32/23 33/2 34/14 34/17 40/24 41/10 42/9 42/23 43/2 43/7 44/8 44/19 44/22
**funded [2]** 53/6 53/13
**funder [2]** 6/13 78/20
**funding [1]** 53/7
**fundraisers [6]** 12/6 17/22 18/17 23/3 23/15 55/1
**fundraising [1]** 23/3
**funds [7]** 13/15 15/21 44/12 52/22 68/23 71/10 79/6
**further [9]** 11/6 26/6 26/23 34/9 40/19 49/4 49/6 52/11 83/8

**G**

**GACKLE [2]** 1/23 84/11
**Gallardo [1]** 79/12
**games [2]** 61/22 67/5
**Gate [1]** 3/6
**gave [1]** 79/20
**Geller [3]** 8/21 9/2 9/10
**general [40]** 2/15 2/22 3/6 5/25 6/1 6/4 10/3 17/4 17/8 17/9 17/10 17/11 17/12 17/14 18/11 18/19 19/6 20/10 20/18 20/19 21/4 25/21 25/24 27/20 29/17 37/20 45/24 49/9 55/22

63/16 63/19 69/10 71/17 71/24 72/17 74/19 78/7 79/9 82/5 82/16
**general's [12]** 17/1 40/23 42/13 43/3 43/9 46/9 63/18 64/12 75/24 76/7 77/11 80/19
**generals [3]** 22/13 22/14 43/25
**get [21]** 14/8 18/8 18/16 23/9 24/4 25/5 25/23 26/15 26/17 26/22 27/5 36/15 43/20 43/24 45/20 59/11 62/2 69/17 69/22 70/12 77/21
**gets [1]** 15/15
**getting [4]** 16/7 21/9 32/8 59/14
**gift [19]** 27/14 28/1 30/11 30/13 30/15 30/16 30/18 30/20 31/1 31/7 31/8 31/9 31/10 31/13 32/3 33/10 44/22 47/9 51/7
**gifts [2]** 31/2 31/4
**give [17]** 17/16 18/1 19/15 22/10 22/11 24/12 24/25 29/9 31/21 33/13 59/22 59/22 65/4 66/23 66/23 67/13 80/4
**given [5]** 64/22 66/4 66/7 66/12 72/6
**gives [1]** 8/22
**giving [20]** 15/18 31/22 52/5 52/21 52/25 53/5 54/4 54/9 54/10 54/10 54/13 54/21 54/24 55/3 56/7 56/7 59/20 59/20 60/6 72/10
**Globe [1]** 56/19
**Golden [1]** 3/6
**good [9]** 5/23 16/23 50/24 51/12 52/18 63/11 63/12 75/8 75/9
**goods [1]** 27/14
**Gordon [1]** 3/5
**Govenrment [1]** 2/16
**governing [5]** 51/8 52/21 54/9 55/9 60/6
**government [6]** 7/22 8/2 8/5 8/12 8/19 55/19
**governments [1]** 65/13
**graduate [1]** 53/15
**group [2]** 41/24 55/16
**groups [1]** 54/25

**grows [1]** 27/12
**guess [1]** 57/7
**Guide [1]** 54/3

**H**

**had [17]** 5/7 30/25 32/19 44/11 44/25 45/1 68/23 70/10 70/17 76/8 80/22 80/23 80/24 80/25 81/6 81/22 82/13
**hand [4]** 16/8 38/21 50/13 62/25
**handled [1]** 41/11
**handling [1]** 41/12
**happen [1]** 43/22
**happened [1]** 45/10
**happens [3]** 25/3 26/22 31/7
**happy [1]** 10/9
**harassment [2]** 7/21 8/17
**hard [1]** 56/10
**harm [2]** 10/14 16/1
**harmed [2]** 8/1 8/9
**HARRIS [1]** 1/11
**Harrison [1]** 2/6
**has [52]** 5/18 6/5 6/12 6/22 7/22 8/1 8/3 8/6 8/9 8/17 9/8 9/14 9/15 12/7 13/5 13/8 14/16 14/23 15/13 20/2 23/4 24/15 28/6 28/10 28/12 31/13 32/7 34/14 34/15 36/13 39/21 46/2 46/7 46/16 47/7 49/23 51/14 52/3 52/9 54/5 54/8 57/24 61/6 61/9 62/3 70/18 70/19 71/23 72/1 73/19 73/21 78/3
**have [168]**
**haven't [1]** 8/15
**having [3]** 30/8 82/25 83/5
**Hawaii [1]** 68/19
**head [1]** 56/12
**health [1]** 41/12
**hear [13]** 5/21 12/2 12/4 12/6 12/12 12/13 13/18 14/18 14/20 15/1 15/16 41/16 44/5
**heard [9]** 6/12 7/23 8/6 8/17 8/20 11/2 19/2 59/25 61/4
**held [6]** 17/5 52/20 52/21 52/23 52/25 84/4
**Helmsley [1]** 57/6
**Help [2]** 32/19 32/21
**helped [2]** 79/4 80/13
**here [19]** 6/20 6/25

7/2 10/4 24/19 24/21 31/7 33/17 34/1 43/1 56/25 58/9 59/19 59/25 76/23 77/1 78/6 78/17 81/10
**hereby [1]** 84/1
**Hewlett [2]** 53/9 53/12
**higher [1]** 15/19
**hired [1]** 82/13
**his [8]** 14/1 52/9 58/22 59/3 59/5 59/6 60/1 69/12
**historical [1]** 35/7
**hold [3]** 19/12 51/17 53/15
**holding [1]** 53/2
**honest [1]** 81/10
**Honor [81]** 5/6 5/23 6/21 7/5 7/17 7/22 9/2 9/7 9/10 9/18 11/2 16/4 19/4 24/7 26/19 26/25 27/16 29/11 33/14 34/2 34/7 34/13 38/1 38/12 38/17 39/10 39/14 40/9 48/14 48/25 49/4 49/6 49/11 49/18 50/2 50/11 52/2 58/4 58/9 59/7 60/20 60/25 61/4 61/16 61/24 62/9 62/14 62/16 62/19 62/21 64/17 64/24 65/14 65/18 65/23 66/15 66/21 67/1 67/3 67/6 67/9 67/11 69/6 70/21 71/13 71/15 73/6 73/8 73/14 74/3 74/4 74/10 74/11 74/16 74/22 74/25 75/3 75/20 83/10 83/12 83/14
**HONORABLE [1]** 1/5
**housed [1]** 39/9
**houses [1]** 8/21
**how [50]** 11/8 11/11 12/7 12/13 12/17 17/5 17/7 18/18 19/5 20/9 21/15 22/4 22/16 25/8 25/11 25/16 26/7 27/9 27/15 28/7 28/23 29/6 34/24 35/2 35/21 36/7 36/20 40/1 41/22 51/4 53/6 54/10 54/24 55/1 55/7 55/22 63/19 64/3 65/5 67/25 72/24 72/24 73/4 73/12 73/17 73/22 74/2 76/4 79/13 83/16
**hundred [1]** 5/14
**hundreds [5]** 19/7 19/8 19/9 19/10 35/22

**I**

**I'd [5]** 10/9 37/22 38/6 62/22 69/6
**I'll [8]** 5/21 27/3 34/8 38/17 43/6 52/13 52/13 71/15
**I'm [40]** 10/5 10/5 17/1 19/3 19/3 19/12 21/8 22/13 34/2 36/8 38/1 39/17 41/15 41/16 42/3 42/6 42/16 42/24 43/5 48/2 51/3 51/11 53/11 53/19 54/7 55/11 55/12 55/15 58/17 58/24 59/16 59/20 60/9 62/13 64/17 75/3 76/23 79/10 80/5 83/16
**I've [17]** 19/12 33/11 33/12 45/18 54/1 54/22 55/23 56/15 56/15 56/17 56/17 57/5 57/16 65/1 66/24 70/17 73/22
**I-b-a-n-e-z [1]** 16/17
**Ian [1]** 2/7
**IBANEZ [40]** 4/5 5/25 7/2 7/8 12/12 14/21 16/6 16/15 16/16 16/20 16/23 16/24 17/16 21/13 22/16 24/22 26/22 27/4 28/24 29/9 30/15 33/9 34/14 34/24 35/19 36/5 36/18 37/9 37/15 37/22 38/6 38/19 39/20 40/14 40/23 44/24 47/24 48/5 49/7 49/8
**identifiable [1]** 72/4
**identified [1]** 80/9
**identify [4]** 69/25 71/22 79/4 80/5
**identity [5]** 34/11 80/4 80/11 80/14 80/17
**if [42]** 5/12 10/13 12/25 18/16 19/1 23/6 23/24 24/17 25/3 25/6 28/4 28/15 32/3 32/9 34/3 36/14 36/21 46/21 47/5 47/21 47/21 47/22 48/3 52/11 52/16 57/10 59/11 61/4 61/24 61/24 62/1 68/3 69/7 71/6 72/9 78/8 80/23 81/5 81/12
**II [1]** 1/20
**immediately [1]** 15/5
**Immortality [1]** 54/7

**I**

implementing [1] 15/11

important [3] 11/14 11/21 65/16

improper [4] 19/18 59/15 64/1 72/12

improperly [2] 28/1 40/7

improprieties [1] 81/15

in [266]

in to [1] 72/3

inactive [1] 53/19

inadvertent [4] 15/1 15/4 39/21 40/15

incidents [1] 44/25

include [4] 27/6 46/19 48/22 57/16

included [1] 57/8

includes [3] 22/7 54/20 59/21

including [17] 6/11 11/1 12/14 13/14 15/18 15/20 26/2 27/5 42/20 45/24 53/8 54/4 64/10 65/11 68/18 78/14 82/21

inconsistencies [1] 81/21

inconsistent [1] 68/8

incorporation [2] 24/13 26/4

incorrect [7] 34/16 59/25 60/1 60/4 60/5 60/5 60/8

incorrectly [1] 39/9

incur [1] 70/5

independent [1] 82/12

indicates [1] 59/13

individual [1] 80/8

individual's [1] 54/10

individuals [2] 65/12 72/8

inflate [1] 30/14

informal [1] 21/19

information [54] 8/19 11/6 12/16 12/19 16/2 20/8 23/14 23/16 23/21 23/22 24/16 24/20 27/9 27/13 27/15 34/16 34/25 35/12 36/12 41/7 47/8 58/2 64/13 65/9 68/10 68/25 69/17 69/21 69/22 70/8 70/11 70/12 70/19 71/2 72/2 72/4 72/7 76/3 76/6 76/17 76/19 78/12 78/13 78/16 78/18

79/23 80/8 81/17 81/18 81/20 81/21 82/14 82/15 82/21

informed [1] 66/19

initial [1] 24/23

initialed [1] 82/10

initially [2] 78/20 82/10

initiated [5] 42/1 42/12 42/17 42/18 79/14

injunction [1] 15/25

insider [1] 79/18

insider's [1] 80/2

inspection [1] 38/8

inspections [1] 40/2

instance [1] 45/10

instead [1] 35/24

institute [1] 15/6 55/16

insurance [2] 32/9 32/12

intake [1] 26/14

interest [1] 51/14

interested [2] 46/19 81/12

interested-party [1] 46/19

interesting [1] 47/11

Internal [2] 8/7 24/14

interpretation [1] 38/14

interrogatories [1] 34/11

interrogatory [1] 79/5

interviewed [2] 60/13 60/15

interviews [1] 60/10

into [9] 5/8 5/17 6/7 24/5 29/13 35/3 44/1 55/22 58/5

inundated [1] 45/16

investigate [6] 17/19 18/12 25/19 45/11 70/2 82/17

investigated [1] 49/9

investigates [1] 45/17

investigating [3] 20/10 42/5 70/18

investigation [57] 10/21 10/22 11/6 11/9 11/11 11/25 12/17 12/20 14/25 23/24 26/6 26/23 28/4 28/5 28/8 28/21 29/24 31/5 36/8 40/24 41/20 42/1 44/20 45/24 65/6 67/17 67/18 67/25 68/1 68/15 68/21 69/8 70/1 70/9 70/17 71/7 71/9 73/5 75/15 76/1 76/5 76/16 76/20 77/9

78/8 78/12 78/13 78/13 79/2 79/13 79/14 79/21 79/24 80/21 81/23 82/23 83/5

investigations [36] 6/5 10/16 10/17 10/19 18/15 18/18 18/22 19/1 19/14 19/21 20/12 20/23 21/1 21/9 28/24 29/10 33/11 43/2 43/8 63/23 64/4 64/6 64/7 64/15 64/18 65/1 65/3 68/14 69/9 72/1 72/18 72/20 73/21 76/24 78/15 78/15

investigative [1] 66/18

investigator [1] 70/25

investigators [1] 6/9

involve [3] 15/9 34/3 55/5

involved [25] 11/3 17/23 18/4 18/8 18/16 21/1 21/8 21/9 29/19 29/23 30/2 32/14 35/19 41/13 41/19 41/23 41/24 42/8 48/5 55/17 56/6 59/22 67/18 76/24 80/5

involving [1] 74/8

irregularities [1] 47/9

irrelevant [1] 45/6

IRS [6] 24/14 32/25 37/3 37/6 64/9 82/20

Islands [1] 80/10

issue [4] 32/17 36/14 44/14 52/8

issued [1] 36/5

issues [9] 10/9 10/12 11/25 43/12 43/12 46/10 52/24 73/20 81/19

it [116]

it's [41] 9/3 11/14 11/16 21/10 24/17 24/19 25/14 25/20 30/19 31/23 32/5 34/17 34/21 35/8 36/19 36/24 37/3 37/5 38/20 38/20 39/12 47/14 47/19 50/1 56/10 57/7 57/10 57/15 57/17 57/17 60/6 61/12 70/5 70/18 72/22 76/2 78/2 78/15 79/12 81/18 83/3

its [18] 75/20 8/7 8/11 24/22 25/3 28/15 37/6 44/1 45/24 46/7 46/8 46/10 47/1 64/9 77/11

78/9 78/10 82/25

itself [2] 34/15 38/13

**J**

J.D [1] 53/16

January [1] 17/15

job [5] 11/14 11/16 63/22 71/16 72/25

Joe [1] 6/3

Johnston [1] 2/7

joint [1] 5/16

Jose [1] 3/5

JOSEPH [5] 4/7 7/13 62/19 63/6 63/8

journalists [1] 53/1

JUDGE [1] 1/5

judges [1] 55/16

judgments [1] 33/3

Judicial [1] 84/5

July [2] 12/11 39/1

just [35] 7/3 10/5 10/23 10/24 13/16 18/20 19/3 19/24 22/10 24/4 24/6 29/22 31/25 34/2 35/23 36/2 36/12 37/2 38/6 38/10 38/19 38/25 40/14 48/2 49/18 56/8 61/5 61/24 62/5 65/10 69/18 69/24 73/24 74/14 80/5

Justice [2] 2/14 2/21

**K**

KAMALA [1] 1/11

Kaufman [1] 2/7

kdvlaw.com [1] 2/9

keep [4] 28/23 29/2 42/24 61/22

keeping [1] 73/10

kept [5] 12/10 20/22 32/11 39/6 40/4

Kevin [1] 2/14

Kevin.Calia [1] 2/18

Kim [1] 2/21

kim.nguyen [1] 2/24

kind [19] 24/18 27/14 28/1 30/11 30/13 30/15 30/16 30/18 30/20 31/1 31/7 31/8 31/9 31/10 31/13 32/3 33/10 44/22 47/9

kinds [2] 14/1 36/16

know [23] 10/3 15/10 24/2 29/6 38/10 42/4 45/16 47/19 47/21 47/21 48/13 60/4 60/18 65/16 73/18 73/20 78/3 78/5 78/6 78/17 78/24 80/23 81/5

knowing [1] 82/16

knowledge [3] 45/23 46/2 46/9

known [5] 9/15 24/12 31/14 34/17 71/9

**L**

L.A [4] 20/20 21/5 21/17 56/18

L.B [1] 11/1

Lacks [1] 72/13

large [3] 14/4 23/16 37/2

Las [1] 68/20

last [12] 10/20 11/10 15/3 16/14 16/16 22/22 40/14 50/18 63/5 73/13 73/17 73/18

later [3] 11/4 14/24 42/11

law [63] 1/8 2/16 6/11 6/13 6/14 6/15 6/16 6/17 7/19 7/24 8/3 8/3 8/6 8/8 8/11 8/20 9/14 10/13 13/9 15/19 38/14 39/2 45/25 46/3 46/7 46/10 46/11 46/12 47/17 47/18 49/10 49/12 49/16 49/18 49/21 49/22 51/3 51/12 53/16 53/17 53/20 54/1 54/8 55/14 55/15 57/23 59/15 59/21 59/22 60/6 60/10 60/14 60/18 61/5 74/20 75/11 76/9 76/18 76/19 78/3 78/8 78/18 78/20

laws [3] 24/13 26/3 51/8

lawsuit [5] 29/24 41/25 50/7 61/21 62/8

lawsuits [1] 10/25

lawyer [1] 59/12

lawyers [3] 11/21 13/19 55/16

layers [1] 36/13

Lcastoria [1] 2/9

lead [4] 12/19 35/16 41/13 54/2

leading [2] 54/3 55/16

leads [1] 14/5

Leagues [1] 13/14

learned [1] 43/10

learning [1] 15/4

least [1] 21/17

led [3] 20/23 29/18 48/6

legal [15] 21/7 21/17 22/6 22/10 23/16 23/23 36/2 58/20 59/1

**L**

**legal...** [6] 59/12 59/19 59/21 59/23 59/24 61/9
**legally** [3] 59/25 60/1 60/5
**legislature** [1] 17/19
**legitimate** [1] 8/22
**length** [1] 61/9
**lengthy** [1] 70/11
**Leona** [1] 57/5
**less** [4] 14/22 14/22 15/7 15/18
**let** [2] 52/13 77/3
**letter** [2] 13/16 24/14
**letters** [6] 13/5 13/8 13/12 14/2 14/20 21/1
**liability** [1] 15/21
**license** [3] 24/2 35/4 44/2
**lieutenant** [1] 30/12
**life** [2] 54/11 54/19
**light** [2] 62/16 62/21
**like** [18] 6/18 9/25 10/18 13/20 19/13 29/4 31/18 31/19 31/22 31/25 37/13 37/22 38/6 45/22 62/10 62/22 68/19 69/6
**likely** [2] 15/7 83/4
**limine** [4] 51/24 52/3 60/21 61/17
**limited** [3] 11/20 15/21 61/7
**line** [1] 31/11
**lines** [1] 75/14
**list** [6] 7/4 7/7 27/11 43/24 78/9 81/24
**listed** [3] 25/6 68/6 79/6
**listing** [1] 28/1
**lists** [3] 7/6 27/12 27/13
**literally** [1] 59/16
**litigating** [1] 73/19
**litigation** [8] 29/18 29/19 41/25 42/12 42/17 42/18 42/19 74/21
**little** [7] 13/14 17/6 19/15 28/11 29/22 57/17 83/15
**live** [1] 10/7
**living** [1] 16/25
**LLM** [1] 53/17
**LLP** [1] 2/7
**load** [1] 20/23
**loaned** [1] 68/24
**loans** [4] 19/18 79/6 81/12 81/19

**local** [2] 23/5 65/12
**long** [6] 17/5 17/7 25/16 51/4 55/24 63/19
**longer** [2] 15/6 36/14
**longstanding** [1] 14/15
**look** [15] 12/25 27/4 28/6 28/18 31/18 33/11 46/15 46/16 46/18 46/21 46/24 46/25 47/6 57/13 57/20
**looked** [10] 28/2 29/4 29/5 31/5 31/19 31/21 49/19 73/22 78/8 78/10
**looking** [10] 12/17 19/17 20/1 20/7 43/14 44/21 44/22 57/10 81/17 82/20
**LOS** [4] 1/17 1/24 2/23 5/1
**loss** [1] 19/20
**lot** [6] 8/20 30/6 33/10 54/23 55/2 55/8
**lots** [1] 56/5
**Louie** [2] 2/6 75/10
**lunch** [1] 5/6

**M**

**M-a-d-o-f-f** [1] 50/19
**ma'am** [1] 47/4
**made** [13] 5/18 9/14 13/4 25/20 26/23 27/11 45/1 45/9 46/2 48/11 59/1 70/6 82/10
**MADOFF** [19] 4/6 6/2 7/10 15/23 50/12 50/19 50/21 51/23 52/3 52/7 52/16 58/13 59/12 60/21 61/1 61/8 62/11 62/12 62/23
**Madoff's** [1] 61/18
**mail** [3] 6/17 14/8 45/20
**mailed** [1] 14/5
**main** [2] 11/15 35/13
**maintain** [2] 77/22 77/23
**major** [1] 6/13
**make** [10] 14/11 14/13 14/14 15/7 26/4 40/3 61/25 76/3 79/23 82/22
**makes** [4] 23/15 23/21 23/23 47/1
**making** [7] 10/5 15/9 15/20 25/22 46/15 69/3 75/25
**mandated** [1] 17/18
**manual** [1] 40/5

**MANUEL** [1] 1/5
**many** [18] 9/14 11/16 11/16 13/10 18/18 19/5 22/4 22/16 25/11 26/7 35/21 35/25 36/7 41/22 73/12 73/17 73/22 78/14
**Marion** [1] 2/6
**marked** [3] 5/9 56/23 57/11
**Martha** [1] 79/12
**material** [3] 14/11 65/24 65/25
**materials** [4] 14/3 14/10 45/17 45/20
**math** [1] 19/3
**matter** [16] 7/24 28/4 29/20 37/5 38/14 49/16 53/1 59/15 60/7 60/9 66/14 66/15 67/8 73/19 79/10 84/4
**matters** [7] 18/23 52/20 53/4 54/23 55/17 59/21 79/2
**may** [21] 11/25 25/7 44/24 48/3 50/8 52/11 57/10 58/9 58/10 61/4 61/24 62/15 64/13 70/12 70/16 71/8 72/5 72/11 76/5 81/5 83/11
**McClave** [1] 13/11
**me** [22] 9/20 9/20 9/25 18/15 21/8 21/25 22/6 22/7 22/15 23/1 25/21 29/22 38/25 41/5 43/14 45/13 49/19 56/11 57/24 59/17 61/22 77/3
**mean** [8] 6/19 9/24 19/25 28/25 32/13 36/8 36/25 47/3
**means** [4] 30/15 37/1 38/16 42/11
**meant** [1] 55/25
**measures** [1] 40/10
**media** [5] 11/24 42/2 42/6 42/22 42/24
**meet** [4] 7/24 21/13 21/15 21/23
**meetings** [3] 21/15 21/16 21/19
**Melanie** [1] 16/15
**member** [4] 6/14 55/10 55/13 55/15
**members** [1] 69/2
**mentioned** [13] 7/9 7/12 7/15 31/25 35/3 41/19 43/15 44/3 54/14 56/3 76/15 79/1 81/23
**mentions** [1] 56/21
**merit** [2] 28/10 28/12

**met** [1] 75/11
**methodology** [1] 59/13
**methods** [3] 15/20 58/21 59/2
**Michigan** [1] 6/22
**middle** [1] 50/20
**might** [2] 14/24 44/16
**million** [1] 47/14
**millions** [6] 30/25 30/25 31/1 31/20 31/22 32/10
**mind** [1] 79/7
**mine** [1] 73/10
**minute** [2] 7/3 31/20
**minutes** [1] 74/25
**misappropriation** [1] 63/24
**misleading** [1] 63/25
**mismanagement** [3] 18/6 18/13 19/19
**missing** [4] 13/1 13/6 13/17 78/7
**misuse** [5] 30/7 47/8 63/24 65/7 72/12
**misused** [1] 68/11
**misusing** [2] 67/23 68/17
**mixed** [1] 59/14
**moment** [1] 48/3
**Monaghan** [6] 6/12 6/22 47/18 47/22 60/19 78/19
**Monaghan's** [1] 10/1
**money** [3] 28/17 47/8 69/4
**month** [2] 26/8 26/9
**months** [1] 25/17
**Morello** [1] 6/23
**moreover** [1] 66/20
**morning** [2] 83/18 83/20
**most** [6] 12/22 14/11 44/11 47/15 57/7 77/18
**motion** [4] 51/24 52/3 60/20 61/16
**move** [7] 5/17 27/3 34/8 58/4 60/21 62/22 71/15
**moving** [2] 21/10 67/12
**Mr** [4] 6/11 63/11 65/24 69/11
**Mr.** [18] 5/7 6/6 6/22 7/13 7/16 10/1 11/10 13/25 14/21 66/8 66/22 67/2 67/12 69/9 71/16 71/22 75/8 83/7
**Mr. Calia** [1] 5/7
**Mr. David** [2] 6/6 7/16
**Mr. Eller** [1] 13/25

**Mr. Joseph** [1] 7/13
**Mr. Monaghan** [1] 6/22
**Mr. Monaghan's** [1] 10/1
**Mr. Zimring** [10] 11/10 14/21 66/22 67/2 67/12 69/9 71/16 71/22 75/8 83/7
**Mr. Zimring's** [1] 66/8
**Ms** [2] 7/2 33/9
**Ms.** [43] 5/25 6/23 9/10 12/12 14/21 16/23 16/24 17/16 21/13 22/16 24/22 26/22 27/4 28/24 29/9 30/15 34/14 34/24 35/19 36/5 36/18 37/9 37/15 37/22 38/6 38/19 39/20 40/14 40/23 41/3 41/7 41/10 44/17 44/24 47/24 48/5 49/7 49/8 58/13 59/12 61/1 62/11 62/12
**Ms. Berndt** [4] 41/3 41/7 41/10 44/17
**Ms. Geller** [1] 9/10
**Ms. Ibanez** [31] 12/12 14/21 16/23 16/24 17/16 21/13 22/16 24/22 26/22 27/4 28/24 29/9 30/15 34/14 34/24 35/19 36/5 36/18 37/9 37/15 37/22 38/6 38/19 39/20 40/14 40/23 44/24 47/24 48/5 49/7 49/8
**Ms. Madoff** [5] 58/13 59/12 61/1 62/11 62/12
**Ms. Morello** [1] 6/23
**Ms. Tania** [1] 5/25
**much** [6] 20/9 21/2 21/24 31/18 64/3 83/18
**multiple** [1] 36/13

**N**

**name** [16] 16/13 16/14 16/16 45/13 45/18 50/17 50/18 50/20 56/8 56/10 63/4 63/5 63/6 75/10 79/17 80/5
**named** [1] 69/9
**names** [7] 5/12 6/24 7/1 7/20 10/21 56/12 79/3
**naming** [1] 10/23
**nature** [4] 68/4 78/11 83/2 83/3

**N**

necessary [1]  11/7
need [5]  10/13 28/15
36/12 38/9 70/4
needed [1]  78/16
needs [1]  78/7
nepotism [1]  30/7
never [3]  28/19 31/16
65/21
new [6]  15/6 15/11
34/18 53/21 56/17
65/25
next [7]  7/9 7/12 50/10
53/2 62/18 83/13
83/16
Nguyen [1]  2/21
nine [4]  5/14 53/21
56/17 63/21
No. [5]  51/24 57/20
69/11 79/4 81/24
No. 4 [2]  69/11 79/4
No. 5 [1]  81/24
No. 69 [1]  51/24
No. 79 [1]  57/20
Noah [1]  63/6
noncash [1]  30/16
none [1]  8/18 33/15
40/10
nonprofit [3]  18/23
20/15 24/20
nonresponsive [1]
59/7
North [1]  1/24
Nos [1]  5/10
not [119]
noted [1]  69/10
notes [3]  43/14 47/11
48/4
nothing [7]  28/20
40/19 49/4 62/3 67/1
68/7 79/19
notice [1]  25/15
noticed [1]  13/17
notices [1]  25/14
notifications [2]  25/5
25/11
notify [1]  24/17
noting [1]  49/6
number [12]  4/17 5/8
5/10 6/11 22/22 52/20
53/7 68/20 71/25 72/1
80/22 81/1
numerous [1]  54/1
NYU [2]  53/16 53/17

**O**

o'clock [1]  83/20
oath [1]  43/1
object [11]  29/11
33/14 34/9 38/12
39/10 40/9 59/7 64/17

69/6 71/12 72/13
objected [1]  51/22
objection [39]  26/19
26/20 26/25 27/1
27/16 27/18 29/15
34/18 40/12 45/5 45/7
48/14 48/16 48/25
49/2 58/7 59/8 65/14
65/18 70/21 70/22
71/14 71/19 71/20
72/15 73/1 73/6 73/7
74/3 74/5 74/10 74/12
74/16 74/17 75/20
75/21 76/11 78/22
78/23
objections [1]  5/18
objectives [1]  11/21
obtain [3]  14/19 34/24
35/12
obtained [2]  33/3
47/23
obviously [1]  82/8
occurred [1]  76/17
occurring [1]  40/15
off [3]  56/12 70/16
76/15
offer [1]  61/25
offering [1]  61/8
office [25]  2/15 2/22
13/20 17/2 20/20
20/24 21/5 21/7 32/24
33/10 37/4 39/1 39/21
42/13 43/3 43/9 45/17
46/9 63/18 64/13
75/25 76/8 77/11
77/17 80/19
office's [1]  43/3
officers [24]  24/16
26/12 33/5 44/6
often [1]  21/15
oftentimes [1]  45/13
Oh [1]  29/4
okay [32]  18/25 21/12
22/9 23/11 23/18 24/4
24/20 27/19 28/22
29/8 30/4 31/24 33/7
36/4 37/21 39/3 39/19
41/18 42/7 43/6 43/19
44/15 48/1 57/13
57/17 59/18 78/25
80/15 81/2 81/7 82/4
82/10
on-site [1]  77/23
once [2]  70/18 82/15
one [31]  7/6 7/6 11/15
12/19 18/5 22/14
28/16 29/18 30/22
31/7 32/19 37/24 38/5
40/14 45/11 46/21
54/3 57/8 59/10 61/18
65/6 69/10 74/7 77/7
79/4 79/5 79/7 81/22

81/23 82/2 83/6
ongoing [1]  10/19
only [11]  11/21 13/3
23/14 30/9 34/13 36/1
46/16 47/13 61/7
61/17 65/3
op [1]  56/17
op-eds [1]  56/17
open [5]  21/24 22/2
37/10 73/20 79/10
open-door [2]  21/24
22/2
opening [2]  5/21 9/5
operate [1]  24/10
operated [1]  67/19
operating [2]  20/3
68/22 71/10
opinion [7]  56/14
56/15 59/4 59/19
59/20 59/24 60/3
opinions [5]  52/6 59/3
59/24 60/1 61/18
opportunity [2]  62/22
67/2
opposition [1]  52/3
order [6]  28/3 31/12
31/12 37/18 44/2 65/8
organization [18]
44/10 64/11 65/11
67/19 68/16 70/3 72/9
72/10 72/11 76/21
79/18 79/20 81/6
81/20 82/13 82/20
83/5 83/6
organizations [4]
13/14 55/10 76/24
83/1
Organize [1]  75/2
original [2]  43/11 44/9
other [42]  8/12 8/16
10/19 12/1 13/3 13/15
14/15 14/18 17/10
17/22 18/6 18/7 20/14
20/15 20/24 32/17
33/8 34/11 35/11
41/19 42/7 43/11
45/15 46/13 47/9
48/18 51/9 56/4 64/12
65/11 67/15 68/13
68/20 69/17 69/19
70/14 70/20 70/14
72/8 77/10 81/21
81/23
others [2]  13/10 41/22
our [19]  5/16 6/2 9/12
10/20 11/13 15/8
15/22 31/5 35/5 35/9
45/17 52/2 53/13 54/6
60/20 60/23 68/21
77/16 83/16
out [14]  13/13 13/16
14/2 15/15 28/19

32/18 42/6 44/23
54/25 57/17 59/9 61/5
77/18 81/24
outcomes [1]  26/18
over [7]  17/6 19/5
22/17 27/8 41/4 47/14
66/20
overbroad [3]  71/19
73/1 75/20
overruled [6]  27/18
29/16 45/7 48/16
76/12 78/23
overview [2]  17/16
18/2
overwhelmed [1]
41/12
owed [1]  68/24
own [2]  60/22 68/18
owned [1]  67/21

**P**

p.m [2]  5/2 83/21
PACS [1]  52/24
page [8]  37/23 37/24
38/4 38/4 38/19 38/20
57/23 84/4
PAGES [1]  1/21
Pamela [2]  8/21 9/2
paper [1]  14/4 31/22
papers [1]  51/17
56/20
paralegals [1]  22/15
pardon [3]  43/14
51/22 67/14
part [16]  5/24 9/12
10/10 11/14 12/15
31/5 31/5 33/22 33/24
34/14 41/6 76/6 79/22
80/13 80/16 81/8
participate [2]  20/22
48/21
particular [3]  14/6
28/16 52/8
particularly [1]  54/23
parts [2]  12/18 21/10
party [2]  5/18 46/19
past [4]  28/17 51/19
55/14 73/22
patients [1]  30/10
paying [2]  32/11
32/12
payments [1]  68/1
penalties [1]  48/22
penalty [2]  20/5 20/7
pending [4]  51/24
68/15 82/8 82/9
people [11]  15/10
17/23 22/2 22/4 36/1
54/18 55/7 68/17
68/22 69/2 71/6
per [1]  26/8
percent [2]  20/11

32/18 42/6 44/23
54/25 57/17 59/9 61/5
77/18 81/24
performing [2]  67/20
72/25
Perhaps [2]  25/7
59/10
periods [1]  14/9
perjury [2]  20/5 20/7
permanent [1]  15/25
permission [3]  42/14
61/19 62/10
permitted [1]  9/11
person [4]  33/17
42/25 67/21 72/9
personal [1]  68/19
personally [5]  6/6
64/16 65/4 67/17
82/24
persons [2]  6/19
81/12
pharmaceuticals [2]
30/17 32/10
philanthropic [1]  53/5
Philanthropies [2]
53/9 53/12
philanthropy [13]
51/12 51/15 52/4
52/17 52/24 52/25
53/1 53/2 55/4 55/6
55/7 55/9 61/10
physical [1]  43/23
pieces [1]  56/14
placed [1]  57/2
plaintiffs [1]  61/17
planing [1]  54/23
planning [8]  51/7 54/3
54/4 54/15 54/18
54/21 54/22 55/22
plans [2]  5/25 54/20
platform [1]  8/22
play [1]  67/5
playing [1]  61/22
pleadings [1]  20/25
please [29]  16/8 16/11
16/13 16/25 17/7
19/16 22/11 23/13
24/6 24/8 27/9 28/12
29/9 33/13 38/25 48/4
50/13 50/17 52/16
53/10 57/20 58/24
59/17 62/25 63/3 63/4
63/22 65/4 67/13
plus [4]  22/6 30/2 30/3
32/25
point [3]  25/6 61/5
65/12
policies [4]  51/8 53/5
55/9 56/7
policy [9]  14/16 15/9
21/24 22/2 37/5 37/8
51/15 53/2 55/17
portion [2]  30/11

**P**

**portion...** [1]  54/21
**portions** [1]  69/12
**position** [1]  17/5
**possible** [5]  26/17
76/2 78/2 81/16 81/18
**Post** [1]  56/18
**posted** [3]  15/8 35/6
35/7
**potential** [2]  8/2 47/8
**potentially** [1]  10/22
**power** [11]  6/22 9/11
10/2 10/8 31/14 31/15
32/2 32/5 32/15 32/23
54/8
**Practical** [1]  54/2
**practice** [3]  46/25
53/20 53/23
**practiced** [1]  53/21
**practices** [7]  18/7
18/21 30/6 44/12
45/12 45/17 45/18
**practicing** [2]  53/18
53/24
**precise** [1]  65/25
**preclude** [1]  51/25
**present** [11]  8/25 9/1
9/3 9/5 9/6 9/13 9/19
9/20 10/4 10/6 10/14
**president** [2]  8/8
55/15
**PRESIDING** [1]  1/6
**pretty** [2]  21/24 42/6
**previously** [5]  11/2
37/14 56/23 62/23
69/8
**primarily** [2]  15/9
51/17
**primary** [2]  63/23
73/19
**prior** [9]  5/9 26/2
29/13 39/11 40/11
40/25 64/18 64/20
65/21
**private** [5]  36/18
36/21 74/8 74/11
74/14
**probability** [1]  7/19
**probably** [3]  22/17
22/24 28/21
**probate** [2]  18/23
20/15
**problem** [2]  30/21
43/10
**problems** [1]  41/12
**procedures** [1]  15/7
**proceed** [1]  12/20
**proceeded** [1]  83/14
**proceedings** [3]  1/16
83/21 84/3
**process** [9]  25/16

25/22 35/24 39/25
40/5 42/8 46/16 48/6
76/16
**processed** [1]  14/8
**processes** [1]  14/10
**produce** [1]  69/20
**produced** [2]  34/10
66/16
**production** [1]  69/21
**professional** [2]  51/9
55/10
**professionals** [1]  29/5
**professor** [15]  6/2
7/10 15/23 50/11 51/3
51/4 51/23 52/3 52/7
52/16 59/3 59/14
60/21 61/8 62/23
**profit** [10]  67/20 67/24
68/2 68/3 68/5 68/7
68/10 68/12 81/25
82/1
**program** [1]  30/9
**programs** [1]  24/18
**promoted** [2]  17/13
17/15
**proof** [1]  61/25
**proper** [2]  40/3 79/3
**properly** [1]  83/1
**proposed** [1]  48/22
**prosecution** [1]  18/16
**prospective** [1]  63/25
**Prosperities** [1]  48/9
**Prosperity** [3]  39/20
41/1 66/9
**protect** [1]  17/19
**protecting** [1]  11/13
**protection** [1]  63/25
**provide** [9]  8/13 11/4
20/4 23/8 49/22 51/9
65/8 70/11 81/18
**provided** [12]  8/15
20/24 20/24 27/10
34/16 47/8 55/19
55/21 55/23 59/13
64/14 65/9
**provides** [3]  70/7 72/2
72/4
**providing** [3]  52/5
60/22 81/20
**public** [30]  7/22 9/15
10/18 11/13 11/24
14/12 14/13 14/15
15/6 23/16 23/22
32/24 36/18 36/19
36/21 36/23 36/24
37/2 38/8 45/2 48/5
48/8 51/12 51/14
51/15 52/18 65/11
65/17 76/22 76/25
**publication** [1]  54/6
**publications** [2]  53/25
56/9

**publicly** [4]  10/17
14/12 15/8 34/17
**publish** [1]  51/17
**published** [5]  54/5
56/3 56/4 56/5 56/9
56/15 56/17 56/18
57/5
**pulled** [1]  15/14
**purpose** [1]  11/5
**purposes** [3]  12/6
16/3 68/19
**pursuant** [3]  12/10
14/15 84/1
**pursue** [3]  28/5 70/9
82/23
**pursuing** [1]  70/1
**put** [2]  28/20 40/3

**Q**

**qualifications** [1]
52/12
**qualified** [1]  61/14
**quantify** [2]  73/18
73/22
**question** [11]  7/18
38/18 40/14 42/16
49/3 50/3 50/5 58/6
58/24 59/16 77/4
**questions** [9]  24/6
39/14 44/25 45/23
51/15 55/6 74/23
75/12 83/8
**quickly** [4]  19/24
61/25 83/15 83/16
**quite** [2]  21/2 56/15

**R**

**R-a-y** [1]  50/20
**raise** [4]  16/8 50/13
62/25 71/10
**raised** [1]  43/11
**range** [1]  13/13
**RAY** [7]  4/6 6/2 7/10
15/23 50/12 50/19
50/21
**re** [1]  15/11
**re-enforcing** [1]  15/11
**reach** [4]  54/25 83/16
**reached** [1]  10/13
58/20
**reaching** [2]  58/22
59/3
**read** [6]  5/12 38/9
44/2 50/3 50/5 60/19
**reading** [1]  59/4
**ready** [2]  52/9 75/3
**real** [2]  1/5 10/23
**realized** [1]  32/22
**really** [2]  30/8 68/23
**reason** [1]  49/15
**reasonable** [2]  7/19
16/2

**reasons** [1]  81/22
**rebuttal** [6]  51/23
51/25 58/18 59/23
60/21 61/7
**rebutting** [2]  6/3
60/23
**recall** [11]  42/22 44/8
44/16 44/18 44/24
45/3 47/16 48/8 48/11
81/5 81/10
**receipt** [1]  79/14
**receive** [3]  25/11 26/8
47/13
**received** [13]  4/17
5/15 11/23 11/24
22/22 30/25 32/25
36/2 41/7 46/5 48/8
48/19 53/7
**receivership** [1]  33/4
**receives** [2]  6/17
31/13
**receiving** [4]  6/7
48/12 65/10 72/10
**recent** [2]  33/8 33/15
**recently** [2]  12/8
33/12
**recipient** [1]  32/4
**recognize** [1]  57/22
**recollection** [4]  77/1
80/25 82/12 82/19
**record** [6]  7/25 16/14
34/15 39/12 63/4
64/19
**records** [6]  20/4 26/3
35/4 35/6 35/8 38/8
**RECROSS** [1]  4/3
**redacted** [2]  37/2 78/9
**redirect** [4]  4/3 49/5
83/9 83/10
**referred** [2]  34/10
65/21
**refused** [1]  8/13
**regard** [1]  75/19
**regarding** [4]  10/15
61/10 74/8 76/21
**register** [5]  11/19 12/3
12/8 17/24 23/7
**registered** [4]  11/17
11/18 22/20 22/23
**registering** [3]  23/2
23/2 23/3
**registrar** [1]  6/6
**registration** [18]  18/9
18/14 18/21 20/6
20/13 23/10 24/9
24/23 25/1 25/4 25/9
35/10 35/24 64/11
77/11 77/19 78/1
78/10
**registry** [45]  6/7 12/24
13/5 13/19 13/20
13/25 14/5 14/8 14/10

15/3 15/10 17/21 21/8
22/7 22/21 22/25 23/1
23/4 23/7 23/20 23/21
24/1 24/3 24/11 24/18
25/5 25/23 26/14 35/1
39/6 39/9 39/25 40/15
43/16 43/23 44/1 44/4
46/5 46/8 49/20 49/21
76/8 77/6 78/19 82/16
**registry's** [2]  25/25
35/3
**regularly** [1]  72/22
**regulation** [11]  12/9
12/11 14/16 37/18
38/11 38/13 38/14
48/6 48/22 48/24
61/10
**regulations** [3]  37/8
55/23 84/5
**related** [14]  13/9
20/11 32/17 43/12
44/14 53/5 56/7 60/6
63/23 65/7 67/24
68/12 68/16 81/18
**relationship** [5]  13/18
23/19 47/18 72/12
82/1
**relevance** [1]  70/21
**relevancy** [5]  70/22
70/23 71/12 72/14
74/10
**relevant** [2]  62/24
81/22
**religiously** [2]  76/21
76/25
**relitigating** [1]  39/12
**rely** [2]  6/10 6/15
**remain** [1]  15/17
**remained** [1]  28/6
**remedial** [1]  40/10
**remedy** [1]  11/7
**remember** [5]  44/21
44/22 48/17 56/12
82/2
**removed** [1]  33/5
**renewal** [4]  13/2 25/1
64/11 77/19
**renewals** [1]  78/1
**repayment** [2]  68/23
69/5
**repeat** [1]  58/24
**report** [9]  17/24 31/2
31/4 31/13 47/1 52/9
60/19 77/12 78/10
**reported** [4]  31/17
47/22 68/5 84/3
**REPORTER'S** [1]  1/16
**reporting** [18]  18/8
18/13 18/21 19/14
19/24 20/1 20/8 20/13
23/8 24/24 27/25
30/25 31/2 33/1 35/10

# R

**reporting... [3]** 35/24 42/22 46/14
**reports [9]** 11/24 20/2 42/2 64/11 66/19 68/6 77/16 77/21 77/25
**represent [1]** 75/10
**representation [2]** 8/23 9/15
**represented [1]** 9/14
**reprisals [1]** 7/21
**request [1]** 15/25
**requested [1]** 34/11
**requesting [1]** 13/6
**requests [2]** 8/14 70/5
**require [2]** 11/19 76/5
**required [12]** 17/24 20/3 24/8 24/22 24/25 26/24 47/5 47/12 49/21 77/22 83/1 83/6
**requirement [8]** 12/2 12/5 12/7 12/10 12/23 15/10 46/14 49/14
**requirements [4]** 19/14 24/24 25/4 35/11
**rescue [2]** 67/19 68/16
**research [3]** 11/2 14/13 51/18
**reserve [1]** 52/13
**resides [1]** 6/22
**resource [1]** 47/14
**resources [4]** 11/20 70/2 70/12 76/4
**respect [2]** 54/24 76/18
**respond [3]** 52/5 52/10 52/12
**responding [1]** 70/5
**responds [1]** 52/23
**response [5]** 8/14 9/12 15/4 37/8 68/21
**responses [1]** 79/5
**responsibilities [5]** 18/10 20/17 21/3 51/9 51/10
**responsibility [1]** 18/12
**responsible [2]** 6/7 17/21
**rest [1]** 81/3
**restatement [1]** 55/17
**restricted [2]** 19/19 79/6
**resubmit [1]** 60/20
**result [2]** 9/21 48/11
**resulted [1]** 14/23
**results [1]** 19/20
**retain [1]** 70/4
**reveal [2]** 10/20 81/16

**revealed [1]** 8/4
**revenue [7]** 8/8 19/22 24/15 27/12 31/18 47/14 72/2
**revenues [1]** 30/14
**review [24]** 13/22 18/14 20/25 21/1 24/2 25/25 26/1 26/2 26/3 26/6 36/14 39/25 43/4 43/16 47/7 47/16 54/1 64/8 64/9 77/3 77/5 77/10 77/14 77/20
**reviewed [5]** 20/20 43/9 47/19 47/20 52/9
**reviewing [6]** 21/9 32/16 32/16 47/23 76/3 78/17
**reviews [1]** 14/1
**revisit [1]** 10/9
**revocable [1]** 15/21
**reward [4]** 31/15 32/6 32/8 32/15
**right [24]** 5/19 7/8 7/11 7/14 10/11 16/8 32/22 34/5 34/6 38/21 39/16 42/2 50/13 57/4 61/22 62/20 62/25 67/7 69/15 75/1 75/4 80/1 81/4 83/11
**right-hand [1]** 38/21
**ring [1]** 81/13
**rise [2]** 52/22 79/20
**Rising [1]** 54/8
**risk [7]** 25/2 31/15 32/6 32/8 32/9 32/15 76/15
**Robert [1]** 3/5
**role [1]** 28/6
**roles [1]** 17/10
**room [3]** 1/24 16/7 36/1
**roughly [2]** 20/11 35/21
**routinely [2]** 28/2 77/20
**RPR [1]** 1/23
**RRF1 [1]** 24/25
**rule [1]** 61/1
**rules [3]** 52/21 53/1 54/9
**ruling [4]** 52/14 62/5 62/17 62/22
**run [1]** 30/12
**running [3]** 67/21 68/17 69/3

# S

**Sacramento [1]** 2/17
**SAG [2]** 24/1 28/9
**said [5]** 43/17 56/16 66/24 75/14 80/16
**same [10]** 12/15 30/13

31/10 52/7 61/7 70/12 73/6 74/3 74/16 77/14
**San [4]** 2/8 3/7 21/6 21/16
**San Francisco [2]** 21/6 21/16
**sanctuary [2]** 67/19 68/16
**saw [1]** 68/1
**say [13]** 19/24 20/11 28/11 28/14 29/4 36/25 40/23 55/25 60/7 60/24 75/19 79/19 81/12
**saying [3]** 19/13 43/5 69/1
**says [7]** 8/21 13/11 37/23 38/4 38/7 38/23 56/16
**scam [2]** 31/23 42/23
**scan [1]** 14/11
**scanned [5]** 15/13 15/14 40/4
**scanning [1]** 6/8
**schedule [122]**
**Schedule-B [1]** 43/12
**schedules [9]** 12/14 25/2 26/2 27/5 32/17 32/18 46/18 46/24 64/10
**scheme [1]** 37/7
**schemes [1]** 44/23
**Schervish [4]** 52/6 58/22 59/3 59/14
**Schervish's [4]** 6/3 52/12 59/4 59/24
**scholars [2]** 53/2 53/3
**school [6]** 13/15 51/3 51/12 53/16 53/17 57/23
**Schools [1]** 55/14
**scope [5]** 45/5 48/15 48/25 76/11 78/22
**search [2]** 15/12 25/25
**searches [2]** 40/6 40/8
**seasonality [1]** 14/5
**seat [2]** 16/11 63/3
**second [2]** 15/6 38/20
**secondary [1]** 10/12
**section [34]** 2/16 6/2 6/5 6/10 10/15 11/15 11/20 11/22 12/1 12/13 13/20 14/19 17/2 17/7 17/17 17/18 17/20 18/3 22/5 22/8 23/20 25/18 26/7 34/24 35/11 35/23 38/8 54/4 55/15 63/17 63/20 80/11 80/16 84/1

**sections [1]** 45/25
**see [9]** 12/25 20/1 25/10 37/11 38/23 59/11 68/4 69/2 72/9
**seeing [2]** 33/10 68/11
**seek [2]** 42/13 77/17
**seen [2]** 13/8 37/15
**self [2]** 19/18 30/7
**self-dealing [2]** 19/18 30/7
**sell [1]** 28/15
**send [3]** 13/2 13/4 14/2
**sending [1]** 14/20
**senior [9]** 17/4 17/9 17/14 21/3 21/5 28/6 41/14 41/17 43/25
**sense [1]** 37/3
**sent [6]** 13/2 13/3 13/5 13/13 13/16 26/14
**separate [1]** 7/5
**separately [1]** 77/15
**SEPTEMBER [3]** 1/18 5/1 84/8
**sequence [1]** 5/13
**series [2]** 13/5 79/5
**serious [1]** 10/23
**serve [1]** 36/16
**Service [2]** 8/8 24/15
**services [2]** 30/24 31/23
**serving [1]** 33/5
**set [1]** 52/6
**settle [1]** 18/17
**settled [1]** 33/3
**seven [2]** 22/14 56/16
**Seventy [1]** 56/25
**Seventy-eight [1]** 56/25
**several [4]** 6/15 25/5 56/6 69/9
**share [5]** 42/7 42/14 42/17 67/15 74/7
**shared [2]** 42/19 42/20
**sheets [1]** 40/3
**should [17]** 11/7 11/18 12/20 13/1 22/24 26/5 28/8 31/16 34/4 37/9 37/10 38/15 40/23 48/22 52/23 56/25 75/16
**shouldn't [2]** 15/14 36/17
**show [8]** 7/17 7/19 7/25 10/13 13/16 16/1 32/5 37/13
**showing [1]** 14/21
**side [2]** 55/4 55/6
**sides [1]** 72/10
**significant [4]** 30/11 54/21 72/5 80/14

**similar [1]** 67/20
**since [4]** 8/15 10/20 39/20 54/5
**single [1]** 54/5
**sir [1]** 5/5
**sit [5]** 43/1 76/23 78/6 78/17 81/10
**site [1]** 77/23
**sitting [1]** 77/1
**situation [2]** 11/7 28/21
**situations [1]** 18/5
**slow [1]** 53/10
**smaller [1]** 41/24
**so-called [1]** 42/23
**Society [2]** 30/23 52/24
**sociological [2]** 58/21 59/2
**sociologists [1]** 51/24 60/9
**sociology [4]** 58/14 58/16 60/7 60/9
**soft [1]** 40/2
**soft-filed [1]** 40/2
**sold [2]** 45/15 45/19
**solely [1]** 61/8
**solicit [2]** 23/6 28/16
**solicitation [9]** 18/7 18/13 18/20 20/12 27/24 44/12 45/12 45/16 45/20
**solicitations [1]** 64/1
**soliciting [1]** 64/2
**some [23]** 6/12 10/6 10/16 13/8 13/20 15/1 18/23 20/22 20/22 25/6 29/9 32/18 51/19 52/17 54/14 56/8 65/12 69/25 73/20 77/22 77/23 77/25 82/13
**somebody [2]** 33/21 54/13
**someone [5]** 13/1 13/3 28/14 43/8 45/12
**something [6]** 47/23 61/12 75/14 77/17 77/19 82/17
**something else [1]** 61/12
**sometimes [10]** 14/23 28/8 28/14 28/18 47/11 69/19 69/19 69/21 75/25 77/5
**Sonia [2]** 41/2 41/13
**sorry [16]** 19/3 23/13 24/7 34/2 38/1 38/20 39/17 41/15 41/16 48/2 53/11 58/24 59/16 60/24 62/13 75/23

**S**

sort [1] 18/1
source [4] 12/4 12/15
 44/9 82/15
sources [4] 11/25
 26/11 26/15 44/3
speak [3] 54/22 54/25
 55/2
specialization [1]
 54/12
specific [13] 29/9
 48/22 65/4 67/13
 67/15 68/13 71/22
 72/2 73/9 74/7 76/23
 77/1 79/1
specifically [7] 13/9
 35/2 38/9 55/4 66/25
 73/5 73/23
specificity [1] 19/15
spell [1] 63/5
spelling [3] 16/14
 16/18 50/17
spend [1] 70/2
spent [4] 20/9 64/3
 64/5 73/19
spiking [1] 14/6
spoken [1] 61/9
Spring [2] 1/24 2/22
St [1] 2/22
staff [5] 12/24 14/1
 21/13 21/15 39/25
stand [2] 14/1 50/12
standard [1] 81/8
Stanford [1] 52/24
started [8] 10/19 17/8
 23/9 29/24 44/20
 80/20 82/11 82/19
state [13] 8/13 8/14
 8/16 11/17 12/3 16/13
 17/1 20/3 24/10 30/2
 42/7 50/17 63/4
statement [3] 5/21 9/5
 70/23
statements [8] 46/22
 47/3 47/6 47/7 47/12
 47/13 47/20 47/22
states [9] 1/1 1/23
 30/2 41/19 41/24 42/1
 42/7 84/2 84/6
stating [1] 59/19
status [8] 8/4 33/2
 45/1 53/19
statutes [1] 46/13
statutory [1] 37/7
steadfastly [1] 8/13
stenographically [1]
 84/3
step [2] 50/8 83/11
steps [2] 15/3 28/25
still [7] 21/8 28/6
 79/10 82/6 82/7 82/8

82/9
stipulate [1] 5/7
stipulated [6] 29/13
 33/3 38/13 56/24 58/5
 64/19
stipulation [1] 5/16
storage [1] 32/12
Street [3] 1/24 2/8
 2/16
stricken [2] 62/23
 62/24
strike [4] 22/19 44/17
 60/21 79/13
structure [1] 55/1
subject [10] 5/16 5/17
 7/21 11/9 40/25 51/6
 53/23 54/12 61/8 67/8
submit [4] 7/23 12/3
 12/24 13/11
submits [1] 8/7
submitted [3] 12/10
 34/19 34/21
submitting [2] 12/23
 34/20
subpoena [8] 6/22
 9/11 10/2 10/8 36/5
 36/8 36/12 36/16
subpoenas [1] 14/20
subsection [1] 38/9
subsidies [1] 68/5
subsidize [1] 67/24
subsidized [1] 68/9
subsidizing [1] 68/3
successful [1] 31/18
successfully [2]
 82/24 83/4
such [4] 35/6 45/13
 69/22 77/11
sufficient [2] 78/16
 78/19
suggest [1] 72/11
suggesting [1] 81/16
Suite [3] 2/8 2/22 3/6
supervising [8] 17/11
 17/12 20/17 20/19
 22/13 22/14 25/20
 25/24
supervision [2] 12/5
 21/6
supervisor [6] 22/1
 23/25 28/2 28/9 41/5
 41/14
supervisors [1] 43/25
supplemental [1]
 64/13
supplied [1] 13/7
support [3] 30/24
 51/17 59/5
supporting [1] 71/6
sure [11] 10/5 15/9
 40/3 42/3 42/6 42/16
 43/5 51/21 52/19

76/24 83/16
suspended [2] 25/7
 25/9
suspension [3] 25/12
 25/13 25/15
sustained [17] 26/20
 27/1 33/16 39/18
 39/19 40/12 49/2 59/8
 70/23 71/14 71/20
 72/15 73/2 73/7 74/5
 74/17 75/21
sworn [6] 16/9 16/20
 50/14 50/21 63/1 63/8
system [4] 13/21
 14/22 14/22 15/15

**T**

taken [1] 58/16
takes [3] 25/17 36/14
 70/11
taking [1] 32/7
talk [1] 11/8
talking [1] 19/17
 33/16 33/17 33/18
 34/1 39/4
TANIA [7] 4/5 5/25 7/2
 7/7 16/6 16/15 16/20
tank [1] 51/14
target [1] 8/22
tax [5] 24/14 24/15
 51/8 53/24 55/22
tax-exempt [1] 24/14
taxation [1] 19/22
 53/17
teach [1] 51/6 51/7
 57/6
teaching [1] 54/22
team [1] 65/9
telephone [1] 21/25
tell [9] 9/25 16/24
 29/22 38/25 43/7
 63/22 68/13 69/7
 69/10
telling [1] 15/9
ten [5] 18/22 18/22
 19/1 53/13 83/20
term [1] 46/3
terms [4] 24/20 28/25
 31/25 54/13
test [1] 7/24
testified [1] 16/20
 27/4 34/14 41/2 50/21
 63/8 69/18 73/24
testify [10] 6/20 10/25
 11/11 11/13 13/24
 43/1 61/7 62/1 62/3
 76/20
testifying [3] 44/16
 51/25 66/14
testimony [36] 5/9 5/19
 6/3 6/10 6/15 9/1 9/3
 9/4 9/13 10/1 10/14

11/10 13/10 13/16
 14/21 15/22 29/13
 34/15 39/11 41/6
 43/13 52/5 55/19
 55/21 55/23 56/16
 60/22 60/23 64/20
 65/24 66/9 69/12
 75/13 75/23 75/24
 76/2
Thank [28] 5/20 16/4
 16/11 16/12 17/25
 19/8 19/11 34/22
 35/18 36/10 40/18
 49/7 50/9 50/16 54/17
 57/1 57/25 62/9 62/14
 63/3 64/24 67/11
 69/14 75/5 77/2 83/7
 83/10 83/12
Thanks [1] 62/12
that's [41] 8/24 8/24
 9/5 9/17 9/23 13/23
 16/16 21/7 24/24
 25/20 30/18 31/6 32/4
 32/12 33/18 34/5
 35/13 38/17 39/11
 40/5 50/7 51/14 54/21
 55/12 55/14 55/16
 56/13 65/20 65/23
 66/11 66/24 67/4 72/3
 72/3 74/1 74/21 77/17
 79/10 81/8 81/22 82/8
their [41] 8/4 8/14
 11/14 12/4 12/23
 14/12 20/5 20/6 22/1
 24/13 24/13 24/14
 24/14 24/16 24/23
 24/24 24/25 25/1
 30/10 30/14 31/18
 32/20 32/21 32/23
 32/25 42/14 42/21
 44/12 45/13 45/14
 54/11 54/19 54/20
 54/25 55/7 66/20
 68/18 71/1 77/23
 77/25 78/1
them [25] 6/8 6/8 8/14
 8/15 11/18 12/18
 14/11 15/5 20/21
 28/20 32/19 34/4
 40/10 47/6 53/1 56/10
 56/11 56/12 65/25
 68/24 76/14 76/16
 77/22 77/23 80/23
therefore [1] 61/18
these [11] 5/17 10/9
 10/25 11/20 11/23
 30/24 33/15 34/3
 45/17 45/18 55/6
they've [4] 10/15 11/1
 24/23 58/5
thing [5] 12/16 23/25
 32/22 43/16 83/17

things [14] 6/12 6/17
 8/16 8/18 10/18 11/15
 19/13 36/17 45/11
 59/5 68/20 75/2 77/7
 83/14
think [11] 23/9 30/9
 32/17 39/5 42/5 43/11
 43/18 51/14 54/5
 76/23 80/23
third [3] 37/23 38/4
 61/18
this [54] 5/23 7/18 9/1
 10/8 10/12 12/12
 12/22 14/17 14/21
 22/24 23/9 24/20
 28/16 29/4 29/5 29/11
 32/17 34/1 34/10 36/2
 37/15 37/18 38/11
 39/1 39/11 41/20
 42/25 45/19 47/17
 50/7 57/7 57/8 57/14
 57/22 57/23 58/18
 58/22 59/3 59/25 61/2
 61/21 62/8 64/18
 65/24 65/25 66/21
 69/7 69/11 69/12 70/1
 70/13 74/21 76/9
 83/15
THOMAS [26] 1/8 6/11
 13/9 45/25 46/3 46/10
 46/12 47/16 49/10
 49/12 49/16 49/18
 49/21 49/22 60/10
 60/13 60/18 74/20
 75/11 76/8 76/18
 76/19 78/3 78/8 78/18
 78/20
those [28] 5/10 7/21
 8/18 9/16 10/16 11/25
 13/4 13/8 14/3 14/9
 14/10 15/14 15/7 15/9
 19/21 22/19 22/20
 31/2 31/4 31/16 31/21
 33/13 40/8 44/13
 48/12 65/3 72/20
 77/14
threatening [1] 8/18
threats [1] 7/21
three [5] 36/11 37/24
 38/5 51/5 61/17
threshold [3] 15/18
 15/19 76/6
through [15] 5/11 9/2
 11/24 12/25 14/12
 15/22 16/16 22/1
 29/13 35/4 36/13 40/6
 42/2 43/4 47/23
time [18] 11/19 19/5
 20/9 35/24 36/15
 39/20 52/25 55/24
 59/10 64/3 64/5 64/18
 70/2 70/11 73/19

**T**

**time...** [3] 77/14 80/20 83/18
**times** [14] 14/6 21/17 35/21 36/7 36/11 39/5 56/17 56/18 70/25 72/20 72/22 73/12 73/17 73/22
**tipping** [2] 70/16 76/15
**title** [3] 17/3 17/4 84/2
**Title 18** [1] 84/2
**titles** [1] 59/14
**today** [4] 43/1 59/19 78/6 78/17
**together** [3] 46/8 53/4 77/25
**told** [1] 49/19
**Tom** [4] 47/18 47/21 60/19 78/19
**tomorrow** [3] 5/24 83/17 83/20
**ton** [1] 28/17
**too** [2] 35/25 83/18
**took** [2] 15/4 41/4
**tool** [2] 15/12 70/7
**top** [1] 56/12
**topic** [1] 61/10
**topics** [1] 61/13
**track** [3] 28/23 29/2 42/24
**Trade** [1] 30/3
**training** [1] 20/24
**transactions** [5] 18/24 19/18 20/16 30/7 46/20
**transcript** [4] 1/16 66/8 84/3 84/4
**travel** [1] 68/19
**Treasury** [4] 55/23 55/25 56/1 56/2
**treated** [1] 37/19
**treatises** [1] 54/3
**trial** [10] 1/16 5/9 7/7 10/20 11/10 15/3 36/8 39/1 40/11 65/22
**Tribune** [1] 56/19
**trips** [1] 68/19
**trust** [34] 6/2 6/4 6/9 10/15 11/15 11/19 11/22 12/13 13/19 14/19 17/2 17/7 17/17 17/18 17/20 18/2 21/8 22/4 22/7 23/8 23/20 25/18 26/7 34/24 35/11 35/23 38/8 46/6 55/12 55/13 63/17 63/20 80/11 80/16
**trust's** [1] 35/4
**trustees** [6] 12/5 17/22 22/18 22/23

**23/3 23/15
trusts** [13] 15/22 17/21 22/21 22/25 23/1 24/1 24/12 24/18 26/14 27/8 35/1 43/23 51/7
**try** [2] 43/6 59/17
**trying** [2] 36/15 83/16
**turn** [2] 37/22 66/19
**turned** [1] 81/24
**Twenty** [1] 51/5
**Twenty-three** [1] 51/5
**two** [16] 7/5 14/6 17/6 22/13 22/15 25/14 27/12 30/10 31/25 47/19 54/2 56/3 56/22 58/8 61/17 74/25
**type** [4] 27/13 46/3 78/12 81/15
**types** [7] 13/15 18/2 18/4 18/5 18/6 18/8 19/21
**typically** [6] 25/14 64/6 64/8 64/9 77/7 77/16

**U**

**U.S** [1] 1/5
**ultimate** [1] 32/4
**ultimately** [2] 71/8 72/5
**unable** [1] 69/22
**uncovering** [1] 11/5
**under** [9] 10/21 20/5 20/7 21/6 21/8 23/1 33/4 37/6 43/1
**understand** [8] 9/22 24/5 33/20 42/16 43/5 59/16 59/17 79/1
**understanding** [3] 38/10 72/24 73/4
**Understood** [1] 79/25
**undertake** [1] 51/16
**uniform** [1] 16/2
**uniformly** [1] 12/7
**unit** [4] 22/6 22/10 23/17 23/23
**UNITED** [4] 1/1 1/23 84/2 84/6
**university** [1] 11/3
**unqualified** [1] 52/1
**unredacted** [1] 8/7 80/20 80/22 80/25
**until** [1] 41/11
**updated** [1] 57/16
**uploaded** [3] 15/13 15/15 40/7
**uploading** [1] 6/8
**upset** [1] 45/21
**us** [31] 10/2 10/7 12/8 16/24 17/16 18/1 20/2 20/4 20/5 20/6 22/11

**22/23 24/13 24/25 33/13 34/10 40/11 43/7 57/6 63/22 65/4 65/21 67/13 68/13 69/8 70/8 71/22 77/23 78/14 80/13 82/19
use** [17] 14/3 18/7 22/2 27/15 27/20 28/23 29/7 35/5 35/9 35/23 44/18 47/15 68/22 72/22 72/24 74/8 79/6
**used** [30] 6/5 10/16 11/1 11/4 11/5 11/8 11/11 15/19 27/23 28/9 29/6 29/10 29/20 30/10 33/9 34/12 43/13 46/3 59/2 64/15 64/25 65/5 67/16 68/14 72/21 73/12 73/17 79/23 82/16 82/21
**useful** [13] 12/16 12/19 70/8 71/16 71/23 71/25 72/1 72/7 73/5 73/21 73/25 74/2 78/14
**uses** [1] 73/9
**using** [7] 12/18 15/20 68/18 69/25 70/6 70/20 79/2
**usually** [6] 19/21 21/16 25/14 25/23 26/13 43/22

**V**

**V-i-r-n-i-g** [1] 16/19
**validity** [2] 58/21 59/2
**valuable** [1] 24/19
**variance** [5] 31/14 32/2 32/4 32/15 32/23
**variety** [5] 26/11 26/15 53/3 56/5 56/19
**vary** [2] 64/5 78/12
**Vegas** [1] 68/20
**vendors** [1] 26/13
**very** [10] 10/23 14/4 17/16 30/11 39/14 56/10 61/25 64/23 78/14 83/3
**victim** [1] 45/18
**victims** [1] 72/5
**video** [2] 9/12 21/17
**violating** [1] 46/13
**violation** [3] 15/8 31/2 33/1
**violations** [10] 18/9 18/9 18/13 18/13 18/14 18/21 19/24 20/1 27/25 39/15
**Virgin** [1] 80/10
**Virnig** [2] 16/15 16/18

**visit** [1] 21/25
**VOIR** [1] 58/11
**Voluck** [1] 2/7
**volume** [3] 1/20 14/4 14/6
**voluntarily** [1] 69/20

**W**

**want** [7] 10/3 23/6 24/4 38/10 58/6 70/2 70/9
**wanted** [2] 9/19 61/5
**wants** [2] 10/4 24/10
**warrant** [1] 11/25
**was** [117]
**Washington** [2] 52/22 56/18
**waste** [1] 19/18
**wasting** [1] 36/15
**water** [1] 48/2
**way** [3] 35/13 35/14 43/10
**ways** [12] 10/15 10/25 13/20 14/2 14/18 15/16 35/11 59/21 69/17 69/19 71/22 72/1
**we** [104]
**we'd** [2] 61/18 62/10
**we'll** [5] 15/24 24/4 28/19 62/20 67/7
**we're** [23] 16/6 19/17 19/17 20/1 20/7 28/4 28/7 33/10 33/16 33/17 33/18 33/25 34/20 53/2 61/8 69/25 74/11 74/20 74/21 76/3 77/8 79/2 83/15
**we've** [8] 38/12 39/4 39/25 51/22 52/20 52/25 70/5 70/10
**wealth** [3] 54/19 55/7 55/22
**web** [1] 57/23
**website** [5] 14/12 15/15 39/9 40/15 58/2
**WEDNESDAY** [2] 1/18 5/1
**week** [1] 53/3
**well** [21] 11/10 21/6 25/23 31/5 35/3 37/6 41/23 43/22 45/11 46/22 57/15 64/20 64/23 65/13 66/21 70/7 70/16 71/11 77/16 78/11 80/13
**went** [1] 12/11
**weren't** [2] 18/16 31/4
**what** [88]
**what's** [5] 9/4 24/8 32/6 33/2 37/13
**where** [17] 14/12

**26/10 26/15 29/10 32/5 32/11 38/7 38/23 44/8 44/23 44/23 53/3 68/13 70/10 70/17 77/21 78/15
whether** [36] 7/19 12/20 12/21 20/1 20/12 23/5 26/5 26/23 27/13 27/21 27/22 27/23 27/25 28/3 28/10 28/12 43/7 44/18 47/16 47/17 48/8 48/11 48/21 52/8 60/7 70/1 70/9 75/15 76/4 76/7 77/8 78/3 78/17 81/19 82/23
**which** [43] 5/8 7/18 10/13 10/15 11/1 11/2 11/2 11/9 12/5 14/2 15/10 15/13 17/21 23/1 32/17 33/9 34/12 44/25 45/14 47/1 48/6 49/8 52/10 54/3 56/9 56/23 59/24 61/2 61/11 61/13 61/21 62/7 65/20 66/9 66/19 67/16 69/10 70/12 71/23 72/21 73/19 73/21 81/10
**which are** [1] 61/11
**while** [2] 36/15 41/5
**who** [45] 5/25 6/2 6/3 6/5 6/6 6/12 6/12 6/16 6/24 7/1 7/12 8/9 8/17 8/21 10/6 10/14 11/22 12/3 12/25 13/2 13/3 14/24 15/17 25/18 30/1 32/4 33/17 41/3 41/4 41/9 44/23 45/15 48/23 62/20 67/21 69/3 72/5 79/11 79/17 80/4 80/17 82/10 82/10 82/12 83/1
**who's** [1] 72/10
**whole** [1] 17/23
**whom** [2] 21/23 45/10
**Why** [4] 31/4 35/23 36/12 69/24
**wide** [1] 13/13
**willing** [1] 69/20
**wills** [1] 51/7
**wishes** [2] 5/12 54/11
**withdraw** [1] 38/17
**within** [1] 15/10 62/8
**without** [8] 35/13 45/9 56/10 70/20 73/10 78/9 82/25 83/5
**witness** [31] 6/2 7/1 7/3 7/6 7/7 7/9 7/12 7/15 13/24 15/22 16/5 16/7 16/9 16/20 35/16

**W**

**witness... [16]** 37/13
50/4 50/10 50/14
50/21 51/23 51/25
57/3 58/18 59/23
60/22 62/18 63/1 63/8
83/13 83/16
**witnesses [15]** 4/3
5/10 5/13 5/25 6/11
6/16 6/21 6/24 10/6
10/20 10/25 11/8
11/13 14/24 72/5
**won't [2]** 70/11 76/14
**word [1]** 43/13
**work [11]** 10/14 11/22
16/16 22/4 27/15
53/13 55/2 55/4 57/24
63/15 77/6
**worked [3]** 6/6 41/4
63/19
**working [1]** 6/4
**works [1]** 56/4
**World [2]** 32/19 32/21
**worth [3]** 31/22 67/16
70/1
**would [60]** 5/17 7/23
8/4 9/25 10/22 15/8
18/14 18/15 18/16
18/21 20/11 20/15
20/22 23/25 24/1 24/2
25/9 25/11 25/24
25/25 26/1 26/2 26/3
26/4 27/4 28/18 28/21
31/21 31/25 32/9 34/3
37/13 43/16 43/16
43/21 44/14 44/25
46/19 46/21 46/24
47/6 50/3 52/16 61/25
62/3 64/6 66/19 68/4
69/4 77/17 77/20
77/21 78/11 78/19
79/22 81/12 81/16
82/19 82/21 83/4
**write [1]** 55/8
**writing [1]** 55/17
**written [5]** 14/16 54/1
56/14 56/15 76/8
**wrong [1]** 71/8
**wrongdoing [1]** 12/21
**wrote [1]** 59/5

**Y**

**year [17]** 8/7 12/12
14/6 14/17 18/22
18/22 19/1 21/17 36/2
47/14 54/5 54/6 73/13
73/17 73/18 73/23
80/23
**years [13]** 9/15 9/16
14/7 17/6 27/8 44/19
47/20 51/5 53/21

54/22 63/21 80/23
81/1
**Yep [1]** 57/21
**yet [2]** 10/24 23/12
**yield [1]** 12/19
**York [2]** 53/21 56/17
**You'll [2]** 12/4 31/7
**you've [10]** 9/8 19/13
46/2 47/10 56/21
58/18 65/3 71/1 72/21
73/24
**yourself [1]** 41/10

**Z**

**Z-i-m-r-i-n-g [1]** 63/7
**Zelidon [1]** 3/5
**Zepeda [1]** 3/5
**ZIMRING [17]** 4/7 6/3
7/13 11/10 14/21
62/20 63/6 63/8 63/11
66/22 67/2 67/12 69/9
71/16 71/22 75/8 83/7
**Zimring's [2]** 65/24
66/8