O

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS MORE LAW CENTER, | CASE NO.  CV 15-3048-R |
| Plaintiff, | ORDER FOR JUDGMENT IN FAVOR OF PLAINITFF |
| v. | |
| KAMALA HARRIS, in her Official Capacity as Attorney General of California, | |
| Defendant. | |

For the reasons that follow, this Court grants Thomas More Law Center's ("TMLC")

motion for a permanent injunction to enjoin the Attorney General of California from demanding

its Schedule B form and enters judgment in favor of TMLC.  After conducting a full bench trial,

this Court finds the Attorney General's Schedule B disclosure requirement unconstitutional as

applied to TMLC.

Plaintiff TMLC is a nonprofit corporation organized under Internal Revenue Code section

501(c)(3) that funds its activities by raising charitable contributions from donors throughout the

country, including California.  California state law requires charitable organizations, such as

TMLC, to file a copy of its IRS Form 990, including its Schedule B, with the State Registry of

Charitable Trusts ("the Registry").  Cal. Code Regs. tit. 11, § 301.  An organization's

1   Schedule B includes the names and addresses of every individual nationwide who donated more
2   than $5,000 to a charity during a given tax year.  While a nonprofit's IRS Form 990 must be made
3   available to the public, an organization's Schedule B is not publicly available.  26 U.S.C. §
4   6104(b), (d)(3)(A).

5        Since 2001, TMLC filed its Form 990 as part of its periodic reporting with the Attorney
6   General, without including its Schedule B.  For each year from 2001 through 2009, the Attorney
7   General accepted TMLC's registration renewal and listed TMLC as an active charity in
8   compliance with the law.  In a letter dated March 6, 2012, the Attorney General indicated that
9   TMLC's 2010 filing was insufficient due to its failure to include a Schedule B.  In April 2015,
10  TMLC brought the present action seeking an order preliminarily enjoining the Attorney General
11  from demanding its Schedule B.  Among other claims, TMLC argued that the California law
12  requiring disclosure of its Schedule B to the Attorney General was facially unconstitutional.
13  TMLC also brought an as-applied challenge against the disclosure requirement.

14       This Court granted Plaintiff a preliminary injunction, which the Ninth Circuit vacated.
15  *Americans for Prosperity Found. v. Harris*, 809 F.3d 536 (9th Cir. 2015).  In its remand, the Ninth
16  Circuit held that this Court is bound by its previous decision in *Center for Competitive Politics v.*
17  *Harris,* 784 F.3d 1307, 1317 (9th Cir. 2015)—that the Attorney General's nonpublic Schedule B
18  disclosure regime was not facially unconstitutional.  *Americans for Prosperity Found.*, 809 F.3d at
19  538.  The Ninth Circuit did, however, instruct this Court to have a trial on the as-applied
20  challenge.  *Id.* at 543.  Accordingly, the Court now focuses on TMLC's as-applied challenge.

21       Courts review First Amendment challenges to disclosure requirements under an "exacting
22  scrutiny" standard.  *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010); *Citizens United v. FEC*,
23  558 U.S. 310, 366 (2010).  Exacting scrutiny "requires a 'substantial relation' between the
24  disclosure requirement and a 'sufficiently important' governmental interest."  *Center for*
25  *Competitive Politics*, 784 F.3d at 1312 (citations omitted).  This encompasses a balancing test.  In
26  order for a government action to survive exacting scrutiny, "the strength of the governmental
27  interest must reflect the seriousness of the actual burden on First Amendment rights."  *John Doe*
28  *No. 1*, 561 U.S. at 196.

### I.      Substantial Relation to a Sufficiently Important Governmental Interest

Defendant argues that the state law requiring that all charities file a complete copy of IRS Form 990 Schedule B is substantially related to the Attorney General's compelling interest in protecting the public and ensuring that charitable organizations are not abusing their legal privileges.  The Attorney General argues that the disclosure of Schedule B allows the Registry to determine how much revenue a charity receives and who is donating to the charitable organization and in what form.  According to the Attorney General, the Schedule B information assists her office in determining whether an organization has violated the law, including laws against self-dealing, improper loans, interested persons, or illegal or unfair business practices.  The Court finds that as applied, the disclosure of the Schedule B form is not substantially related to the Attorney General's interest in monitoring and investigating charitable organizations.  First, the Attorney General's arguments that Schedule B is necessary is undercut by the fact that she has only recently determined a need for the information and has access to the same information from other sources.  Second, even assuming arguendo that this information does genuinely assist in the Attorney General's investigations, its disclosure demand of Schedule B is more burdensome than necessary.

Although *Center for Competitive Politics* found that the Attorney General's "disclosure requirement bears a 'substantial relation' to a 'sufficiently important' government interest," this Court, for the second time, held a bench trial and was left unconvinced that the Attorney General's collection of Schedule B forms substantially assists the investigation of charitable organizations.  TMLC, like Americans for Prosperity, was registered with the Registry for years and was never required to disclose its Schedule B.  It was not until 2012 that the Attorney General first notified TMLC that it was required to file its Schedule B.  This fact alone indicates that it is indeed possible for the Attorney General to monitor charitable organizations without Schedule B.  The Attorney General undoubtedly had the same interest in protecting the public and monitoring charitable organizations prior to 2012.  Yet, she was able to further this interest without the collection of TMLC's Schedule B.

Portions of the *Americans for Prosperity* testimony and evidence were admitted in the TMLC trial.  Particularly relevant here is the testimony of a supervising investigative auditor for

1   the Attorney General, Steve Bauman.  Mr. Bauman's trial testimony confirmed that auditors and

2   attorneys seldom use Schedule B when auditing or investigating charities.  Bauman testified that

3   out of the approximately 540 investigations conducted over the past ten years in the Charitable

4   Trusts Section, only five instances involved the use of a Schedule B.  (Exhibit 913, *AFPF v.*

5   *Harris*, Bauman Test., 3/4/16, p. 19:15-19).  Even in the few instances in which a Schedule B was

6   relied on, the relevant information it contained could have been obtained from other sources.

7   (Exhibit 913, *AFPF v. Harris*, Bauman Test. 3/4/16, p. 31:8–32:10).

8         At trial in the present case, the Attorney General presented the testimony of Tania Ibanez,

9   the head of the Attorney General's Charitable Trusts Section.  Ms. Ibanez testified that her office

10  uses Schedule B regularly to assist in the evaluation of the merits of complaints and assess the

11  legality of a charitable organization's finances.  Additionally, Joseph Zimring, a Deputy Attorney

12  General in the Charity and Trusts section, testified that he has used a Schedule B in an

13  investigation he was involved in.  However, Zimring also testified that it was "very likely" that he

14  could have completed a successful investigation without a Schedule B and that other sources, such

15  as Schedule L, contain the same information as Schedule B.  (Zimring Test., 9/14/16, p. 80:11-18,

16  81:18-19).  Ms. Ibanez's testimony establishes nothing more than a convenience and general usage

17  of Schedule B.  This Court does not doubt that the Attorney General does in fact use the Schedule

18  Bs it collects.  However, Mr. Zimring's testimony also indicates that the Attorney General is more

19  than capable of protecting the public and enforcing the laws by other means.  The numerous other

20  means by which the Attorney General could obtain the information she needs to investigate

21  charitable organizations show that the collection of the Schedule B is not substantially related to

22  her important interest.

23        It is apparent to this Court that the Attorney General's requirement of Schedule B is not

24  substantially related to its interest in regulating charitable organizations.  Furthermore, the

25  Attorney General's interest could be more narrowly achieved.

26        In the context of associational rights, "even though the governmental purpose [may] be

27  legitimate and substantial, that purpose cannot be pursued by means that broadly stifle

28  fundamental personal liberties when the end can be more narrowly achieved."  *Louisiana v.*

4

1   *NAACP*, 366 U.S. 293, 296 (1961).  This differs from the electoral context.  The Ninth Circuit has

2   held that disclosure of electoral donations and financing information is not subject to a least-

3   restrictive-means analysis.  *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d

4   520, 541 (9th Cir. 2015).  This Court does not hold the Attorney General to a least-restrictive-

5   means standard.  However, the Attorney General is limited to pursuing its interest in protecting the

6   public from illegal charitable organizations by means which do not "broadly stifle fundamental

7   personal liberties when the end can be more narrowly achieved."

8          Here, like in *NAACP*, the Attorney General's interests can be more narrowly achieved as

9   evidenced by the testimony of Zimring and Bauman.  As was the case in the Americans for

10  Prosperity Foundation ("*AFPF*") trial, there is substantial evidence that the Attorney General

11  could accomplish her goals without the Schedule B.  During the *AFPF* trial, the Attorney

12  General's investigators testified that they have successfully completed their investigations without

13  using Schedule Bs, even in instances where they knew Schedule Bs were missing.  For example,

14  Mr. Bauman testified that he reviewed Form 990s in connection with audits that did not include

15  Schedule Bs.  (Bauman Test. 3/4/16, p. 27:12–14).  Specifically, he admitted that he successfully

16  audited those charities and found wrongdoing without the use of Schedule Bs.  (*Id*. at 27:18–23).

17  In fact, Mr. Bauman admitted that he successfully audited charities for years before the Schedule

18  B even existed.  (Bauman Dep., TX-731, p. 49:2–15).  In the TMLC trial, Mr. Zimring testified

19  that he had simply asked individuals who filed complaints against charitable organizations for

20  information which would otherwise appear on a Schedule B.  Additionally, Mr. Zimring testified

21  that in an investigation into fraudulent loans to a charitable organization, much of the information

22  he pursued could have been obtained through a different attachment to the organization's Form

23  990, Schedule L.  (Zimring Test., 9/14/16, p.81:15-22).  Taken together, the testimony of multiple

24  lawyers within the Attorney General's office clearly indicate that the Attorney General could have

25  achieved its end by more narrowly tailored means.  While this Court cannot find such a disclosure

26  requirement facially invalid, it is prepared to find it unconstitutional as applied to TMLC,

27  especially in light of the requirement's burdens on TMLC's First Amendment rights.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.  Burden on First Amendment Rights

Setting aside the Attorney General's failure to establish a substantial relationship between her demand for TMLC's Schedule B and a compelling governmental interest, TMLC would independently prevail on its as-applied challenge because it has proven that disclosing its Schedule B to the Attorney General would create a burden on its First Amendment rights.  While the Ninth Circuit in *Center for Competitive Politics* foreclosed any facial challenge to the Schedule B requirement, it specifically left open the possibility that a party could show "'a reasonable probability that the compelled disclosure of [its] contributors' names will subject them to threats, harassment, or reprisal from either Government officials or private parties' that would warrant relief on an as-applied challenge."  784 F.3d at 1317 (quoting *McConnell v. FEC*, 540 U.S. 93, 199 (2003)).  The Supreme Court has noted a particular need for protection of "minor political part[ies] which historically ha[ve] been the object of harassment by government officials and private parties." *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 88 (1982).  "A strict requirement that chill and harassment be directly attributable to the specific disclosure from which the exemption is sought would make the task even more difficult." *Id*. at 74.   Examples of the type of evidence sufficient to succeed on an as-applied challenge include past or present harassment of members due to their associational ties, or of harassment directed against the organization itself, or a pattern of threats or specific manifestations of public hostility. *Id*.  TMLC produced evidence of such harassment and hostility at trial.

TMLC is an advocate for issues which arouse intense passions by its supporters and its opponents.  The Law Center represents clients who are in the midst of intense public scrutiny and often times on the receiving end of extremely negative criticism and insults.  These positions taken by TMLC have led to threats, harassing calls, intimidating and obscene emails, and even pornographic letters sent to TMLC.  (*See, e.g.,* Exhibit 38, 39).  In one particularly angry letter to TMLC in response to a request for donations an opponent wrote, "YOU FU**ING FEAR MONGERING PIECE OF S**T F**K YOU!!!"  (Exhibit 38).  Opponents also mailed pornographic images to TMLC.  (Exhibit 39).  The level of harassment and "vehement criticism" directed towards TMLC has necessitated the Law Center's President, Richard Thompson, to train

his employees how to effectively handle and respond to the negativity. Members and donors of TMLC obviously share the same views as TMLC. Thus, the evidence of threats and harassment directed toward TMLC because of their views indicates a high likelihood of similar treatment towards donors. It also satisfies the requirement of *Center for Competitive Politics* that an organization show "a reasonable probability" that the disclosure of TMLC's donors would subject them to threats or harassment.

Additionally, TMLC produced evidence of one donor who suffered negative consequences as a result of his support of TMLC issues and another donor who supported TMLC but wished to remain anonymous for fear of harassment as a result of his affiliation. Tom Monaghan was the founder of TMLC and also a donor. Mr. Monaghan was listed at the top of a list of "most antigay persons in the country." (Exhibit 908, Monaghan Dep., at p. 33:21, 34:5-23). Due to his opposition to abortion, an issue which TMLC consistently advances, Mr. Monaghan's business was boycotted by the National Organization for Women. (Id. at p. 43:23-44:9). Furthermore, TMLC produced a donation accompanied by a letter which stated that the donor did not want to provide his personal information because the donor feared there would be consequences of being personally tied to TMLC. (Thompson Test., 9/13/16, Vol. 1, p. 62:9-24).

The Attorney General argues that little can be drawn from the testimony of Mr. Monaghan and the letter from the anonymous donor. First, the Attorney General argues that Mr. Monaghan and TMLC do not "connect Mr. Monaghan's inclusion on [the antigay list] to his donations to the Law Center, as opposed to his public status as a member of the Law Center's board." (Defendant's Proposed Order, p. 6). However, this misunderstands the level of proof required to prevail on an as-applied challenge to a disclosure requirement. The Supreme Court in *Brown* explicitly held that a plaintiff need not show that he was harassed directly as a result of a disclosed donation. Rather, evidence of harassment of a member of an organization due to that membership is sufficient. Here, Mr. Monaghan was certainly harassed at minimum because he shared the same views as TMLC. He testified that his inclusion on the antigay list was possibly a product of his association with TMLC. (Exhibit 908, Monaghan Dep., at p. 33:11-17, 34:5-23). Secondly, the Attorney General disputes the relevance of the anonymous donor's request to remain anonymous.

The Attorney General argues that the donor wished to remain anonymous from TMLC (not the Government) and that the donor would not have appeared on the Schedule B. Neither argument is persuasive. The anonymous donor evidence is informative because it is illustrative. The anonymous donor likely did not know the intricacies of tax filings and whether or not the donor would be included on a Schedule B. What is illustrative about the anonymous donor is that the donor was afraid of the repercussions of being affiliated with TMLC as a donor. It is highly likely that other donors felt the same fear as this anonymous donor and equally likely that at least some of those donors withheld contributions because of that fear. Compelling the disclosure of donors' identities would only compound such fears and difficulties for TMLC.

The evidence of harassment, opposition, and threats directed at TMLC, its donors, and those supporting the very same issues as the Law Center is sufficient to establish a "reasonable probability" that the compelled disclosure of the identity of TMLC donors would burden the donor's First Amendment Rights. This Court finds that the TMLC has shown harm sufficient to outweigh the Attorney General's interest in protecting the public from illegal charitable organizations and her overly burdensome means of achieving that interest.

The Court spent significant time in the *Americans for Prosperity Foundation* case examining the factual underpinnings of the inadvertent public disclosures of Schedule B by the Attorney General. *AFPF*, __ F. Supp. 3d __, 2016 WL 1610591 at *5 (C.D. Cal., 2016). This Court stands by its finding that the Attorney General's history of inadvertent disclosures raises significant concerns for donors who desire to have their affiliations remain confidential. However, the Attorney General has since modified the approach by the Registry to protect the confidentiality of Schedule Bs and prevent inadvertent disclosures. As such, this Court will examine the new evidence presented at the TMLC trial.

Since the conclusion of the *AFPF* litigation, the Registry's confidentiality policy was codified in a formal regulation. California Code of Regulations, title 11, section 310(b) now requires donor information be maintained as confidential and not be disclosed except in limited scenarios. The Registry also implemented a system of automated and personal reviews to identify documents that were incorrectly classified as not confidential. Ultimately, given the history of the

1   Registry completely violating the "longstanding confidentiality policy," the Attorney General's

2   assurances that a regulatory codification of the same exact policy will prevent future inadvertent

3   disclosures rings hollow.  The Attorney General's steps to attempt to rectify the disclosures and

4   prevent future disclosures is commendable.  Yet, trial testimony supported what should be an

5   obvious fact, the Registry cannot assure that documents will not be inadvertently disclosed no

6   matter what steps it takes.  The Registry is not required to have a perfectly secure, fool-proof

7   system to prevent disclosures.   However, taken in the context of a proven and substantial history

8   of inadvertent disclosures, this inability to assure confidentiality increases the "reasonable

9   probability" that compelled disclosure of Schedule B would chill Plaintiff's First Amendment

10  rights.  Donors and potential donors would be reasonably justified in a fear of disclosure given

11  such a context.

### III.        Plaintiff's Remaining Claims

13          Finally, TMLC has advanced, albeit briefly, several additional arguments against the

14  collection of its Schedule B.  First, TMLC claims that the required disclosure of Schedule B

15  constitutes an unreasonable search and seizure in violation of the Fourth Amendment.  TMLC

16  cites no case law in support of its novel theory.  The Fourth Amendment provides that "the right of

17  the people to be secure in their persons, houses, papers, and effects, against unreasonable searches

18  and seizures, shall not be violated."  As is apparent from the plain text, a search violates the Fourth

19  Amendment only when it is "unreasonable."  This Court discussed above the legitimacy of the

20  Attorney General's interest in protecting the public from illegal activities of charitable

21  organizations.  In her attempt to further that interest, the Attorney General requests information

22  from all charitable organizations registered in the state.  These requests are not unreasonable.  This

23  Court has found that the disclosure requirement is overly burdensome in the freedom of

24  association context, but it is not prepared to find it unreasonable in the context of the Fourth

25  Amendment.  Given the lack of unreasonableness shown by TMLC, this Court need not determine

26  whether a search occurred within the meaning of the Fourth Amendment.

27          Next, TMLC argues that the Schedule B disclosure requirement violates the Supremacy

28  Clause and the Free Exercise Clause.  TMLC failed to produce evidence sufficient to satisfy either

9

1  claim.  The mere fact that the IRS also collects Schedule Bs does not mean that federal law

2  preempts the Attorney General's collection of Schedule B.  Similarly, the mere fact that TMLC is

3  an organization promoting religious beliefs does not mean that the Attorney General cannot

4  regulate such an organization by means of a neutral, generally applicable law.

5      Plaintiff's claims under the Fourth Amendment, Supremacy Clause, and Free Exercise

6  Clause all fail.

7  **IV.      Injunctive Relief**

8      Because AFP has prevailed on its First Amendment as-applied challenge, it is entitled to

9  declaratory and injunctive relief.  A "plaintiff seeking a permanent injunction must satisfy a four-

10  factor test before a court may grant such relief." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S.

11  388, 391 (2006).  Specifically, the plaintiff "must demonstrate: (1) that it has suffered an

12  irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to

13  compensate for that injury; (3) that considering the balance of hardships between the plaintiff and

14  defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved

15  by a permanent injunction." *Id.*  Each of these factors weighs in favor of an injunction here.

16      TMLC has suffered an irreparable injury as a result of its required disclosure of Schedule

17  B.  As discussed above, given donors' desire to remain anonymous, the Attorney General's

18  required disclosure of Schedule B chills First Amendment speech and the Freedom of Association.

19  TMLC presented evidence that significant harassment can and has occurred to both individuals

20  associated with the Law Center as well as those who donate to it.  If TMLC refused to comply

21  with the Attorney General's required disclosure, it would be prevented from operating as a

22  charitable organization in the state of California.  Forcing the Law Center to choose between

23  operating in the state and revealing its donors in violation of their desires to remain anonymous is

24  an irreparable injury.  Any "loss of First Amendment freedoms . . . unquestionably constitutes

25  irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *accord, e.g.*,

26  *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014); *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 828

27  (9th Cir. 2013); *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 748 (9th Cir.

28  2012); *Farris v. Seabrook*, 677 F.3d 858, 868 (9th Cir. 2012); *Thalheimer v. City of San Diego*,

1   645 F.3d 1109, 1128 (9th Cir. 2011).  In particular, the government causes "irreparable injury"

2   when, as here, it places individuals "in fear of exercising their constitutionally protected rights of

3   free expression, assembly, and association."  *Allee v. Medrano*, 416 U.S. 802, 814–15 (1974).

4       TMLC's irreparable First Amendment injuries cannot adequately be compensated by

5   damages or any other remedy available at law.  Unlike a monetary injury, violations of the First

6   Amendment "cannot be adequately remedied through damages."  *Stormans, Inc. v. Selecky*, 586

7   F.3d 1109, 1138 (9th Cir. 2009).

8       The balance of hardships also favors granting an injunction.  As discussed above, the

9   primary advantage of the Schedule B is one of convenience and efficiency.  This Court finds that

10  losing such an advantage, though undoubtedly difficult for the Attorney General, is far outweighed

11  by the hardship placed on TMLC by forcing it to disclose its donors.  The Attorney General

12  operated without Schedule Bs for decades and still managed to further its interest of protecting the

13  public.  By contrast, the Thomas More Law Center would be hard-pressed to regain the trust of its

14  donors and continue the exercise of its First Amendment rights should it be required to violate the

15  trust and desires of its donors.  Thus, it is clear that the balance of hardships supports enjoining the

16  Attorney General from collecting TMLC's Schedule B.

17      Finally, the public interest favors an injunction.  As the Ninth Circuit has "consistently

18  recognized," there is a "significant public interest in upholding First Amendment principles."  *Doe*

19  *v. Harris*, 772 F.3d at 683 (quoting *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974

20  (9th Cir. 2002)).  In sum, the four-factor test establishes that injunctive relief is appropriate to bar

21  the Attorney General from demanding Schedule Bs from TMLC as part of their annual registration

22  renewal.  *Brown*, 492 U.S. at 101–02; *Louisiana v. NAACP*, 366 U.S. at 297.

23      In sum, this Court finds, for the second time, after a full bench trial, that the Attorney

24  General has failed to prove a substantial relation between her collection of Schedule B and the

25  investigation of charitable organizations.  Investigators and attorneys testified that they completed

26  investigations without Schedule B, accessed information contained in Schedule B from different

27  sources, and conducted investigations for years before Schedule B was ever collected.

28  Collectively, this Court is convinced that the Attorney General has a myriad of less-burdensome

means available to further her interest of protecting the public from fraudulent and illegal charitable organizations.

**IT IS HEREBY ORDERED** that the Attorney General is permanently enjoined from requiring the Thomas More Law Center to file with the registry a periodic written report containing a copy of its Schedule B to IRS Form 990.  TMLC shall no longer be considered deficient or delinquent in its reporting requirement because it does not file its confidential Schedule B with the Attorney General.  Each party shall bear its own costs.

Dated: November 16, 2016.

_____

MANUEL L. REAL
UNITED STATES DISTRICT JUDGE